UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

PRASANNA  GOONEWARDENA

                    Plaintiff

      -against-

City of New York, Emily Tone-Hill, Ann Scalia,
Dinorah Nunez-White, Eric Smalls,  Caroline Hernandez,
Frank Pira, April Hill, Petal Harlow, Tyra Branch,
Denise Deprima, Alexander Stadnyk, Cindy Rivera,
Charise Latimer-Jackson, Sherkia Boone, Mark George,
Paul Ligresti, Stephen Dickerson, Dennis Whinfield,
Jill Berry

                  Defendants
-----------------------------------------------------------------------X

THIRD AMENDED
COMPLAINT (MMG) (RFT)

JURY TRIAL DEMANDED

DOCKET No.24 CV 5554

## Preliminary statement

1.      Society makes us believe that when a prejudiced, discriminatory & an unlawful act is committed, it is always a white individual on others. It is not.

2.   This prejudiced, and unlawful act committed by Hispanics and African Americans with the help of some white lawyers – not legal minds. The Defendants destroyed Plaintiff's career, reputation & emotional wellbeing because of Plaintiff's race, creed & color and that he objected to Defendants' unlawful practices.

3.  The Defendants were never involved in hiring the Plaintiff. They [are] only involved in committing unlawful acts against the Plaintiff.

4.  The DSS inexperience Counsel Emily-Tone Hill conspired with the Office of Disciplinary Affairs ("ODA") hearing officer Cindy Rivera by writing to the OATH Judge that she was asking for termination of the Plaintiff on the 5th set of charges before the step 1 hearing violating due

process required pursuant to CSL § 75. The DSS General Counsel's Ann Scalia, Paul Ligresti & Emily Tone-Hill (all white race), conspired, aided & abetted with Black & Hispanic HRA employees to falsely accuse (recorded conversations) the Plaintiff for each benefiting in the process (conspiracy based on personal stake). (These are not conclusory allegations, true facts supported by recorded conversations and documents.) The DSS legal department ("OLA") and the office of the disciplinary affairs ("ODA") for years covered up criminal activities by Black & Hispanic employees. The DSS covered up criminal acts by 1st deputy commissioner Michael Laidlaw & Gary Jenkins (both black). (see exhibit A.) Mr. Gary Jenkins, who was a sexual predator, ended up being the DSS commissioner. The only reason Gary Jenkins became the DSS commissioner is because he is black. He was a disappointment and an embarrassment from day one. The DSS became a criminal enterprise. The Plaintiff was retaliated for exposing unlawful acts by the ODA and the OLA staff. Ms. Tone-Hill, Ms. Dinorah Nunez-White, Mr. Paul Ligresti, Ms. Denise DePrima & Frank Pira for several years committed criminal acts by clocking in and out being at various locations using an agency-giving cellphone without working, required 7-hours of honest days of work. This scam had been in practice for several years by Dinorah Nunez-White, Paul Ligresti & Emily Tone-Hill. Ms. Emily Tone-Hill has been home since 2020 and getting paid without working 7 hours a day. Her explanation is that she has reasonable accommodation because she is pregnant. Pregnant for 4 years? The actual reason was that she needed to attend to her child which is not an excuse or reason to be on RA. She was given special treatment.

5.  This complaint was filed on 7/23/24.

6.  It was filed within the statute of limitations. (*id.*)

7.  Buddha said, "Three things cannot be hidden long- the Sun, the Moon & the truth."

## Jurisdiction and venue

8.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.
This Court has supplemental jurisdiction over the state causes of action pleaded.

9.  Venue is proper in this district under 28 U.S.C. § 1391(b) because the underlying
events took place in Manhattan, New York and proper in this district.

## Procedural requirement

10. The plaintiff filed a copy of the complaint within with the NYC corporate counsel in July
24, 2024, & the NYC Commission on Human Rights on July 29, 2024, within 10 days of filing
the complaint pursuant to NYC Administrative Code § 8-502 (c). This requirement was
satisfied.

11. On 5/7/2024, EEOC issued the right to sue letter. This action is within the statute of
limitation.

## Parties

12.  Plaintiff is a 55-year-old male of Sri Lankan ancestry and race, and South Asian
descent. The Plaintiff has been continuously employed by the CITY and the HRA since February
of 2020. Plaintiff's address is: 247-34A 77 Cres, Bellerose, NY 11426.

13. Plaintiff is a resident of the City of New York and the State of York.

14. Defendant New York CITY is a municipal corporation existing under and by the
laws of the State of New York.

15. Defendant Denise DePrima (White Race) at all relevant times was the labor relations

director. She is sued in her individual capacity. Her address is 150 Greenwich Street, 31st Floor, New York, NY 10007.

16. At all relevant times, Defendant Emily Tone-Hill (white Race female) was (and is) an assistant counsel for the HRA and its joint agency, the Department of Homeless Services ("DHS") is sued in her individual and official capacity. Her address is: 150 Greenwich Street, 38th Floor, New York, NY 10007.

17. Defendant Ann Scalia (white Race) is the General Counsel of the DSS is sued in her individual capacity. Her address is: 150 Greenwich Street, 38th Floor, New York, NY 10007.

18. Defendant Paul Ligresti (white Race) is the Assistant General Counsel of the DSS and sued in her individual capacity. Her address is: 150 Greenwich Street, 38th Floor, New York, NY 10007.

19. Defendant Dinorah Nunez-White (Dominican Descent) is the Executive Director of the Office of Disciplinary Affairs and sued in her individual capacity. Her address is: 150 Greenwich Street, 31th Floor, New York, NY 10007.

20. Defendant Charice Latimer-Jackson (black race) is the Deputy Director of the Office of Disciplinary affairs and sued in her individual capacity. Her address is: 150 Greenwich Street, 31th Floor, New York, NY 10007.

21. Defendant Cindy Rivera (Hispanic Puerto Rican Descent) is a step 1 hearing officer with

the office of Disciplinary affairs and sued in her individual capacity. Her address is: 150 Greenwich Street, 31th Floor, New York, NY 10007.

22. Defendant Petal Harlow (black Race) is a step 1 hearing officer with the office of disciplinary affairs and sued in her individual capacity. Her address is: 150 Greenwich Street, 31th Floor, New York, NY 10007.

23. Frank Pira (white race) is the executive director of the special investigation division sued in his individual capacity. His address is: 151 West Broadway 7th Floor, New York, NY 10007.

24. Caroline Hernandez (Hispanic race) is an assistant investigator with the Special investigation division and sued in her individual capacity. Her address is: 151 West Broadway 7 th Floor, New York, NY 10007.

25. Alexander Stadnyk (white race) is an investigator with the special investigation division and sued in his individual capacity.  His address is: 151 West Broadway 7th Floor, New York, NY 10007.

26. Defendant Mark George (White Race) is the Office of Disciplinary office coordinator. He is sued in his individual capacity. His address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

27. Eric Smalls (black race) is an investigator & counsel with the EEO office and sued in his individual capacity. His address is: 150 Greenwich Street, 42nd Floor, New York, NY 10007.

28. Dennis Whinfield is the deputy director of the EEO office and sued in his individual capacity. His address is: 150 Greenwich Street, 42nd Floor, New York, NY 10007.

29. Tyra Brach (black race) is an assistant with the conflict resolution office and reports to Stephen Dickerson sued in her individual capacity. Her address is: 150 Greenwich Street, 31th Floor, New York, NY 10007.

30. Sherkia Boone (black race) is an assistant of the office of the disciplinary office and sued in her individual capacity. Her address is: 150 Greenwich Street, 31th Floor, New York, NY 10007.

31. Stephen Dickerson (black race) is a social worker with the conflict resolution office and sued in his individual capacity. His address is: 150 Greenwich Street, 31th Floor, New York, NY 10007.

32. April Hill (black race) is the coordinator in the office of the disciplinary office and sued in her individual capacity. Her address is: 150 Greenwich Street, 31th Floor, New York, NY 10007.

33. Defendant Jill Berry (white Race) is the first deputy commissioner and sued in her individul capacity. Her address is: 150 Greenwich Street, 42nd Floor, New York, NY 10007.

**Factual allegations**

34. Although Plaintiff lists the third amended complaint as "allegations" they're not, rather facts directly obtained from the trial transcript, documentary evidence, and audio recordings.

35. This complaint is essentially a summary judgment request from the court in favor of the Plaintiff: no discovery is needed as most of the witnesses already testified lying at trial confirming the violation of laws, and statues; 12 (b) (6) motion is not necessary as this circuit

ruling pertains to similar action – *Thomas Colon v. City of New York*, 19 Civ. 10435 (PGG) (SLC) (S.D.N.Y) & *Jim Trotter v. NFL*, 23-cv-08055 (JSR) (S.D.N.Y.) docket # 35, the requirements, and case laws for each claim in this action are presented & covered.

36. The DSS consists of 62% Black, 32% Hispanic, and the other 6 % round up of different races.

37. As such, Thomas Colon's claim that he was demoted and eventually terminated because he is Hispanic is dubious and not plausible: He was given a deputy commissioner position because he is Hispanic; he was demoted and eventually terminated because he committed a criminal act. Mr. Colon's criminal act was published in the newspaper after thorough review. The Colon case was settled immediately because he is Hispanic, and his lawyer is a Nigerian Black. His claim that Whites were promoted (Jill Berry) over him is not plausible because there are not that many whites to find to promote. Essentially, Mr. Thomas is saying that he should have been the 1st deputy commissioner because he is Hispanic, even though he is not qualified. Just nonsensical. However, Plaintiff agrees with Mr. Colon that Defendant Jill Berry is unqualified to be the 1st deputy commissioner. Mr. Colon is lucky that he was not criminally charged with committing a crime. The OATH Judge Spooner recommended Colon's termination because the evidence that he committed a criminal act was overwhelming.

38. Jim Trotter case was settled immediately just like Colon case. In the entertainment industry, a reporter must possess certain criteria to attract viewers to the company. Mr. Trotter does not possess the necessary essential criteria. He would be a top candidate at DSS because DSS hires Blacks & Hispanics, especially people from the projects.

39. Upon information and belief, Mr. Colon had a history of sexually harassing women.

(Exhibit A at p. 4.) Factual evidence is that "Both Gary Jenkins and Colon previously had multiple sexual harassment complaints filed against them but DSS 'did nothing to stop their behavior' and even gave them pay increases" according to Jacqueline Torress lawsuit. (*id.*)

40. Jacqueline Torres' claim was filed in 2019 in Bronx Supreme Court (Index No.: 260161/19) and was settled on 2/18/20.Torress is Hispanic. The city law department immediately settled Torress' case because the Plaintiff- Torress is Hispanic. This is proof that Hispanics and blacks get justice.

41. Mr. Colon was not terminated for sexually harassing women because he is Hispanic. The final straw was his criminal conduct.

42. The accuser Gamarra comes to work wearing a t-shirt and sneakers violating DSS dress code policy. He is Hispanic.

## *Culture at the HRA*

*43.* Since outsiders do not know what kind of people HRA/DHS hire, here are excerpts right from an OATH trial: See Stephanie Thompson case- In the Matter of ; DEPARTMENT OF SOCIAL SERVICES ; (HUMAN RESOURCES ADMINISTRATION) ; Petitioner ; - against - ; STEPHANIE THOMPSON ; OATH Index No. 1598/20.  Excerpts from the transcript: Respondent testified that she was walking down a concededly narrow hallway to distribute folders. Ms. Stephenson and Ms. McMillian were coming from the opposite direction. Respondent stopped by the beam to permit them to pass but Ms. Stephenson did not stop or move over. Instead, she plowed through, touching respondent's arm and shoulder. No words were exchanged. Respondent immediately reported the incident to Ms. Stephenson's supervisor, who

said that he would speak with Ms. Stephenson (Tr. 64, 66-67). As respondent was returning to her cubicle, she passed by the pantry where she saw Ms. McMillian and Ms. Stephenson and according to her, the following exchange ensued: [*12] Respondent to

> Ms. Stephenson: "Do not touch me again."
>
> Ms. Stephenson: "Bitch, shut the fuck up!"
>
> Respondent: "No, you shut the fuck up!"
>
> Ms. Stephenson: "I got something for you."
>
> Respondent: "What do you have for me?

(*id*, p.5-6)

44. This behavior is common at HRA. This is how Maria Feliu, Sherkia Boone, Tyra Branch, Cindy Rivera & Petal Harlow talk.

45. Ms. Stephenson, Ms. McMillian & Stephanie Thompson are Black.

46. Ms. Stephenson, Ms. McMillian & Stephanie Thompson are still with the HRA at the same positions. DSS do not terminate Black employees. But they want Plaintiff terminated.

### *Mr. Gamarra's unlawful conduct*

47. Mr. Gamarra could not even keep his composure at trial. He started to ask questions and argue with the Plaintiff:

> ALJ DAVIS: Dr. Gamarra, you do not answer with a question. Mr.
>
> Goonewardena, he has said -- yes, Dr. Gamarra 17 has testified to
>
> the best of his rele – recollection, he did not wear sneakers
>
> during the meeting on January 11th, 2023.
>
> MR. GOONEWARDENA: Yes, Your honor.
>
> ALJ DAVIS: Next question.
>
> MR. GOONEWARDENA: I also respectfully –

> respectfully request, this is one of the reasons we
> had issues with -- my issues with him, he talks back
> and he --
>
> ALJ DAVIS: No, no, no.
>
> MR. GOONEWARDENA: He did talk back.

(OATH Tr. 139:15-25).

48. At times, Gamarra talked over ALJ Davis.

49. Mr. Gamarra is so arrogant, as he is the elephant in the room, he feels laws, rules don't apply to him. He approached ALJ Davis with his right hand in his pocket to speak to the judge in private:

> MR. GAMARRA: I just had a –
>
> ALJ DAVIS: Okay. If you have a logistical question, we'll discuss it off the
> record.
>
> MR. GAMARRA: It was a question as related to something personal.
>
> ALJ DAVIS: Okay. You can approach me during the break.
>
> MR. GAMARRA: Okay.

(OATH Tr. 296:9-16).

50. Judge Davis agreed to see Mr. Gamarra. No one knows what happened at the meeting since Plaintiff left the courtroom. We will never know unless ALJ Davis decides to break her silence.

51. Mr. Gamarra was still not done with his unlawful and con game. He wanted to speak with ALJ Davis again for the second time in private. This has never happened in the history of the United States at a trial. Gamarra is so physically aggressive that he puts his right hand in his pocket and approaches ALJ Davis:

> MR. GAMARRA: Thank you. I'm coming to speak with you.

ALJ DAVIS: No, you cannot. No, if there are any matters you need to speak, you

can speak to the Petitioner and if it's appropriate to raise it with me.

MR. GAMARRA: Oh, okay.

MR. GOONEWARDENA: Through the lawyer.

ALJ DAVIS: Mr. Goonewardena, stop making comments. Unless it's not clear

from the record, Mr. Goonewardena just said through the lawyer. As I have

indicated before, the only ex-parte communications I will have are administerial

matters regarding scheduling and logistics. And that is all that I will entertain

from either side. Okay. So it is now bout 12:50 PM, we are going to break for

lunch. We are going to come back at 2:15. Who is your next witness?

(OATH Tr. 333-24-25, 334:1-14)

52. Since Plaintiff could not stay quite any further and accept unlawful conducts, Plaintiff said,

"Through the lawyer." *Id.*

53. Rules, procedures, and laws do not apply to these Defendants. These are the star witnesses of the

DSS. There are 1500 pages of comical & clown show by the Defendants -- especially the two lawyers

presented the case to OATH. The Plaintiff cannot put it all here.

54. Mr. Gamarra did not even know what protected speech was under the 1st Amendment. He

claims that he has PhD in criminal justice (an online degree) from the City University of New

York - where you take online classes through various City University Colleges that he received

in 2023.

Q: Is it fair to say that DSS is a -- a government entity?
A: Yes.
Q: And so the -- is it fair to say that the employees have certain rights?
A: Yes.

> Q: And could you -- is -- one of the rights is protective speech?
> A: No.
> Q: No. Okay. And why is that, it's not a -- it's not a right?
> A: Within the agency, we operate through the policies and the procedures
> of the agency, the code of conduct, and a number of other policies
> informationals, that we're supposed to abide by when in agency --

(OATH Tr. 142:12-25)

### *Defendant Emily Tone-Hill*

55. Defendant Tone-Hill is a perfect example that having a bar license does not mean she knows law and possesses legal knowledge. With Ms. Tone-Hill as the lead attorney at OATH trial for the petitioner, it was comical. ALJ Davis had to make objections on behalf of Tone-Hill and had to bail her out.

> Q: Well, if they -- if the hearing officer and hearing officer's supervisor behave childishly and incoherently, does the Respondent have the legal right in his response to make known of that?
>
> ALJ DAVIS: Okay. Is there any, is there -- wait, wait, is there an objection?
>
> MS. TONE-HILL: Yeah, I mean, yes.
>
> ALJ DAVIS: Okay. It's sustained.
>
> MR. GOONEWARDENA: You -- it seems like you are enlisting for the objection.
>
> ALJ DAVIS: I am also rephrasing your question so that they are clear. So I suggest that you ask the next question.
>
> MR. GOONEWARDENA: But isn't that up to the Petitioner to make -- if they want to make an objection.

(OATH Tr. 780:11-25)

56. When the trial judge has to bailout the opposing counsel, that is when you know that the things are going really, really bad for them and question the lawyer's skills.

57. Defendant Tone-Hill conspired with others to bring Plaintiff on charges.

58. Defendant – Emily Tone-Hill (white race) at the employment law division at the advice of her superior General Counsel Ann Scalia (white race) & the 2nd in command Paul Ligresti (white race) who did not hire the Plaintiff, nor do they evaluate Plaintiff's performance conspired & retaliated against the Plaintiff because of Plaintiff's race.

59. Ms. Tone-Hill, at Scalia's orders, requested resignation of the Plaintiff twice. Then again, conspired with the ODA step 1 hearing officer Cindy Rivera violating CSL § 75 & 76, that Ms. Emily Tone Hill wrote to ALJ Davis requesting the termination of the fifth set of charges even before the step 1 hearing.

60. At trial, Defendant Petal Harlow testified that until the step 1 hearing is entertained, until all the evidence is in, ODA does not contact the law department. Then why is Tone-Hill in the direction of Ann Scalia interfering with the step 1 hearing process: racial hatred?

> ALJ DAVIS: Okay. To prepare for the informal conference, do you talk to people -- do you talk to other employees at the agency to understand what the penalty that's being -- that should be appropriate in that case?
>
> MS. HARLOW: This is done after the informal conference.
>
> ALJ DAVIS: Okay.
>
> MS. HARLOW: After the Respondent has submitted testimony and evidence.
>
> ALJ DAVIS: Okay. Q: So at this -- at this po -- and if I -- if the Department of Legal Affairs, even before the step 1 hearing is being schedule -- held, if the Department of Legal Affairs come up  and say -- communicate to the

Respondent or someone else that we are requesting his termination, he was

just served with the charges. Is that the standard policy?

ALJ DAVIS: Do you understand the question?

A: Sir, it does not work that way.

ALJ DAVIS: Okay.

Q: So --

ALJ DAVIS: So you -- wait. So, just to be clear,

your testimony is that the agency does not come with its recommended

penalty to you before the step 1 conference?

MS. HARLOW: That is correct.

ALJ DAVIS: Okay. Next question.

Q: So if at any point, a lawyer from the legal department communicated

with the Respondent saying, we are asking for his termination and the step

1 hearing has not even been held, is that a -- is that a code of conduct

violation?

(OATH Tr. 565: 5-25; 566: 1-8)

61. Ms. Tone-Hill made a fool out of herself in response to her objection that audio recordings

should not be played because the witness did not know that he was being taped:

MS. TONE-HILL: Well, Your Honor this -- the -- the witness has no knowledge of this

recording as they were not informed that the recording was being taken at all, prior. They

also -- the recording is an hour -- is an hour -- over an hour and a half long. There's been

no specification as to what portions of the recording are -- the Respondent intends to

admit into evidence. So there's a relevance issue. But the -- yeah, the witness was not

informed that this would -- this recording was taking place beforehand. And actually --

ALJ DAVIS: Is there a -- is there -- is there a requirement that the witness be informed that he -- that he's being recorded?

MS. TONE-HILL: I mean, there -- this meeting was - you know, there was an understanding that -- that the cell phones would not be on as -- as per even the Respondent.

ALJ DAVIS: No, no, no. Okay. Are there any -- what -- you're saying the witness was not informed, and I'm asking you what required the witness to be informed that there was going to be a recording?

MS. TONE-HILL: I'm -- I'm just saying the witness did not have knowledge of this recording taking place.

ALJ DAVIS: I -- I understand that. I understand 6 that, but is there a requirement that the witness be informed that the meeting was going to be recorded?

MS. TONE-HILL: Technically, there's -- there is the possibility that cases could have been discussed that specific, you know, client information could have been discussed during this --

ALJ DAVIS: No, no, no. Ms. Tone-Hill, I'm asking you a very specific question. Is there some prohibition that -- or -- or -- or some requirement that the witness had to be alerted that there was -- that the meeting was going to be recorded?

MS. TONE-HILL: No, there's no specific requirement in this context.

ALJ DAVIS: Okay. So --

MS. TONE-HILL: Yeah.

ALJ DAVIS: Okay. Mr. Goonewardena.

MR. GOONEWARDENA: Yes, Your Honor.

(OATH Tr. 218:3-25)

62. The Defendants violated the code of conduct, and they should be brought upon charges.

63. There are too many attorneys' disciplinary rules violations by Tone-Hill,

Ann Scalia, Shavani Naidu-Price, Paul Ligresti, and Dinorah Nunez-White to list here. This is to

satisfy the F. R. Civ. P. 8 (a).

### *DSS Discriminated against Asians and South Asians.*

64. The DSS discriminates against South Asians. Proof: Plaintiff's case and that there are no

Asian or South Asian managers at DSS. There are less than 2% of Asian and South Asian

employees at DSS. The entire HRS (human resources department) consists of Blacks and

Hispanics. The DSS breaks civil service laws by bypassing hiring procedures only to hire

Hispanics and Blacks. For example, Mr. Gary Jenkins's sister- Ms. Bass was brought into HRA

bypassing and manipulating the civil service requirements. Upon information and belief, Gary

Junkin's sister assaulted her director at her previous employment- correction department and was

terminated, then suddenly she ended up at the HRA finance department.

65. Upon information and belief, Gary Jenkins & Thomas Colon had a history of sexually

harassing women. (See Exhibit A.) Yet, they held a high position. Jenkins eventually became the

DSS commissioner. He was an embarrassment from day one to the DSS. This is evidence that

DSS favors blacks, and Hispanics, and society favors blacks.

66. As a matter of policy, DSS does not bring charges against Blacks and Hispanics (Exhibit A.)

67. Applying the Colon standard & Jim Trotter, *supra*, Plaintiff's case should be settled

immediately.

68. Some claims are not yet actionable as Plaintiff is still employed. If The Defendants terminate the Plaintiff, then the termination will trigger those claims such as property interest.

***October 18, 2024, conference with the Magistrate Judge Tarnofsky***

69. The Defense attorney Ms. Damera said that Plaintiff's complaint is a rehashing of the OATH hearing.

70. Ms. Damera is mistaken. Plaintiff's case here is for money damages for the unlawful conducts the Defendants committed against the Plaintiff.

71. At Oath, Plaintiff was the respondent where the Defendants took their recommendation of termination to be reviewed by a tribunal.

72. Here, Plaintiff is suing the Defendants for their unlawful conducts on the Plaintiff.

73. Essentially, the OATH trial and Plaintiff's case here are *mutually exclusive*. However, the evidence that came out at OATH is used against the Defendants here as the facts are the same.


74. The Plaintiff is a Fraud investigator (South Asian ancestry & race Sri Lankan-born colored immigrant) who currently works for the Bureau of Fraud Investigation division. He was a fraud investigator approving IDNYC cards at the IDNYC department from February 10, 2020, to March 9, 2023.

75. Plaintiff started his journey with the Department of Social Services ("DSS") on 2/10/2020 as a Fraud Investigator with the IDNYC department.

76. The plaintiff had a dream to be part of NYC. He accomplished his dream. The plaintiff wanted to continue his journey. But the Defendants [had] other ideas. They continue to harass Plaintiff, creating a hostile working environment by serving 8 sets of dubious disciplinary

charges that contained false statements damaging Plaintiff's reputation emailing them to several people to be served on the Plaintiff.

77. None of the Defendants involved here are involved in hiring, working with, and evaluating the Plaintiff. The Plaintiff met most of the Defendants for the first time at the OATH trial that was held from May 14, 2024, to June 11, 2024.The Defendants only knew that Plaintiff is a South Asian Immigrant.


78. Every phone conversation & meeting Plaintiff had with the Defendants was recorded. They did not know that they were recorded when the false accusations were made. They became aware that they were recorded after the Defendants filed the four sets of charges at OATH in November of 2023. Their unlawful acts were caught on tape. It was too late for them. But the lies continued throughout the trial. The lawyers – Shavani Naidu-Price and Emily Tone-Hill spoon-fed the false statements to the witnesses.

79. Defendant Emily Tone-Hill said at trial that the HRA law department is not representing the individual defendants, only the agency. (OATH Tr. 592: 7-12, 892: 1-3.) As such, there is no lawyer-client privilege that exists.

### *December 23, 2022, interaction by email*

80. On December 23, 2022, following the DSS agency policy time and leave (seven days in advance), Plaintiff requested December 30, 2022, off. As per department policy, Plaintiff requested in writing that his immediate supervisor Andrei Singh (Guyanese descent) CC Maria Feliu and Charmaine Harvey. No violation was made here by the Plaintiff.

81. On the same day, Plaintiff's immediate supervisor - Mr. Singh wrote back asking if the request was sick leave or personal, meaning if it was sick leave, it would be granted.

82. The Plaintiff wrote back stating it was personal for personal business.

83. After some time, Mr. Singh wrote back stating that Plaintiff's request was denied. Since the Plaintiff knew ahead of time that other fraud investigators were going to be present on December 30, 2022, which could have relieved, the Plaintiff requested an explanation why the 30th off was denied.

84. After back-and-forth communications with Mr. Singh, Plaintiff called Ms. Maria Feliu (the one in charge of site coverage) stating that Plaintiff is no longer requesting December 30, 2023, off and that Plaintiff will report to work. Ms. Feliu wrote to others in writing confirming that the Plaintiff no longer wants the 30th off and that he will be present at the Navigation site (Red Cross building at 350 West, 49 Street Manhattan). No agency violations and the standard procedures were followed.

85. The Plaintiff reported to work on December 30, 2022, early as usual. The leave request was a dead issue. However, it was not for Mr. Albert Gamarra.

## *Retaliation by Gamarra, Nunez-White & Scalia*

86. Upon information and belief, Mr. Gamarra contacted Defendant Dinorah Nunez-White and Ann Scalia conspired in December of 2022, talked how to terminate Plaintiff's employment. They felt that they needed to start the process by bringing Plaintiff on false charges.

87. On or around December 28, 2022, Gamarra requested a request from his friend Maria Feliu (Hispanic Race) to pull the Plaintiff from the Navigation site. A reason was not given to the Plaintiff.

88. The Plaintiff was scheduled to be at the navigation site until June of 2023, it's scheduled

closure. The Plaintiff bonded with his coworkers. The Plaintiff exchanged Christmas gifts and worked as a team. He did not want to leave the Navigation site.

*89.* Plaintiff contacted Mr. Andrei Singh one of the few Asians at HRA and was in touch with him to find out the reason why Plaintiff was pulled from the site.

90. On or around December 28, 2022, in a recorded phone conversation with Mr. Singh, confirmed that he did not know the reason for the pull and that he was not informed of the reason.

91. A few days later, Plaintiff received an email from Charmaine Harvey, Plaintiff's deputy Director at the direction of Gamarra, that a meeting had been scheduled for January 11, 2023, and that Plaintiff may bring a union representative as the meeting could lead to disciplinary action.

92. The Plaintiff was not told what the purpose of the meeting was.

93. On December 29, 2022, Plaintiff received an email from Sonia Daily, executive director of performance, who oversees community service associates that she wants to get the union representative of the choice of Albert Gamarra (Andrew Douglas) for the Plaintiff.

94. Plaintiff responded to her email stating that Plaintiff is in touch with his immediate supervisor (standard procedure) and that her help is not needed as she is not in the Plaintiff's chain of command, which she is not.

95. Mr. Gamarra does not understand that when Plaintiff requested on December 23, 2022, to take December 30, 2022, off, that is seven days in advance pursuant to DSS time and leave policy. Mr. Gamarra has his timeline that is not standard with DSS time & leave policy:

> Q: And this -- and this was about leave that I'm requesting for December 30th, correct?
> A: Yes.

Q: So is it fair to say, this is a yes or no answer, is it fair to say I did follow the agency time and leave policy by requesting it seven days in advance?

A: No.

Q: Yes, or no

A: No.

Q: Why is that?

A: Because that's not the deadline you gave the staff member.

Q: I don't have –

ALJ DAVIS: Okay. Okay. Mr. Goonewardena -- Dr. Gamarra?

MR. GAMARRA: Yes.

ALJ DAVIS: Is there a DSS or HRA policy as to the deadline for an employee to request leave time?

MR. GAMARRA: Yes. Seven days.

MR. GOONEWARDENA: Okay. That's the end of that question.

Q: So it's fair to say that I follow the time and leave policy to its word. I requested a -- on 23rd, I requested I want 30th off. I'd like to have the 30th off right? Yes, or no? That's -- is a yes or no answer.

A: No.

Q: No. Why is it -- so you are telling me that when I requested on December 23rd, early in the morning –

(OATH Tr. 149:22-25, 150:1-24)

96. Mr. Gamarra violated the chain of command by not contacting Plaintiff's immediate supervisor. He contacted his Hispanic friend Maria Feliu. He didn't contact Plaintiff's immediate supervisor because he is South Asian.

97. Mr. Gamarra terminated Mr. Andrei Singh's employment the only South Asian supervisor at DSS. At OATH trial, Mr. Gamarra testified:

Q: So you contacted my immediate supervisor and what did you contact my immediate supervisor about this?

A: I contacted a deputy director.

Q: Did you at any point contact my supervisor?

A: No.

(OATH Tr. 190:8-12).

98. Plaintiff is a proud American and wants to be treated just like other Americans.

99. . Plaintiff is a team player. That is why everyone loves the Plaintiff.

100. Plaintiff loves his coworkers, that is why coworkers have not had any issues with Plaintiff.

101. Mr. Gamarra, Dinorah Nunez-White, Ann Scalia & Stephen Dickerson conspired to bring false charges against the Plaintiff. Documentary evidence shows email communication between each other. The subject of the email communications: Plaintiff.

102. Ms. Nunez-White and Gamarra gave contradicting statements at the OATH trial about the purpose of their communications.

**103.** Mr. Gamarra himself confirmed that Defendant Daly is not in Plaintiff's chain of command. Mr. Gamarra stated in that email to Plaintiff, "You should not directly contact Executive Director of Operations Sonia Daly (Who is not in your chain of command) or Deputy Commissioner Colette Samman." Now we have confirmation from Mr. Gamarra that, (1) Sonia Daly is not in Plaintiff's chain of commands, (2) that Ms. Daly herself should not be contacting any investigators (Plaintiff) as she is not in Plaintiff's chain.

104. As such, the charges against the Plaintiff when he told Daly that she was not in Plaintiff's chain of command is not a violation.

105.When Mr. Gamarra contacted Daly and conveyed confidential information that Plaintiff was brought up on charges (without a valid cause) and he needed her help, Mr. Gamarra violated Plaintiff's rights, specifically confidentiality.

106.At no point before and after the January 11, 2023, disciplinary meeting, Gamarra

gave any documentation about the false charges. January 11, 1023, meeting with Gamarra, Defendant Daly was not present as she had no business – she was not in Plaintiff's chain of command. More proof that (1) she is not in Plaintiff's chain; (2) that she entered the picture (to get a union rep for the Plaintiff) to help Gamarra as a coconspirator. The meeting on January 11, 2023, was recorded and admitted onto evidence at OATH trial.

107. The plaintiff was brought upon charges stating that the Plaintiff only gave seven days in advance (December 23, 2022) when he requested December 30, 2022, off. Plaintiff also brought upon charge falsely stating that the Plaintiff made racial comments to EEO officer Eric Smalls.

108. Ms. Sonia Daly is the entertainment queen. She does the dirty work for Mr. Gamarra.

## *Retaliation for filing a complaint with the EEO office*

109. On December 28, 2022, Defendant Denise DePrima in a recorded phone conversation with Plaintiff after listening to the harassment Plaintiff endured, advised:(1) to file a complaint with the EEO office;(2) she can take a complaint to investigate harassment; (3) that she is going to refer the facts to conflict resolution officer Stephen Dickerson and that Mr. Dickerson should help the Plaintiff.

110. As per DePrima's request, Plaintiff filed a complaint against Gamarra & Daly on 1/8/23 with Ms. DePrima to investigate harassment and Discrimination complaint to the EEO office.

111. On January 9, 2023, Defendant Eric Smalls contacted Plaintiff by email stating that he wants to talk to the Plaintiff.

112. The Plaintiff spoke with the Defendant Smalls on January 10, 2023. The

conversation was recorded. That recording was played at the OATH hearing.

113. In the conversation with Mr. Smalls, Plaintiff did not want to go into detail about the complaint since he had the complaint.

114. Defendant Smalls discouraged Plaintiff from moving forward with his complaint. This is a violation of NYC EEO policy. Although Plaintiff already knew that everyone in the EEO department was black since Mr. Smalls' behavior was not in line with NYC EEO policy, Plaintiff wanted to get on record Mr. Smalls admitting that he is Black. The Plaintiff asked whether he was African American after more than ten minutes into the conversation. This is not a violation at all.

115. Then since a complaint should include the Plaintiff's own experiences, the Plaintiff said that the plaintiff was assaulted by an African American guy in December of 2022. There were many African Americans were watching but no one came to assist Plaintiff. Then an Irish man (Tony) from Ireland helped the plaintiff. The Plaintiff told his experience to Mr. Smalls. The Plaintiff never said, "… he was very nice." Mr. Smalls lied to Defendant Nunez-White in writing stating that Plaintiff at the confidential conversation said: (1) Irish man was nice & that his supervisor- Dennis Whinfield "sounds like a black man too" to bring Plaintiff on false charges.

116. Upon information and belief, Mr. Smalls in prejudiced mind spoke on the phone with Defendant Nunez-White on how to bring the Plaintiff on charges. Defendant Nunez-White advised Defendant Smalls to send an email to Nunez-White.

117. Defendant Smalls wrote to Nunez-White by email on 1/20/23, giving a false

narrative of the protected phone conversation he had with plaintiff regarding the racial discrimination complaint Plaintiff filed with the EEO office on 1/8/23. Mr. Smalls' 1/20/23, email to Nunez-White was used to bring the Plaintiff on charges. They conspired & aided and abetted to injure Plaintiff.

118. Since Plaintiff is South Asian, upon information and belief, after consulting on the phone with Ann Scalia, Nunez-White, Smalls' supervisor Dennis Whinfield, & Charise Latimer-Jackon, Mr. Smalls wrote to Defendant Nunez-White.

119. Mr. Smalls confirmed at trial that he wrote to Ms. Nunez-White to bring Plaintiff on disciplinary charges. Retaliation is established.

120. Mr. Smalls falsely stated: "...when I brought up Dennis Whinfield's name, he stated 'He sounds like a black man also.'"

121. Defendant Smalls admitted that Plaintiff's conversation with him was confidential and that it is a protected activity. (Filing an EEO complaint is a protected activity, and the investigator must not retaliate on the information obtained during that conversation related to an EEO complaint.)

122. Working for the EEO office as an instigator and labor Relations director, positions are a sacred one where no one should be retaliated against & discriminated against for any reason using *the* position for contacting and filing a complaint.

123. Mr. Smalls violated that sacred duty because of his hatred against South Asians and the The department policy is that they only serve blacks and Hispanics.

124. As of today, Defendant DePrima has not investigate or responded to Plaintiff's harassment complaint he filed with her department – labor relations.

125. Mr. Smalls owes a fiduciary duty to the Plaintiff.

126. On a recorded phone conversation on March 2, 2023, Mr. Smalls stated that he never received a complaint from the Plaintiff and he referred to the proper area. However, at trial, Mr. Smalls testified:

> Q: So you never referred my complaint to anyone else; yes or no?
> A: No.
> ALJ DAVIS: Other than Ms. Nunez-White?
> MR. SMALLS: Yes.
> Q: Is -- our communications should be confidential?
> ALJ DAVIS: Mr. Goonewardena, you already asked those questions and got the answers.
> MR. GOONEWARDENA: Which is?
>
> ALJ DAVIS: Which is yes, they're supposed to be confidential. Next question, please. On a new subject.

(OATH Tr. 909:10-20).

127. Mr. Smalls further stated:

> Q: So do you believe your actions were proper referring the co -- referring our confidential conversations to Dinorah Nunez White?
> A: Yes.

(OATH Tr. 910: 3-6).

128. Mr. Smalls to cover up his unlawful act, falsely stated:

> Q: Did you ever tell me that your office never received a complaint from me; yes or no?
>
> A: No.

129. On March 2, 2024, in a recorded phone conversation, Mr. Smalls clearly stated that his office never received a complaint from Plaintiff. If Mr. Smalls never did anything wrong, he should not lie.

130. These kinds of racist people should not be allowed to hold positions where they have decision-making powers.

131. Defendants Tone-Hill, Scalia, Ligresti, & DePrima, have a copy of March 2, 2023,

phone call to Mr. Smalls. Yet, the Defendants continue to spin lies, violating ethical obligations as an officer of the Court. They also have a copy of 6/22/23, step 1 hearing recording. The recording prove that Charise Latimer Jackson's and Cindy Rivera's unlawful behavior that include admitting that they enlisted a bodybuilder because Defendant Sherkia Boone complained that Plaintiff threatened her that was confirmed at trial by Boone herself as false.

### *Defendant Dinorah Nunez-White conspired with the co-Defendants*

*132.*Defendant Nunez-White testified that she was not directly involved unlawfully bringing Plaintiff on charges.

133. Nunez-White falsely accused Plaintiff on ODA charge # 2 that (1) she told Plaintiff not to contact her, (2) Plaintiff asked for personal information about Petal Herlow. The recording of the conversation was played at trial, and she confirmed that she never heard Plaintiff asking Nunez-White for personal information about Petal Harlow, and that she never told Plaintiff not to contact her.

134.Ms. Nunez-White told hearing officer Cindy Rivera to write these false statements on the second set of disciplinary charges against the Plaintiff.

135.Defendant Cindy Rivera typed the false charges with the assistance of her supervisor Charise Latimer-Jackson, then gave the false charges to April Hill to deliver to the Plaintiff's deputy commissioner Sheronda Williams by email. Ms. Williams read it and sent a second set of disciplinary charges by email with special instructions to Venessa Faison - another HRA employee, to serve them to Plaintiff. All these were confirmed at the OATH trial. There are too many to list here.

136.As per policy (chain of command), at the DSS legal department, no one acts

without consulting with the General Counsel Ann Scalia. It is her department. Everything goes through her. As such, she is responsible for the legal department's acts.

137. Defendant Paul Ligresti testified that after the charges and specifications are drafted, the hearing officer sends them to the legal department for review. Then they send it back to serve on the Respondent. Therefore, Paul Ligresti, & Scalia, are involved in approving the false accusations on 8 sets of disciplinary charges to move forward. It was a family affair.

138. Petal Harlow testified that her supervisor Charise Latimer-Jackson and her together drafted the first set of charges. Therefore, Ms. Latimer-Jackson is involved in the conspiracy and the discriminatory unlawful conduct of drafting 8 sets of charges that contained false statements along with Mark George, Paul Ligresti, Ann Scalia, Nunez-White and Cindy Rivera.

139. At the step 1 hearing on 6/22/23, Latimer-Jackson enlisted a bodybuilder who is not an HRA employee or HRA contracted security – FJC security officer. Ms. Latimer-Jackson admitted that she called the bodybuilder – who harassed, intimidated, and followed Plaintiff around because the secretary Sherkia Boone told her that Plaintiff threatened her.

140. At trial, after the recording, Ms. Bonne confirmed that on the recording the Plaintiff did not threaten her. Now Plaintiff has a claim against Boone, Latimer-Jackson.

141. The hearing officer Cindy Rivera & Latimer-Jackson argued at the step 1 hearing that Plaintiff does not have OATH rights.

142. When asked the name of the author of the first set of charges, Ms. Latimer-Jackson said that Plaintiff is not entitled to that information.

143. They both recommended a 65-day suspension on the second set of charges. According to CSL, the maximum penalty that can be imposed is 60 days' suspension.

144. At the step 1 hearing on 6/22/23, Defendant Latimer-Jackson was laughing and made incoherent comments. The Plaintiff recorded the step 1 hearing.

145. The ODA step 1 hearing officers Petal Harlow, Cindy Rivera & her supervisor Deputy Director Latimer-Jackson does not even know the CSL. They did not know what is CSL §75-b is and how it should be applied. Both Ms. Rivera and Latimer-Jackson behaved like 10-year-olds. These people should be terminated. But it will not happen because of their race.

146. The charges on second, third & fourth sets of charges were related to the comments Plaintiff made in defending the false charges in CSL §75-b. As such, the statements are privileged.

147. The comments Plaintiff made in Defending those charges are privileged. As such, Defendants cannot bring Plaintiff upon charges.

148. The person who drafted the first set of charges was Petal Harlow. The orders to draft all 8 sets of false charges came from Defendants Latimer-Jackson, Mark George & Nunez-White. It was approved by Defendants Ligresti & Scalia.

149. Seven sets of charges were drafted by the 1st step-hearing officer Cindy Rivera in the direction of Nunez-White, Mark George & Charise Latimer-Jackson.

150. Based on the OATH trial transcript, the charges were approved by the legal department employees as a team – Scalia, and Paul Ligresti.

151. Mr. Ligresti testified at the OATH trial that it is the standard policy DSS follows.

### Defendant April Hill

152. April Hill oversees emailing and mailing documents related to Disciplinary charges. The directives come from Charise Latime-Jackson & Dinorah Nunez-White.

153. At DSS the orders are given and come from top to bottom. All employees, before

making any decision, following the chain of command, must check with their supervisor. In the Plaintiff's case, it was a coordinated attempt by Scalia, Latimer-Jackson, Ligresti, Mark George & Nunez-White involving other Defendants.

154. After the write-up by Albert Gamarra, on 3/13/23, Plaintiff took his expertise and talent to the Bureau of Fraud Division.

155. The Plaintiff and his current Director- Robyn Battle immediately bonded. It was an unbreakable bond.

156. The Defendants destroyed that bond with their false accusations tapping into Plaintiff's director and deputy commissioner Sheronda Williams.

157. On May 15, 2023, the Plaintiff was brought upon charges related to Gamarra's discriminatory & false accusations. Plaintiff was shocked as (1) he was already punished by Mr. Gamarra; (2) it was a dead issue where everyone moved on; (3) the Plaintiff was in a good place where he was accepted and enjoyed working; and, (4) that the Defendants had a discretion not to retaliate for filing a complaint with the EEO office & labor relations.

158. Plaintiff was served with charges (1st set of charges) that contained false accusations using Nationwide Court Services. The charges were emailed to Hector Pacheco by April Hill.

159. The charges were unsigned and not dated.

160. Since the Plaintiff was never brought upon charges in his entire life, he took every avenue to fight the false accusations to clear his name.

161. The Defendants thereafter retaliated against Plaintiff for exercising his 1st Amendment rights by speaking out about the first set of charges in a CSL §75-b filing.

162. Based on the evidence that came out at the OATH trial, the final decision was to move forward with the charges given by Defendant Scalia's office.

### 163. *False statements& retaliation in ODA No.: 1412014-01*

On or about December 28, 2022, you violated the chain of command and called Deputy Director Maria Feliu, to inquire about the reason for the scheduled meeting to be held on or about January 9, 2023, and to ask why you were being removed from the site. Deputy Director Maria Feliu informed you that she was unaware of the issue and that you should be speaking to your chain of command, your supervisor Andrei Singh, and Deputy Director Charmaine Harvey, who were both present in the office at the time. You demanded that Deputy Director Maria Feliu respond to your inquiries and when she reiterated her statements and advised you that an assignment is based on the needs of a program area, you became agitated and raised your voice. Director Maria Feliu attempted to further provide an explanation to you, but you hung up the phone on her.

(Specification 1 bullet point 3).

On or about January 3, 2023, you made a request to your supervisor Andrei Singh for leave on or about January 11, 2023, claiming you needed to prepare for the scheduled meeting, describing it as the, "So called meeting," and that you must be notified by on or about January 4, if the meeting would be cancelled due to your scheduled leave from on or about January 5 through on or about January 6, 2023. Subsequently, Executive Director of Operations Sonia Daly contacted you to notify you that she would be providing coverage in the absence of Executive Director Albert Gamarra, and that she is available to support you in securing representation for the January 11th meeting with Deputy Director Charmaine Harvey. You unprofessionally responded: "I'm good to go on the 11th at 2:30 pm….I am waiting a response from Mr. Singh; Moreover, you are not on my side of chain of command, as such, please let Mr. Singh respond accordingly as there are U.S. and NY State Constitution violations. Toothpaste is out of the tube! No one can put it back in the tube." You inappropriately requested Executive Director of Operations Sonia Daly to appear as a witness to the scheduled meeting and stated, "It appears that you inserted yourself as a witness and possible accomplice to the ongoing unlawful actions I have been subjected; therefore, your appearance is a must!" You demanded that she needed to notify you before 4 pm, if she declined. You then accused Supervisor Andrei Singh of harassing you, in concert with Executive Director Albert Gamarra, Deputy Director Charmaine Harvey, and Deputy Director of Program Integrity Maria Feliu.

(Specification 1 bullet point 4)

On or about January 4, 2023, Executive Director Albert Gamarra responded to your unprofessional and inappropriate email response to Executive Director of Operations Sonia Daly that she was providing coverage during his absence. Mr. Gamarra directed you to adhere to the chain of command . In response, you accused Mr. Gamarra of a lack of understanding the Code of Conduct, and that he was using it as, "A weapon!" You accused Mr. Gamarra of making threats to you, of preventing you from collecting witnesses, for causing you severe emotional trauma, and of dishonesty.

(Specification 1 bullet point 5)

On or about January 6, 2023, you sent an email to Supervisor Andrei Singh, and the supervisory/management staff claiming you filed Worker's Compensation alleging that you sustained injuries from threats and other unlawful actions committed against you by Executive Director Albert Gamarra, Deputy Director Charmaine Harvey, and Deputy Director of Program Integrity Maria Feliu, and accused the supervisory/management staff of compromising your safety, for allegedly conspiring with security and IT to hack into your email and block your access to your work email, and for making false statements against you to your co-workers. Subsequently, you sent an email dated on or about January 13, 2023, proposing that if a written disciplinary statement is withdrawn, that you would agree not to contact anyone in the future, and you can move forward with a warning and a handshake; however, if a written disciplinary statement is submitted, it would be escalated to litigation.

(Specification 1 bullet point 6)

On or about January 10, 2023, during a phone call with EEO Counselor/Investigator Eric Smalls of the Office of Equal Employment Opportunity (EEO) called you to gather information regarding the EEO complaint you filed on or about January 8, 2023, you improperly asked Mr. Smalls whether he was of African American descent, stating that you did not believe you would be assisted fairly by an African American employee. Subsequently, you inquired who Mr. Small's supervisor was, and Mr. Smalls informed you that the name of his supervisor was Dennis Whinfield, to which you inappropriately replied, "He sounds like a black man also! An Irish man helped me before and he was nice!

You were informed that your complaint would be investigated; however, you were unhappy to hear that. Your communications with Mr. Smalls with were inappropriately and racially derogatory, in violation of Agency policy.

(Specification II)

On or about March 2, 2023, although you had been notified numerous times to adhere to the chain of command, you were insubordinate and continued to violate the chain of command when you sent an email to Executive Director Albert Gamarra and included Chief External Affairs Officer Maritere Arce and Executive Director of Operations Sonia Daly to make a request to review your personnel folder. You accused the supervisory/management staff of harassment and retaliation, and for submitting false information in your personnel folder. You demanded a response to your request and inquiries before 4 pm that day. Executive Director Albert Gamarra responded that the Agency adhered to Agency policy as it relates to conferencing you in the presence of your union delegates. Executive Director Albert Gamarra reminded you again that, although, on numerous occasions you were warned of violating the chain of command, you had continued to violate the Agency's policy as it relates to adhering to the chain of command. You again responded to Executive Director Albert Gamarra that Ms. Arce was the External Affairs Officer, and that you had a right to contact her office, and that you were not going to stop, unless Ms. Arce's office sends you a direct message that they were refusing to investigate your concerns. You also requested that Mr. Gamarra refrain from including Union Local 371 so they could provide representation to you, and you again demanded a response to your inquiry. Subsequently, Mr. Gamarra notified you to contact Myrta King, and provided you with Ms. King's email address in order to set up an appointment to review your personnel folder and reminded you again that violations of the Agency's Code of Conduct would be recorded and submitted to the Office of Disciplinary Affairs (ODA). You responded to Mr. Gamarra, requesting that he refrain from adding Executive Director of Operations Sonia Daly to any communications regarding you; although, you included Ms. Daly in your original email. You then accused Mr. Gamarra of copying verbiage from a lawyer, and that the lawyer can send you a message directly. You improperly told Mr. Gamarra that superiors must follow directives from employees as well. Although you were notified of the contact person to review your HRA Personnel folder, on or about February 7, 2023, via email you contacted the

Office of Disciplinary Affairs (ODA), requesting copies of all negative comments in your file.

(Specification IV)

On or about May 24, 2022, you sent an email to your supervisor Andrei Singh, Deputy Director Charmaine Harvey, Deputy Director of Program Integrity Maria Feliu, and Executive Director Albert Gamarra with a work-related suggestion. The following day, you sent a similar email to Executive Director of Operations Sonia Daly and Assistant to the Commissioner Colette Samman. Mr. Gamarra informed you that your suggestion would be reviewed and reminded you that you must adhere to the chain of command. You responded that you did not think that sending copies to parties of Operations was a violation of the chain of command. Your insubordinate behavior again violated the chain of command, which you have been notified of repeatedly.

(Specification V)

### 164.False & retaliatory acts in ODA No.: 1412014-02

From on or about May 16, 2023, until on or about July 13, 2023, you repeatedly violated the chain of command, and you made unprofessional, disparaging, unfounded, and inappropriate statements to ODA Executive Director Dinorah Nunez-White over a series of phone calls, described below. You also misused agency time by relentlessly calling Ms. Nunez-White's mobile work phone, and your calls were disruptive to ODA operations, contained inappropriate remarks, and were personally harassing to Ms. Nunez-White. Your overwhelming and harassing phone calls to Ms. Nunez-White were unreasonable and caused alarm.

• On or about May 16, 2023, at approximately 4:00 PM, you called Ms. Nunez-White and demanded that discovery be sent to you, to which Ms. Nunez-White responded that you had not signed a waiver of representation by your union and that you should contact your union. You then inappropriately requested personal information about your assigned Informal Conference Hearing Officer Petal Harlow.

• On or about May 17, 2023, you called Ms. Nunez-White and inappropriately made allegations about Hearing Officer Petal Harlow. You then requested discovery in advance of your Step I Hearing/Informal Conference1 , and Ms. Nunez-White informed you that since you had not signed a waiver of representation by

your union, that they would be your representation and that you should contact your union. Ms. Nunez-White instructed you that you would have the opportunity to present your evidence at the Step I Hearing/Informal Conference, but that until then you should refrain from contacting her further.

• On or about May 18, 2023, despite being asked by Ms. Nunez-White not to continue to contact her, you called Ms. Nunez-White's office but were told that Ms. Nunez-White was not at her desk at which point you falsely accused Ms. Nunez-White of instructing staff to tell you that Ms. Nunez-White was not there.

• On or about July 13, 2023, you emailed your "Election of a Section 75 hearing" form to the Office of Disciplinary Affairs. You inappropriately violated the chain of command by including DSS Commissioner Molly Wasow Park on the email. In the email, you disrespectfully called ODA Hearing Officer Cindy Rivera "unqualified." You then forwarded this email directly to ODA Executive Director Dinorah Nunez-White, to which she responded "Received." In response to her email, you wrote in an intimidating manner, "See you at OATH and a federal court deposition. Good luck."

(Specification 1)

From on or about May 16, 2023, until on or about May 17, 2023, you repeatedly sent Senior Hearing Officer Petal Harlow a series of emails containing unprofessional, harassing language, and unfounded allegations of conspiracy against you. Additionally, you contacted Ms. NunezWhite and attempted to gather personal information regarding Ms. Harlow (See Specification I, bullet point 1, above). Your emails and phone calls were unprofessional and made Ms. Harlow feel highly uncomfortable, causing her to be recused from conducting your Step I/ Informal Conference, described in detail, below.

• On or about May 16, 2023, at approximately 4:16 PM, you sent an email to Ms. Harlow where you seemed to imply that you knew Ms. Harlow was at work but that she was purposefully avoiding your phone calls by writing, "You Ms. Harlow is on the computer. I just called your phone, and you did not pick up."

• In addition, described in Specification I, above, on or about May 16, 2023, at approximately 4:00 PM, you called ODA Executive Director Dinorah Nunez-White and inappropriately requested personal information about your assigned Hearing Officer Petal

Harlow. • On or about May 17, 2023, at approximately 2:36 PM you sent an email to Ms. Harlow alleging that Ms. Harlow engaged in a conspiracy with OLA General Counsel Ann Marie Scalia and "another outside lawyer" to terminate you. You then recklessly accused Ms. Harlow of defamation against you. At the end of the email, you wrote, "Be safe" which caused Ms. Harlow to be concerned about your overall behavior towards her.

• In addition, described in Specification II, above, on or about May 17, 2023, you called ODA Executive Director, Ms. Nunez-White and made baseless allegations that Ms. Harlow was biased against you and was attempting to ruin your reputation and terminate you.

(Specification II)

From on or about May 16, 2023, to on or about June 29, 2023, you repeatedly violated the chain of command, were insubordinate, and you made unprofessional, threatening, disparaging, and inappropriate statements to supervisory/management staff in your written correspondences, which also included implications of racial discrimination. You also consistently misused agency time, by constantly sending non-work-related emails concerning a lawsuit you brought against the Agency to the supervisory/management staff, which caused an unwarranted logistical hardship for the supervisory/management staff, as a significant amount of time was expended on responding to you.

• On or about May 16, 2023, at approximately 4:36 PM you violated the chain of command by forwarding an email containing scheduling details for your Step I/ Informal Conference with the Office of Disciplinary Affairs to DSS General Counsel Ann Marie Scalia. • On or about May 24, 2023, at approximately 12:21 PM you violated the chain of command by emailing April Hill and included DSS Commissioner Molly Park alleging procedural deficiencies in your service of disciplinary charges.

• On or about May 24, 2023, at approximately 3:08 PM you emailed Commissioner Molly Park requesting that she independently dismiss the disciplinary charges filed against you. In the same email you disrespectfully and derogatorily implied that Mark Neal assisted an employee Glenn Parker due to them both being African American.

• On or about June 2, 2023, at approximately 2:40 PM, you emailed Commissioner Molly Park alleging that ODA Executive Director Dinorah Nunez-White falsified charges against you and lied to you on the phone. You also made a disparaging and

disrespectful comment saying, "Ms. Nunez-White is not a hotshot lawyer. It took her three times to pass the bar exam. I have never heard that some one taking three years to pass the bar exam. How many times did she fail?" Later in the email you made disparaging and disrespectful comments about two separate employees who you identify as African American.

• On or about June 12, 2023, at approximately 2:05 PM you sent an email to Ms. NunezWhite, Mark Neal, Ms. Scalia, and Commissioner Molly Park containing discourteous language alleging that you have proof that Ms. Nunez-White helped an African American employee and implying she did so due to her also being African American, without any relationship or tether to your disciplinary case or lawsuit.

• On or about June 13, 2023, at approximately 8:37 AM you sent an email to Ms. NunezWhite, Mark Neal, Ms. Scalia, Stephen Dickerson, and Commissioner Park regarding a civil lawsuit you filed against Ms. DePrima. You allege the individuals included in the email of "conspiring to terminate my employment," when the Step I/Informal Conference for your disciplinary charges had not even been held.

• On or about June 29, 2023, at approximately 1:10 PM you sent an email to Ms. Scalia and Paul Ligresti accusing Ms. Scalia of unlawfully reading your email communications with other Agency staff. On or about June 29, 2023, at approximately 1:24 PM you sent a follow up email to Ms. Scalia and Mr. Ligresti alleging that reading your Agency emails, "is a criminal conduct."

(Specification III)

On or about June 22, 2023, at approximately 9:15 AM, you arrived at the 31st floor of 4 World Trade Center, located at 150 Greenwich St., New York, NY 10007 for an Informal Conference before ODA Hearing Officer Cindy Rivera. While sitting in the waiting area, you began to make inappropriate and offensive inquiries to the 31st floor receptionist Sherkia Boone about Office of Conflict Resolution Director Stephen Dickerson's race (which has nothing to do with your disciplinary charges) and whether he worked on that floor. Shortly after, you stopped Office of Conflict Resolution staff member Tyra Branch on her way to her work area and asked her if her name was Petal. When she responded "no" you proceeded to point to your hand with your finger while rubbing your hand and obnoxiously said, "Are you sure, because you look alike." Your hand gesture was inappropriate and offensive because

it implied that Ms. Branch and Ms. Petal looked alike due to their skin color.

(Specification IV)

### 165. False & retaliatory acts for exercising 1st Amendment in ODA No.: 1412014-03

On or about August 22, 2023 at 11:39 am, you wrote an email (Subject: "Recap of unlawful acts with my opinion") to Ann Marie Scalia, cc'ing Commissioner Molly Park, inappropriately making offensive and derogatory statements including:

o "In March of 2023, I communicated by email with Nunez-White regarding whether the write-up was in personal folder. Nunez-White acted dumb as though she did not know me. She enlisted Daniel Paul Korenstein as Nunez-White do not poses any legal knowledge."

o "Mr. Dickerson with prejudiced mind got his secretary and Ms. Boone (call forwarded) to lie making up outrageous excuse that Mr. Dickerson was on Ms. Boone's phone while she was talking with me."

o "Mr. Dickerson is Black and did not want to execute his duties as taxpayers expects."

o "Since Nunez-White has no legal knowledge, she contacted Ms. Scalia."

o "But Ms. Latimer-Jackson (unstable) needed a muscle man to harass and intimidate me. When the bodybuilder started stalking and harassing me, that created a criminal conduct (third degree harassment and conspiracy) by Cindy Rivera, Latimer-Jackson and the bodybuilder."

o "The hearing was a clown show: I had two unqualified, aggressive not too smart people (my opinion) just kept talking and talking making threats misbehaving and making comments that are legally and logically not possible."

(Specification I (C))

On or about July 20, 2023 at 11:35 am, you sent an email to OLA staff (Subject: "Name of secretary"), making inappropriate statements and baseless allegations concerning Office of Conflict Resolution Director, Stephen Dickerson, including:

o "Who hired Dickerson? Why is he still there misbehaving? Here is another thing: Mr. Dickerson is using his city time to see his private clients as a social worker. How is this allowed to happen, where taxpayers are paying for his personal gain?"

(Specification I (E))

On or about July 31, 2023 at 9:19 am, you wrote an email (Subject: "Stipulation"), including Ms. Scalia, and other OLA and ODA staff, making offensive statements including:

o "Upon information and belief, Mr. Korenstein is a very decent person. He is not in the same class as Nunez-White. As such, he should cut ties with Nunez-White who has no legal knowledge."

o "I advise everyone to cut ties with people like Nunez-White, Latimer-Jackson..."

o "Ms. Scalia, You are on the phone at the time I am sending this message."

o "I am also, requesting you to report Ms. Latimer-Jackson to the NYPD for having the muscle guy to annoy, harass & intimidate me on 6/22/23 making an outrageous allegation that I [approached] and threatened Sherkia Boone, that never happened. These individuals' employment must be terminated."

(Specification I (F))

On or about August 10, 2023, IREA Director of the Health Exchange Division, Venessa Faison, and Administrative Investigator I, Robin Annunziata, went to your office desk to serve you with a notice of disciplinary charges. 1 Ms. Faison introduced herself and Ms. Annunziata by name, title, division and asked you if they could speak with you in the conference room. Once in the conference room, Ms. Faison informed you that they were there to formally serve you with disciplinary charges in the absence of Division Director Robyn Battle. You then became noticeably irate and asked them to identify themselves again and began to question how they came into possession with the documents. As they repeated their titles and purpose in serving you, you then began making accusations against Ms. Faison, asking her why the documents were in an envelope other than the interoffice envelope and inappropriately accusing her of reading the documents which contained your business. Ms. Faison assured you she had not read

the documents. For the next 15 minutes, you continued to repetitively ask how they came into possession of the documents, the interoffice envelope and their identity. Following this, on or about August 24, 2023, you emailed Ms. Faison, inappropriately stating that she does not have your consent to share this communication with your Director, Robyn Battle. You also told Ms. Faison that since she is not a process server that, "Even assuming arguendo you are a director, it did not give you the right to approach me to serve legal documents. (Please see your job description.). I respectfully ask you never to approach me again." In addition, you falsely accused Ms. Annunziata of being aggressive and you described the interaction as an "altercation," stating, "You should not be filing any false accusations, as I have done nothing wrong. … You and your coworker will be a witness to altercations that you two initiated unlawfully stating that you were following orders from the legal department. (You two had no business of approaching me with a disciplinary notice.)." In an additional email, sent to Commissioner Park, OLA and ODA staff, on or about August 22, 2023, entitled, "Recap of unlawful acts with my opinion," you made inflammatory statements about Ms. Faison and Ms. Annunziata (described as "Jane Doe"), "I became feared for my safety as the two were unstable individuals that approached to carryout the orders that were given to them at any cost by the author of the email." In addition, in an email sent on or about September 26, 2023, at 8:57 am, you again described Ms. Faison and Ms. Annunziata as "unstable & aggressive."

Your communications were intimidating and unprofessional.

(Specification II)

On or about September 22, 2023, you submitted a written response to the Office of Disciplinary Affairs, entitled, "Respondent's Defense Pursuant to Civil Service Law Section 75-b," concerning your disciplinary charges identified by ODA Tracking No. 1412014-02, in which you made numerous false, baseless and derogatory accusations about other staff such as ODA Executive Director Dinorah Nunez White, OLA General Counsel Ann Marie Scalia, HRS Deputy Commissioner Mark Neal, ODA Assistant Director Charise Latimer-Jackson, and ODA Hearing Officer Cindy Rivera, including:

• "Nunez-White is a sociopath. First, she [tried] to enlist Daniel Paul Korenstein. Upon information and belief, Korenstein didn't want to take part in Nunez-White's unlawful acts." • "Then, she enlisted Mark Neal. Mark Neal is Black, so he agreed to get on

board with her unlawful acts. They both have a common interest: dislike of Asians, a likeness for Black and Hispanics, and enjoy engaging in unlawful acts."

• "Nunez-White and Scalia are street thugs who got around the system because of their race."

• "It took Nunez-White three years to pass the bar exam."

• "It appears that Nunez-White is using and demanding her supervisor Denise DePrima to commit the unlawful acts by inserting DePrima's name. This establishes conspiracy…"

• "DSS promotes unqualified Blacks and Hispanics like Latimer Jackson, Nunez-White and Cindy Rivera."

• "Neither Nunez-White, Rivera, nor DePrima know the law, just got jobs because of their race." • "Moreover, at the first hearing on 6/22/23, both Ms. Latimer-Jackson and Ms. Rivera made numerous incoherent comments, exhibited childish behavior, and acted like street thugs."

• "Goonewardena is assuming that she appears to be claiming violation of the chain of command for including General Counsel Scalia, and Mark Neal- the guy who only supports Blacks…"

• "Finally, Goonewardena asks Nunez-White, Scalia, & Rivera, 'Tell me something you can do better than me? I can do your job better than you, but you cannot perform better than me.' This is no longer a myth; it is a fact."

(Specification III)

From approximately September 2023 to approximately October 2023, you repeatedly emailed DSS Commissioner Park, General Counsel Ann Marie Scalia, FIA First Deputy Commissioner Jill Berry, during Agency work hours, as well as other ODA and OLA staff, making baseless and inappropriate allegations accusing ODA and OLA staff of committing "unlawful" and "criminal acts," described below.

• On or about October 27, 2023, at 10:45 am, you wrote an email with the subject, "ODA No: 1412014-2 is overdue," in which you stated, "My communications with the Commissioner, Deputy Commissioner Jill Berry and the General counsel, Scalia who is your supervisor are appropriate and it is my right. As such, I will

continue to inform them of the unlawful acts committed by Scalia & Nunez-White. ...Maybe Ms. Scalia should have thought about not committing the unlawful act (redacting my email) in the beginning."

• On or about October 27, 2023, at 11:13 am, you wrote an email with the subject, "ODA No: 1412014-2," in which you stated, "Ms. Scalia had been very careful throughout her career not leaving a paper trail (not sending emails, only by phone) of her unlawful acts until now."

• On or about October 24, 2023, you wrote an email with the subject, "Request the outcome of the second frivolous charges today" in which you stated, "This is criminal. Your office had already engaged in numerous criminal acts. This is not disputed. (Enlisting the lobby front desk supervisor to harass and intimidate me on 6/22/2023 while there were two FJC security persons were present and lying about sending the video footage of 6/22/23.)."

• On or about September 26, 2023, at 1:14 pm, you wrote an email with the subject, "Without waiving section 75 rights, I am not attending today's conference (ODA No: 1412014-2 as I fear for my safety," in which you stated, "Considering the criminal/unlawful acts you, Latimer-Jackson, Nunez-White and others committed against me in the past few months, I am sure you are going to proceed as you wish."

• On or about September 26, 2023, at 8:57 am, you wrote an email, "Without waiving section 75 rights, I am not attending today's conference (ODA No: 1412014-2 as I fear for my safety," in which you stated, "DSS is a criminal enterprise."

• On or about August 22, 2023, you wrote an email accusing General Counsel Ann Marie Scalia of altering emails to use as evidence against you, stating that she was committing a criminal act and that her law license should be suspended.

(Specification IV)

**166. False and Retaliatory acts for exercising 1st Amendment in ODA No.:1412014-4**

On or about September 22, 2023, you submitted a written response to the Office of Disciplinary Affairs(ODA) responding to disciplinary charges filed against you. In this written statement, you made false and unfounded allegations, and highly inappropriate and derogatory statements about numerous Agency

employees. The unprofessional, discourteous and derogatory statements are described below.

Page 4 of 12: "Every time Goonewardena listens to the recording the clown show happens in real time, Goonewardena could not stop laughing at the clown show: the threats and how unqualified Latimer-Jackson, Cindy Rivera, and the Bodybuilder harassing Goonewardena."

• Page 4 of 12: "Mark Neal is Black. His mission is to get black employees out of trouble. Glenn Parker is Black. Ms. DePrema [sic] was investigating Mr. Parker's misconduct. Mr. Neal Met with Glenn Parker on the 32nd floor and agreed to help Mr. Parker."

• Page 5 of 12: "Mr. Dickerson, with discriminatory intent abandoning his job as the conflict resolution officer, a social worker, refused to see Goonewardena. He courted various secretaries (recorded) to lie abandoning his job."

• Page 7 of 12: "For Denise DePrima and Nunez-White to enlist two unstable employees that consistently lied, misbehaved causing fear for Goonewardena's safety, is a serious violation."

(ODA No.: 1412014-05 Specification I)

167. Plaintiff was brought upon three sets of charges (ODA Nos 14102014-06, 07 &08) again on 8/7/2024 in retaliation for the harassment complaint he filed with the labor relations director Denise DePrima.

168. On or around July 8, 2024, Plaintiff filed a harassment complaint with the labor relations director Denise DePrima, against the Defendants for enlisting an outside bodybuilder to intimidate, harass, threaten and annoy Plaintiff when he appeared for step 1 hearing on June 22, 2023.

169. Defendant Denise DePrima in retaliation to the complaint, instead of investigating the criminal conduct by Charise Latimer-Jackson & Dinorah Nunez-White, Defendant DePrima conspired with Nunez-White to bring three new charges against the Plaintiff.

170.The Complaint Plaintiff filed with the labor relations director is a protected activity.

## *Gamarra, Nunez-White & Scalia violated CSL §75*

171.Mr. Gamarra violated CSL §75 &76 when he did not provide any documentation to the Plaintiff to prepare for the charges but he was eager to get his choice of union rep for the hearing:

> Q: Was -- was I given -- was I given any copies of what the allegations were or anything prior to this meeting?
> ALJ DAVIS: Was -- was -- Dr. Gamarra, was Mr. Goonewardena served with any formal charges or specifications in advance of the January 11th -- 2023 meeting, yes or no?
> MR. GAMARRA: No.
> ALJ DAVIS: Was there any requirement that Mr. Goonewardena be served with any formal disciplinary document or charges or specifications before this meeting on January, 11th, 2023, yes or no?
> MR. GAMARRA: No.
> ALJ DAVIS: Okay. Next question, Mr. Goonewardena.

(OATH Tr. 198:3-14).

## *Claim against Frank Pira, Caroline Hernandez & Alexander Stadnyk*

172.On March 8, 2024, Plaintiff filed a complaint with the Special Investigations Divisions Director Frank Pira for serious misconduct by Dinorah Nunez-White, Emily Tone-Hill, Paul Ligresti, Albert Gamarra, Maria Feliu, Stephen Dickerson & Daniel Korenstein. (Exhibit B.)

173.Plaintiff's communication with Defendant Pira is a protected activity.

174.Mr. Pira in retaliation for exposing serious misconduct by certain HRA

high-ranking employees decided to bring false charges against the Plaintiff. Also, because Pira himself clock in and out using his HRA cellphone not being present in the office.

175. Mr. Pira enlisted two of his colleagues- Caroline Hernandez & Alexander Stadnyk.

176.Upon information and belief, Mr. Pira scouted his loyal friends bypassing the civil service list & requirements to work in his department. The friend he harassed to join his department, Joe Acosta, only has an H.S. diploma.

177.Mr. Stadnyk sent a letter emailed to Plaintiff's director Robyn Battle in March of 2024, stating that Plaintiff must report for an interview to their office for misconduct and that Plaintiff was the target of the investigation.

178.The Plaintiff's director Robyn Battle printed the documents in front of the Plaintiff and served on the Plaintiff.

179.The Plaintiff's director sits next to the Plaintiff. Plaintiff saw when she was printing the documents, went back to her desk, and wrote on the envelope from and to and served on the Plaintiff. It is her handwriting on the envelope.

180.After back and forth, Plaintiff agreed with Defendant Stadnyk for a video phone interview on April 3, 2024.

181.The plaintiff recorded the entire interview.

182.During the conversation, Defendant Stadnyk called the Plaintiff "common man." Since throughout the conversation Plaintiff acted respectfully towards Defendant Hernandez and Stadnyk, Plaintiff asked, "What did you just call me? Man" Mr. Stadnyk replied, "Yes man."

Then Plaintiff said that he was ending the interview since Mr. Stadnyk was disrespectful. Ms. Hernandez throughout the interview was arguing with the Plaintiff.

183. After that interview, Plaintiff sent a copy of the audio recording of that interaction to Ms. Hernandez, Mr. Pira, DSS inspector General & Caroline Hernandez.

184. Shortly after that, Plaintiff's director – Robyn Battle, served disciplinary charges (the fifth set of charges) on Plaintiff that contained false statements that were drafted by Cindy Rivera and approved and vetted by Scalia, Tone-Hill, Ligreasti, Nunez-White, Mark George, and Latimer-Jackson at the direction of Defendant Pira.

185. Upon information and belief, the charges were emailed to the Plaintiff's deputy commissioner Sheronda Williams. Ms. Williams in return emailed it with special instructions to the plaintiff's director Robyn Battle to be served on the Plaintiff. This was the same process the Defendants used to serve Plaintiff on ODA Nos. 1412014-2 to 1412014-5.

186. The Plaintiff also received another copy of the disciplinary charges that contained false statements as an open document hand delivered by a process server by Nationwide Court Services just like the first set of charges – ODA No.: 1412014-01.

187. The charges and specifications, just like the other four sets of charges were unsigned.

188. On the fifth set of charges, the Defendants falsely accused Plaintiff:

> … you made inappropriate, discourteous comments as well as offensive, racially-based remarks to the SID investigators. Specifically, as the interview started, you unnecessarily made discourteous and unprofessional comments to SID Investigator Alexander Stadnyk by questioning the way he was dressed, making comments about the way he speaks, and calling his smiling during the interview "unprofessional."

(ODA No. 1412014-05, specification V).

189. The Charges state:

> When SID Senior Investigator Caroline Hernandez tried to explain that the notification on Outlook does not necessarily indicate whether someone is at work, you stated yelling, "Because she is Spanish! Because she is Spanish!" indicating that Ms. Hernandez was Defending Ms. Nunez-White because they are both Spanish.

(ODA No.: 1412014-05, Specification V).

190. The accusations are false. Plaintiff never made those comments. The entire interview was recorded. It is easily refutable.

191. The charges and specifications were served by two different people (Robyn Battle & process server at Nationwide Court Services), and have two different fonts, meaning it was drafted by two different people at two different times.

192. The accusations in ODA No. 1412014-05 are false.

193. These false statements were viewed by more than two different people in two different times.

194. These Defendants are dangerous criminals going/went fishing for employees to falsely accuse the Plaintiff because of Plaintiff's race, that he knows too much and for objecting to their unlawful conduct (ex. Clocking in and out without being present in the office for number of years not working required 7 hours).

195. In the process, they made mistakes, and they were caught on tape.

196. Defendants' diabolical acts caused injuries to the Plaintiff.

197. The Defendants' diabolical acts caused the Plaintiff severe emotional trauma.

198. Defendant Nunez-White stated at the OATH trial that Mark George was the coordinator at the ODA, is responsible for reviewing the false charges brought against the Plaintiff to move forward. As such, Defendant Mark George is responsible for the injuries Plaintiff suffered. Defendant Mark George was involved in all 8 sets of disciplinary charges.

### Stephen Dickerson

199. Defendant Stephen Dickerson is the conflict-resolution officer with the office of the ODA.

200. Defendant Denise DePrima contacted Mr. Dickerson on December 28, 2022, after listening to Plaintiff's harassment issues, to help the Plaintiff.

201. Upon information and belief, talking to others, Defendant Dickerson helps only white & African American employees.

202. Defendant Dickerson is a social worker.

203. Defendant Dickerson sent an email to Plaintiff stating that he was going to contact Plaintiff at 2:00 pm. He never contacted the Plaintiff. The plaintiff made numerous calls to his office to reach him.

204. Every time Plaintiff called Dickerson's office, different secretaries told unbelievable stories, the outrageous one being that Dickerson was on her phone while she was on the phone with Plaintiff. The problem with her story was that she only had one receiver.

205. These are not the smartest people on earth: not good liars.

206. At the OATH trial, Dickerson's secretary, Tyra Branch said that Defendant Dickerson told her to file a complaint with Defendant Nunez-White to bring the Plaintiff on charges.

207. On June 22, 2023, when Plaintiff was seated waiting for step 1 hearing,

Defendant Dickerson walked in front of Plaintiff staring at Plaintiff.

208.Defendant Dickerson for prejudice & hatred reasons, told his secretary Tyra Branch - who Plaintiff never met, filed a false accusation with Defendant Nunez-White.

209.Those false statements by Tyra Branch were used by Nunez-White in the second set of charges to bring Plaintiff on charges.

## *Unlawful conducts after Defendant Scalia was served*

210.Defendant Ann Scalia is the leader of squad five – Ann Scalia, Paul Ligresti, Dinorah Nunez-White, Mark Neal, and Jill Berry committed the unlawful acts against Plaintiff. To prove that Defendant Scalia was the one who made the final decisions, Plaintiff came up with a strategy to serve only Scalia and wait for a while to see how everyone was going to react.

211.Plaintiff's server served Scalia on 9/09/24. On Wednesday, September 10, 2024, at 10:00 am, the Squad five- Scalia, Berry, Ligresti, Neal, and Nunez-White were in a lengthy meeting on Teams. (When someone is in a Teams using an HRA device, the program Teams shows who is in the meeting) On September 10, 2024, and before that for months there were no issues in Plaintiff's department specifically with Director Robyn Battle and the immediate supervisor Tomica Paisley. On September 11, 2024, Director Robyn Battle went to the conference room behind our desks and was on the phone for hours. This was the first time Ms. Battle used the phone in that room not at her desk, other than the week when her computer hard drive crashed. Ms. Battle always used her phone and the computer at her desk. She sits behind the Plaintiff. The plaintiff hears her every conversation. We are all in an open area.

212. After September 11, 2024, Ms. Battle without informing anyone and consent, for the first time started recording meetings on Teams and conversations with the Plaintiff.

213. Only the Defendants knew that Plaintiff recorded conversations. Now, Defendant Scalia is telling Plaintiff's director and the supervisor to record conversation they have with the Plaintiff.

214. Ms. Battle and the Plaintiff bonded on the first day – March 13, 2023. We were good friends. We shared food, went to lunch twice, and exchanged various gifts. Plaintiff is the best worker in the department: Plaintiff is the go-to guy for tech issues, and anything related to work.

215. On September 27, 2024, Plaintiff put on record at the beginning of the Teams meeting to identify everyone in the conversation, as participants can listen unnoticed. This did not sit well with the immediate supervisor Tomica Paisley. She made various accusations, became hostile, indicated that she can record anyone that NY is a one-party consent, and denied that Teams Meetings were recorded.

216. The plaintiff told Ms. Paisley that a government employer cannot secretly record employees. When Ms. Paisley became our immediate supervisor, in September of 2023, she bragged that in her previous department under Defendant Ann Scalia in the HRA legal department, her team secretly recorded landlords. The Plaintiff told her that without consent or a warrant, the government cannot record private citizens. She said, "New York is a one-party consent and the HRA legal department approved the recording." Ms. Paisley was out on leave from September 2023 to April 2024; then she came back for about two weeks and has been working remotely on reasonable accommodation since then. Ms. Paisley is African American. Ms. Battle is African American.

217. Ms. Paisley's reasonable accommodation ended on August 30, 2024. Since she is

overweight, she still constantly out even though she has over negative 180 hours that needs to make up.

### *Harassment after Defendant Scalia was served*

218. The Plaintiff was in a training session on September 26, 2024. For the first time in one year and six months, Ms. Battle gets up occasionally and stares at the Plaintiff. One hour into the training session on 9/26/24 (Battle was not a participant), Ms. Battle called Plaintiff:

> Battle: Why are you not on camera
> Plaintiff: Because I don't want to
> Battle: You are supposed to be on camera.
> Plaintiff: The instructor sets the rules, she knows that I am not on camera, others not on camera and she is fine with it.

219. Since Ms. Battle was not in training, she had to look at Plaintiff's computer very carefully for a long period to figure out that Plaintiff was not using the camera. Ms. Battle has no authority to decide how the training sessions are conducted. The instructor does that. Now Ms. Battle at the Direction of Ann Scalia, is instigating and looking for reasons to write up Plaintiff.

220. As Plaintiff looked over his shoulder around 3:00 pm, Plaintiff noticed that Ms., Battle was standing up & just staring at Plaintiff. After a few minutes, she sat down and left her desk most likely to consult with her supervisor, the BFI department Deputy Commissioner, and Ms. Battle's friend Sheronda Williams. Ms. Battle came back around 3:45 and left for the day early. She did not report to work on Friday, September 27, 2024. Ms. Battle always informed her whereabouts to the Plaintiff, including if she was going to be out since we were good friends and trusted each other. Also, Plaintiff does the daily report as he is the most trusted and reliable employee.

### *More retaliation discriminatory acts*

221. The Plaintiff was scheduled, approved by Ms. Paisley, to attend a conference on

10/8/24 at 4 World Trade Center. On 9/20/24, after Plaintiff's appearance for the conference was approved by Plaintiff's supervisor Tomica Paisley, Defendant Scalia with discriminatory intent blocked Plaintiff from attending the conference: Ms. Battle told Plaintiff on 9/20/24, "Prasanna they are saying you can't attend the conference on 10/8/24." The plaintiff said, "Who is telling you?" Ms. Battle replied, "You know I can't tell you that."

222. Now this court has evidence of harassment and retaliation orchestrated by Scalia after she was served. These are not conclusory accusations against the Defendants, specifically Scalia, it is factual evidence based on documents.


## Defendants are accessing Plaintiff's computer

223. Defendant Scalia and Jill Berry are monitoring Plaintiff's activities on the computer and now through other employees. They are constantly accessing Plaintiff's computer. Defendants Alexander Stadnyk and Caroline Hernandez said in a recorded conversation, "We accessed your computer." This puts Plaintiff in a dangerous situation: Defendants can delete Plaintiff's work and claim that Plaintiff is not doing his work and can send emails using Plaintiff's Outlook account then accuse Plaintiff of sending threatening emails. The plaintiff fears for his safety. These Defendants are dangerous criminals.

224. After the Colon debacle in 2019, there was a shakeup at the executive level. The previous General Counsel was let go and Defendant Scalia became the General Counsel. Defendant Scalia is not a good legal mind. Just a person with a law license. She does not leave a paper trail. She does not send emails. All her communications are over the phone and on Teams. The plaintiff's supervisor Ms. Paisley told this to us. Ms. Paisley's old department was with the HRA legal department.

## Misconduct by Scalia and the defense attorney

225. Defendant Scalia was served putting her on notice on September 9, 2024. She retained the NYC Corporate Counsel to defend her. By law, she was supposed to cease any & participating in any conspiracy against the Plaintiff. All communications must be through Ms. Damera. Since Scalia was so upset that she is being sued, she could not stay away from conspiring against the Plaintiff.

## September 30, 2024, unlawful act

226. On September 30, 2024, Plaintiff called his immediate supervisor Tomica Paisley on her work cell to inform her that Plaintiff put his excuse absence from work to attend the October 8, 2024, conference at 4 World Trade Center that she approved, and that if she could sign off on that. Ms. Paisley said, "I'll get back to you on that later." The conversation was recorded, as all Plaintiff's conversations. At around 10:30 am, Ms. Paisley, Ms. Robin Battle – Plaintiff's director, Defendant Ann Scalia, Jill Berry deputy commissioner, and Demon O'Donnell were all in a meeting on Teams until 11:30 am. Right after that meeting at 11:39 am, Ms. Paisley sent Plaintiff an email stating that Plaintiff could not attend the October 8, 2024, conference as Plaintiff was not selected. The problem: there is no selection process for the conference. It is for everyone.

227. Plaintiff responded to Ms. Paisley's email at 11:59 asking for proof that Plaintiff was not selected to attend the conference. As of today, Ms. Paisley has not responded with evidence. At noon, on September 30, 2024, Plaintiff called Ms. Paisley on her work cell since she was working from home every Thursday and Friday and told her that Plaintiff knew that she was on a meeting on Teams until 11:30 am. Ms. Paisley did not deny about the meeting on

Teams. She asked Plaintiff if Plaintiff knew who was at the meeting. When asked about the meeting and who told her that Plaintiff was not selected to attend the October 8, 2024, conference, Ms. Paisley said, "I am not going answer any questions about the meeting and anything related to the conference." The plaintiff recorded the conversation. Now Plaintiff has undisputed evidence against Scalia & Jill Berry of conspiracy, aiding and abetting, selective enforcement, and clear unlawful acts caught on tape.

228. Since Plaintiff was approved to attend the conference and on the list as a guest, on September 19, 2024, Plaintiff received the notice to attend the Wellness Conference on October 8, 2024. The plaintiff was looking forward to attending the conference. The Plaintiff was not allowed to attend the conference. The Defendants' act caused injury to the Plaintiff.

229. The two that were involved in conspiracy, aiding and abetting after September 9, 2024, are Scalia & Jill Berry.

### Defendant Scalia should not be involved in anything related to Plaintiff

230. Ann Scalia is a defendant represented by counsel. By law, she should not be involved in any act related to Plaintiff. Defendant Scalia is an arrogant inexperienced lawyer. No one sues or disrespects Scalia. Defendant Scalia calls all the shots including termination of employments at DSS. While there are other lawyers at DSS, Robyn Battle & Tomica Paisley turned to Scalia for advice since she calls all the shots. The problem here is that since she is a defendant, she should not have been involved in the September 30, 2024, meeting. Defendant Scalia should not have been at that meeting giving unlawful advice to Plaintiff's director Robyn Battle & Tomica Paisley. The Plaintiff does not know if the defense attorney Ms. Shivani Damera

was in that meeting. If she was, she must be investigated and sanctioned. The plaintiff wrote to Ms. Damera on October 3 & 4 of 2024.

231. It is undisputed that Scalia and the other two of the Squad 5 (Jill Berry & Mark Neal) were in a meeting on Teams with Plaintiff's immediate supervisor Tomica Paisley and director Robyn Battle on 9/30/2024 because the defense attorney Ms. Damera never denied or disputed at the conference on 10/18/2024. Her silence was an admission. If it looks like a duck, swims like a duck, and quacks like a duck, then it probably is a duck.

232. Ms. Damera claimed at the October 18, 2024, conference that Plaintiff's claim i barred for appearing at OATH trial. This disturbing & frivolous argument by the defense attorney going on a fishing expedition, must be rejected *sue sponte* by both chambers to avoid further emotional trauma and monetary expenditure to the Plaintiff.

233. The Defendants violated the Civil Rights Act of 1964 Title VIII as described, *supra*.

234. Termination of Plaintiff's employment is not a requirement to succeed in the claims Plaintiff listed, *infra*. Moreover, Defendants repeatedly asked Plaintiff's resignation and took steps requesting Plaintiff's termination on 4 sets of charges at OATH, Defendants terminated the Plaintiff. And on the other four sets of charges, defendants recommended Plaintiff's termination. This is evidence that substitute termination as the Defendants actively took steps to terminate the Plaintiff.

## First claim for relief:
## Race and Ancestry Discrimination in violation of
## 42 U.S.C. Section 1981 pursuant to Section 1983

235. Plaintiff realleges and incorporates by reference each and every allegation

contained in paragraphs 1 to 234 as if fully set forth herein.

**236.** For the standard required for the 12 (b) (6) motion was taken directly from Colon case 19 CV 10435. As such, all rulings in this case must follow the Colon case & Jim Trotter claim.

237. Defendants subjected Plaintiff to differential terms and conditions of employment because of his race and ancestry and violated Plaintiff's rights under Section 1981 and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution pursuant to Section 1983.

238. The charges were unsigned.

239. Specifically, Plaintiff was subjected to adverse employment actions, including: (i) accusing Plaintiff falsely; (ii) Being brought up on false disciplinary charges, unlike Hispanics, whites, and blacks. (iii) created a hostile work environment by serving five frivolous sets of charges that contained false accusations and accusations that were not legally actionable to Plaintiff's director and others.

240. Defendants took the above actions to deprive Plaintiff of equal employment opportunities and other contractual opportunities on account of his race and ancestry.

241. None of the Defendants were involved in hiring and working with Plaintiff every day just violating his rights including liberty interests for prejudiced reasons. Because of Defendants' willful and deliberate actions, and as a proximate cause thereof, Plaintiff has been denied his right to equal employment opportunity in violation of Section 1981 pursuant to 1983.

## Section 1983 & 1981 claims

242. Section 1981 "outlaws discrimination with respect to the enjoyment of benefits,

privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida*, N.Y., 375 F.3d 206, 224 (2d Cir. 2004); see also 42 U.S.C. § 1981(a). Section 1983 – which is not "a source of substantive rights" – "provides a method for vindicating. Federal rights elsewhere conferred, such as those conferred . . . by § 1981." Patterson, 375 F. 3d at 225 (citations and quotation marks omitted); see id. (explaining that § 1983 "allows an action at law against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" (quoting 42 U.S.C. § 1983)).

243. "'[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'" *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (quoting *Jett v. Dallas Indp. Sch. Dist.*, 491 U.S. 701, 733 (1989)) (emphasis in original); see also id. at 620-21 ("Because § 1983 already provides a remedy against state actors, there is no reason to infer from the rights-conferring language of § 1981(c) that it creates an additional, and duplicative, remedy. . . . We . . . therefore join nine of our sister Circuits in concluding that § 1981 does not provide a separate private right of action against state actors."). Employment discrimination claims and retaliation claims brought pursuant to § 1983 are analyzed under the *McDonnell Douglas* framework. *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 575 (S.D.N.Y. 2011); *Radice v. Eastport S. Manor Cent. Sch. Dist.*, 437 F. Supp. 3d 198, 209 (E.D.N.Y. 2020); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (Colon at p. 16.)

244. Section 1983 Discrimination Claim to state a claim for employment discrimination under Section 1983, a plaintiff must allege that the defendants "(1) act[ed] under color of state law, and (2) . . . [that their] conduct deprived [the plaintiff] of a constitutional or a federal statutory right." Bermudez v. City of New York, 783 F. Supp. 2d at 575; see also *Harris v. Westchester Cnty. Dep't of Corr.*, No. 06 CIV. 2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) ("to state a claim for damages under Section 1983, the plaintiff must allege sufficient facts to demonstrate that defendants were personally or directly involved in the violation, that is, that there was personal participation by one who had knowledge of the facts that rendered the conduct illegal" (citation, quotation marks, and alteration marks omitted)).

245. It is not disputed that Plaintiff was treated differently than Blacks, Hispanics, and Whites, where Blacks & Hispanics sexually harassed women were promoted, unqualified to do the assigned job, given pay races, does not even work (Michael Laidlaw, Gary Jenkins Defendant Dinorah Nunez-White, Defendant Eric Smalls, Defendant Stephen Dickerson, Defendant Tyra Branch and the rest of the Defendants).


## Second claim for relief:
## Selective Enforcement under the equal protection clause
## Of the 14th Amendment

246. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 245 as if fully set forth herein.


247. The Equal Protection Clause of the Fourteenth Amended provides "that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To establish a selective enforcement claim, a plaintiff, ordinally, must show:

"(1) that [he], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004) (citation and alteration marks omitted). "In short, a plaintiff must allege that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination," and "[t]o be similarly situated," means that "the individuals with whom [the plaintiff] attempts to compare [himself] must be similarly situated in all material respects." *Cook v. Dubois*, No. 19-CV-8317 (CS), 2021 WL 91293, at *6 (S.D.N.Y. Jan. 11, 2021) (citations and quotation marks omitted).

## Municipal liability

248.    In prose cases, Judges in this Court had ruled there is no claim against the agency for the individual defendants' actions. That is not correct.

249.    If a person in charge of having decision powers terminates the Plaintiff, that triggers a claim against the agency. Since Plaintiff is still employed, he does not have a claim against the DSS. Also, Plaintiff has no evidence that commissioner Molly Park was involved in any of unlawful acts against the Plaintiff.

250. Plaintiff adequately pled the existence of a "mosaic" of intentional discrimination when the (i)Defendants constantly harassed Plaintiff by serving five disciplinary charges that contain false allegations; (ii) EEO officer Eric Smalls (black race) retaliated by making false accusations on a conversation pursuant to the complaint Plaintiff filed with the EEO office which is a protected to the Executive Director of Office of Disciplinary affairs Dinorah Nunez-White to bring Plaintiff on charges, *supra*, and the labor relations director – Denise Deprima referring to EEO office to bring charges against the Plaintiff for making a

complaint with her office on the confidential (protected activity) information Ms. DePrima

(white) obtained which is not even a violation; and the conflict resolution office Stephen

Dickerson (black race)- solicited his assistant Tyra Branch to make an outrageous false

accusation to Dinorah Nunez-White to bring Plaintiff upon charges. Plaintiff was single-

handedly targeted by blacks, Hispanics and whites.

### Third claim for relief:
### Discrimination under NYCHRL
(Race and Ancestry Discrimination under the NYCHRL)

251.Plaintiff realleges and incorporates by reference each and every allegation

contained in paragraphs 1 to 250 as if fully set forth herein.

252.Under the NYCHRL, courts must apply a more liberal standard than that applied

under other federal and state anti-discrimination statutes. See *Loeffler v. Staten Island Univ.*

*Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); *Bermudez*, 783 F. Supp. 2d at 592. "[C]ourts must

analyze NYCHRL claims separately and independently from any federal and state law claims";

"even if the challenged conduct is not actionable under federal and state law, federal courts must

consider separately whether it is actionable under the broader New York City standards."

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Under the

NYCHRL, a plaintiff need only prove "by a preponderance of the evidence that [he] has been

treated less well than other employees because of [his race and ancestry].

253.At all relevant times, Plaintiff was an "employee" within the meaning of the

NYCHRL.

254.By adversely affecting the terms, conditions, and privileges of Plaintiff's

employment because of his race and ancestry, Defendants violated the NYCHRL.

255.It is not disputed that Defendant – Emily Tone-Hill (white race) at the

employment law division at the advice of her superior General Counsel Ann Scalia (white race) & Paul Ligresti(white race) who did not hire the Plaintiff nor did they evaluate the Plaintiff's performance requested resignation from the plaintiff twice. Then again, conspired with the ODA step 1 hearing officer Cindy Rivera violating CSL § 75, that Ms. Emily Tone Hill requested the termination on the fifth set of charges even before the step 1 hearing.

256. The Plaintiff spent thousands of dollars fighting five sets of false, frivolous disciplinary charges leveled against Plaintiff for filing a complaint with labor relations and the EEO office.

257. The fact that the Defendants terminated Plaintiff's immediate supervisor – Andrei Singh, who is South Asian, is more proof that DSS discriminated against South Asians.

258. Because of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $500,000.00.

### Fourth claim for relief:
### AGAINST ALL DEFENDANTS
### (Race and Ancestry Discrimination under the NYSHRL)

259. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 258 as if fully set forth herein.

260. At all relevant times, Plaintiff was an "employee" within the meaning of the NYSHRL.

261. By adversely affecting the terms, conditions, and privileges of Plaintiff's employment because of his race and ancestry, Defendants violated the New York State Human Rights Law.

262. Because of the foregoing, Plaintiff has suffered loss and damage in an amount to

be determined at trial but estimated to be no less than $500,000.00.

### Fifth claim for relief:
### AGAINST ALL DEFENDANTS
### (Retaliation in Violation of NYSHRL)

263. Plaintiff realleges and incorporates by reference each and every allegation

contained in paragraphs 1 to 262 as if fully set forth herein.

264. Defendants above conduct was in retaliation for Plaintiff's complaints of

discrimination to the EEO office, labor relations department, Special Investigations division and

the DSS Commissioner Molly Park asking the individual Defendants' employment to be

terminated and violating Plaintiff's rights under the NYSHRL.

265. As of today, Labor Relations Director Denise DePrima even attempted to

investigate the criminal conduct by the Defendant Charise Latimer-Jacksom, Ann Scalia, Emily

Tone-Hill, Paul Ligresti, and Dinorah Nunez-White for enlisting an outside bodybuilder on June

22, 2023, when Plaintiff appeared for the step 1 hearing. Charise Latimer-Jackson stated at the

hearing (recorded) that she enlisted the bodybuilder because the secretary Sherkia Boone stated

that Plaintiff threatened her. Ms. Boone testified after the recording was played at trial that

Plaintiff did not threaten her as there were no threats recorded on the recording.

266. The various actions Defendants took against Plaintiff after he complained of

discrimination constitutes unlawful retaliation in violation of the NYSHRL.

267. Because of the foregoing, Plaintiff has suffered loss financially, emotional

trauma and damage in an amount to be determined at trial but estimated to be no less than

$100,000.00.

## Sixth claim for relief:
## AGAINST ALL DEFENDANTS
## (Retaliation in Violation of NYCHRL)

268. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 267 as if fully set forth herein.

269. Defendants above conduct was retaliation for Plaintiff's complaints of discrimination to the EEO office & labor relations department and violated Plaintiff's rights under the NYCHRL.

270. All the various actions Defendants took against Plaintiff after he complained of unlawful discrimination to the EEO office, labor relations, and special investigations division for constituting unlawful retaliation in violation of the NYCHRL.

271. By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $500,000.00.

## Seventh claim for relief:
## Conspiracy based on personal interest
## Section 1983

272. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 271 as if fully set forth herein.

**273.  It is not disputed based on** documentary evidence & audio recordings (email & trial transcript) each of these individual Defendants in different departments (EEO, Labor Relations, the Law Department & the ODA) conspired to violate Plaintiff's right violating

Plaintiff's right to enjoy goods and services DSS has to offer because of Plaintiff's race, color, and ancestry.

274. Under the "personal stake" exception, ~~the doctrine does not apply when~~ the *can be held liable as* alleged conspirators are motivated by an improper personal interest separate and apart from that of their principal." (collecting cases). As this Court has previously recognized, various courts in this district have applied the doctrine to § 1983 claims.

### Eighth claim for relief:
### U.S. Constitution 14th Amendment due process claim

275. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 274 as if fully set forth herein.

#### *Harassment and retaliation*

276. Defendants violated Liberty and property interests in discrimination-, harassment-, and retaliation-free workplace.

277. The plaintiff was brought upon three sets of charges in retaliation to the harassment complaint he filed with the labor relations director Denise DePrima.

278.     The Plaintiff was brought upon charges falsely accusing the Plaintiff in retaliation for filing a discrimination complaint with the EEO office.

279. The complaint with the labor relations director Denise DePrima & the EEO office was a protected activity.

280. Defendants retaliated against the Plaintiff for engaging in a protected activity.

281. Defendants violated Liberty interest in practicing Plaintiff's profession without stigma imposed by state officials to her "good name and reputation"

282. Courts in this circuit have recognized procedural due process claims where the

plaintiff was deprived of procedural due process as a result of retaliatory actions. See, e.g.,

*Parra v. Fischer,* No. 11-cv-6518, 2012 WL 3069952, at *5 (W.D.N.Y. July 27, 2012) (providing

false testimony against an inmate motivated by desire to retaliate against inmate's exercise of

substantive constitutional rights constitutes due process violation where inmate is denied

procedural protections allowing him to clear his name); *Williams v. Foote,* No. 08-cv-2838, 2009

WL 1520029, at *11 (C.D. Cal. May 28, 2009) (finding plaintiff was not afforded due process

where a false disciplinary report was filed against him in retaliation for plaintiff exercising a

constitutional right and he was deprived of procedural due process in connection with the

proceedings flowing from the false report, resulting in the deprivation of a cognizable liberty

interest). Moreover, Plaintiff claims here also that cognizable liberty or property interest is the

right to a retaliation-free workplace.

283.Currently, under due process, Plaintiff does not have a claim for loss of property

interest claim since he is still employed.

## Ninth claim for relief:
## Liberty interest-stigma plus claim

284.Plaintiff realleges and incorporates by reference each and every allegation

contained in paragraphs 1 to 283 as if fully set forth herein.

285.A "stigma plus" claim requires that the plaintiff allege "(1) the utterance of a

statement about her that is injurious to her reputation, that is capable of being proved false, and

that . . . she claims is false, and (2) some tangible and material state-imposed burden." *Velez v.*

*Levy,* 401 F.3d 75, 87 (2d Cir. 2005) (internal citation and quotation marks omitted). The Second

Circuit has recognized that "[w]hile there is no 'rigid requirement [] that both the 'stigma' and

the 'plus' must issue from the same government actor or at the same time, 'they must be

sufficiently proximate.'" *Mudge v. Zugalla*, 939 F.3d 72, 80 (2d Cir. 2019) (quoting *Velez*, 401

F.3d at 89). This requirement is satisfied where "(1) the stigma and plus would, to a reasonable

observer, appear connected . . . and (2) the actor imposing the plus adopted (explicitly or

implicitly) those statements in doing so." Velez, 401 F.3d at 89.


286. Defendant Tyra Branch who Plaintiff never met falsely stated, " Shortly after, you

stopped Office of Conflict Resolution staff member Tyra Branch on her way to her work area and

asked her if her name was Petal. When she responded no you proceeded to point to your hand

with your finger while rubbing your hand and obnoxiously said, ' Are you sure, because you look

alike. Your hand gesture was inappropriate and offensive because it implies that Ms. Branch and

Petal Looked alike due to their skin color.'" The plaintiff never met the individual named Petal &

Tyra Branch prior to OATH trial. The Plaintiff met them for the first time at trial. Ms. Petal

Harlow confirmed that at trial.

287. Ms. Branch testified: that this alleged encounter happened before 10 am as she was

entering the front area. The problem is that she was not on the video footage from 9:00 am to

11:31 am when Plaintiff entered and left the 31st floor. The only people captured on video were

the bodybuilder, the Plaintiff, Sherkia Boone, FJC security person, Stephen Dickerson, and the

union representative.

288. Ms. Branch, however, stated that her supervisor, Stephen Dickerson, told her to

put the false statements in writing to Nunez-White to bring the Plaintiff on charges.

289. She covered her tracks by not signing and notarizing the note so it would not be in

an acceptable form. Ms. Branch acknowledged that the notary April Hill – who notarizes papers

for the HRA employees was on the floor.

## Tenth claim for relief: Defamation

290. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 289 as if fully set forth herein.

291. A defamatory statement is one that exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induces an evil opinion of one in the minds of right-thinking persons.

292. The false statements by Tyra Branch, Dinorah Nunez-White, Ann Scalia, Eric Smalls, Caroline Hernandez & Alexander Stadnyk - at the direction of Frank Pira, on the five sets of specifications and charges were emailed to Plaintiff's director and the deputy commissioner by email, publishing them in their database to be served on the Plaintiff.

293. ODA Nos,: 1412014-01 & 05 were emailed to Nationwide Court Services representative Hector Pacheco by email. Mr. Pacheco in return printed the documents that contained false statements, read and gave them to a process server to serve on the plaintiff. The documents were carried by a process server as an open document - not in an envelope and given to a visitor- Soraya Azra who was in Plaintiff's house. The visitor- Ms. Azra confirmed that she had read the documents and put them by Plaintiff's door. The visitor said, "I can't believe that these people did not put the documents in an envelope."

294. ~~Anworthage~~ ^(I December 2023) Plaintiff's director Robyn Battle told Plaintiff, "I know you. I don't believe what they are saying. I want to keep my team together. I hope OATH dismisses all charges."

295. The evidence shows that Plaintiff's director Robyn Battle and his deputy commissioner, Sheronda Williams read and were trying to figure out what to make out of the Defendant's accusations. They read, printed, and served the charges on the Plaintiff.

296. The documents were and still are published & saved at Hector Pacheco's at Nation Wide Court Services, Sheronda Williams' and Robyn Battles' computers.

297. The toothpaste is out of the tube, there is no way to put it back in the tube.

298. Now the Defendants must pay the Plaintiff damages for the injuries they caused on the Plaintiff.

## Eleventh claim for relief:
## Conspiracy Libel

299. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 298 as if fully set forth herein.

300. The Defendants conspired with each other by making false statements against the Plaintiff to cause injuries to the Plaintiff.

## Twelfth claim for relief:
## Garden variety emotional distress

301. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 300 as if fully set forth herein.

302. The Plaintiff is traumatized by the harassment by the Defendants. They served not one, not two 8 frivolous sets of charges that contained false statements delivered to various individuals by email.

303. Defendants' actions affected Plaintiff's work and his personal life causing emotional trauma. (Plaintiff's life is devoted to taking care of his very sick and elderly parents. Defendants' unlawful acts disrupted Plaintiff's ability to take care of his parents.

304. Defendants destroyed Plaintiff's blended family (current director & coworkers) causing tensions and chemistry. It is too late ss the damages cannot be undone.

305. Plaintiff throughout his life had given money, his breakfast, and dinner to African

American & Hispanic homeless people. Then came Margo Brodie and the Defendants.

306.    The plaintiff is claiming garden variety emotional distress instead of intention infliction of emotional distress so the Defendants will not be able to go on a fishing expedition going through years Plaintiff's medical records.

### Thirteenth claim for relief:
### U.S. Constitution 1st Amendment retaliation

307. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 306 as if fully set forth herein

308. The Plaintiff was retaliated for the comments he made exercising the U.S. Constitution 1st Amendment in defending the charges. The comments are privileged as they were made to defend the disciplinary charges.

## Fourteenth Claim for Relief:
## Section 1981 retaliation claim

309. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 308 as if fully set forth herein.

310. To bring a Section 1981 retaliation claim, which is analyzed under the same principles as a Title VII retaliation claim, plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315–16 (2d Cir. 2015) (internal quotation marks omitted). See also, *Trotter v. NFL*, 23-cv-08055 (JSR) (S.D.N.Y. Docket # 35)

311. The Defendants retaliated against the Plaintiff for filing two harassment complaints

(one in criminal nature) with the labor relations director Denise DePrima and one discrimination complaint with the EEO office.

312. This is undisputed evidence.

## Fifteenth claim relief: Negligence
### against the city of New York
### for retention, hiring, training & supervision

313. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 312 as if fully set forth herein

314. It is not disputed based on the factual evidence that the defendants do not possess the knowledge to execute the work they are assigned to do. The only reason the Defendants were hired and promoted was because of their race & color.

315. The City Corporate Counsel is aware, probably participated in the conspiracy with Ann Scalia, Jill Berry and others participated in a meeting on Teams on 9/30/24 after the city of New York and Ann Scala was served on 9/9/24 to further harass the Plaintiff.

316. Instead of ceasing any further harassment against the Plaintiff, Defendants decided to double down on the Plaintiff. (See 9/30/24 meeting pertains to the Plaintiff and other acts.)

317. There was another meeting on Teams on 10/25/24, that including the four members of Squad 5- Scalia, Berry, Mark Neal, Nunez-White with Plaintiff's director Robyn Battle from 1 pm to 2:30 pm. The Plaintiff does not have evidence yet that anyone from the cooperate counsel's office were present.

318. The Defendant city of New York is responsible for employing the unethical, criminals like the Defendants at DSS that caused injuries to the Plaintiff.

319. The 9/30/24 and the 10/25/24 meeting were the last straw. The Defendant City of

New York is responsible for the Defendants' unlawful acts.

320. The city of New York is responsible for the unlawful acts that DSS continues to employ unethical & unqualified (does not possess necessary knowledge in their respective field) employees like Eric Smalls, Dinorah Nunez-White, Ann Scalia, Jill Berry, Paul Ligresti, Emily Tone-Hill, Charise Latimer-Jackson, Petal Harlow & Cindy Rivera got the job because of their race.

## Sixteenth Claim for Relief:
## Aiding Abetting under NYHRL

321. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 320 as if fully set forth herein

322. The Defendants' action serving 8 frivolous charges that contained utterly false accusations in a span of over a year and a half with the cooperation of numerous low-level employees, then again conspiring on 9/30/24, to deny Plaintiff's right to attend a conference that was already approved by Plaintiff's supervisor Tomica Paisley, the Defendants aided and abetted with others to inflict injuries on the Plaintiff.

323. It is the employer's participation in the discriminatory practice that serves as the predicate for the imposition of liability on others for aiding and abetting. Thus, the Plaintiff properly stated a cause of action against the co-employees under [HRL] § 296(6). *Murphy v. ERA United Realty,* 674 N.Y.S.2d 415, 417 (2nd Dep't 1998).

## Seventeenth Claim for Relief:
## Aiding Abetting under NYCHRL

324. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 323 as if fully set forth herein

325. Based on the evidence listed, *supra,* the Defendants must be held liable for aiding

and abetting under NYCHRL.

<strong>Eighteenth Claim for relief:<br>Hostile work environment under<br>NYCHRL & NYSHRL</strong>

326.Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 325 as if fully set forth herein

327. Plaintiff does not have a claim for hostile work environment under federal law; but he has a claim under NYCHRL & NYSHRL.

328.Forensic psychologists will say that for the Defendants, Plaintiff was their Property. Their sociopathic behavior took over when they lost control of the Plaintiff. The Defendants decided to hit Plaintiff with false accusations like a tornado – one after another – 8 sets; then they ran into a problem later when they found out that they were taped. Defendants are sociopaths – even after they were sued, still could not stop the sociopathic behavior, because in their mind, they feel that they are untouchable.

329.This court must not assist the Defendants any further.

330.Ann Scalia & Jill Berry are ticking time bomb: Furious that they are being controlled by a South Asian immigrant.

### *Qualified immunity*

331.The Defendants do not enjoy the only immunity city officials afford - qualified immunity as the Defendant's actions were not a one-time act but rather several in a span of more than a year and a half serving eight sets of disciplinary charges that contained false accusations that established retaliation and discriminatory intents with malice. Also, the final straw was the 9/30/24 conduct by Jill Berry and Ann Scalia, *supra*, and the 10/25/24 meeting with the Plaintiff's director Robyn Battle.

### Prayer for relief

**332. The plaintiff requests** compensatory damages in the amount of five hundred thousand dollars ($500,000.00)

**333.** Plaintiff requests punitive damages in the amount of five hundred thousand dollars ($500,000.00);

**334.** Emotional damages in the amount of five hundred thousand dollars ($500,000.00);

**335.** And any other relief this court may deem and proper.

Dated: October  29,  2024
New York, NY

Respectfully submitted,

Prasanna Goonewardena

# EXHIBIT A

# BRONX JUSTICE NEWS

OUR MISSION    ARCHIVE    POLICIES    CONTACT US

## Exclusive: The Head of Human Resources for NYC Social Services Was Allowed To Resign After Groping, Sexually Harassing Assistant

April 4, 2019    Kevin Deutsch    Lawsuits    1

SEARCH …

MOST POPULAR STORIES



### The Bronx Lags in COVID Vaccinations: Data
May 30, 2021    0



### Remote Learning to End in NYC Schools This Fall
May 24, 2021    0



### CDC Approves Use of COVID Vaccines for Kids 12 to 15
May 12, 2021    0



### Bronx Man Charged with Anti-Asian Hate Crime



April 19, 2021 ⊙ 0



**COVID Vaccines Being Sent to Bronx Colleges**
⊙ April 12, 2021 ☐ 0



Pictured: Michael Laidlaw, formerly the Executive Deputy Commissioner of DSS' Office of Staff Resources – effectively the head of human resources – groped his assistant Jacqueline Torres at a work event and sexually harassed her, investigators found. Credit: LinkedIn

By Kevin Deutsch

kdeutsch@bronxjusticenews.com

The head of Human Resources for the city's Department of Social Services was allowed to resign quietly after investigators substantiated a claim that he groped his assistant at a work event and sexually harassed her, *Bronx Justice News* has learned.

Michael Laidlaw, formerly the Executive Deputy Commissioner of DSS' Office of Staff Resources, grabbed Special Assistant Jacqueline Torres' buttocks at an off-site office gathering in March 2016 as part of his pattern of harassment against her, city investigators found.

The Equal Employment Opportunity complaints filed by Torres that month were "swiftly investigated and substantiated" by DDS, an agency official with knowledge of the probe said.

In August 2016, the agency began a process that would have led to Laidlaw's firing, the official said.

Instead, Laidlaw resigned quietly with no public announcement made about the groping incident or harassment at the nation's largest social

Laidlaw is not alone – several other city employees have been pushed out of their jobs in recent years following substantiated sexual harassment claims, without the reasons for their departures being publicly disclosed by the city.

Laidlaw's exit from one of DSS' top positions was first reported by *Bronx Justice News* Tuesday, after Torres filed a sexual harassment lawsuit in Bronx Supreme Court seeking damages from the city as well as Laidlaw. Laidlaw's departure from the agency, and the substantiated groping and harassment claims against him, had not previously been made public.

"There is no place for harassment of any kind in our City," Social Services Spokesman Isaac McGinn said. "We take concerns like this very seriously, investigate thoroughly, and moved to terminate Mr. Laidlaw upon substantiating the complaints in this case. Mr. Laidlaw resigned under threat of termination."



*Pictured: Jacqueline Torres is suing the city's Department of Social Services and former Executive Deputy Commissioner Michael Laidlaw, who city investigators confirmed groped her at a work event. Her suit alleges that a "culture of sexual harassment" exists within the agency. Credit: LinkedIn.*

DSS is comprised of the administrative units of the NYC Human Resources Administration and the Department of Homeless Services. It oversees most of the city's social service programs.

harassment" exists within the agency.

At the event where Laidlaw grabbed her, he also "danced inappropriately with a subordinate" while DSS executives stood by laughing, the suit states.

One of those executives was Gary Jenkins, now the First Deputy Commissioner for the city's Human Resources Administration, who Torres says told her, "Go get your boss. It is your job to keep him out of trouble," before he broke into laughter, the suit alleges.

The other official was Tom Colon, Deputy Commissioner for the Office of Staff Resources, Torres said.

Both Jenkins and Colon previously had multiple sexual harassment complaints filed against them, but DSS "did nothing to stop their behavior," and even gave them pay increases, Torres claims in her suit.

Both men were seen on video at the off-site event laughing at Laidlaw's inappropriate behavior, the suit alleges.

Efforts to reach Laidlaw, Jenkins, and Colon for response to the lawsuit were unsuccessful.

The DSS official with knowledge of the probe said there have been "no substantiated EEO complaints against Colon or Jenkins."

Torres said her problems didn't end with Laidlaw's resignation.

She claims DSS higher-ups loyal to their old boss retaliated against Torres by removing her access to internal computer systems, curtailing her authority, and spreading rumors meant to harm her reputation and credibility.

The behavior of her colleagues led Torres, a retired Army Major who worked in human resources for the military branch, to seek a job in a different department – a change she said amounted to a demotion and which derailed Torres' career, she said.

Despite the transfer, DSS executives and employees continued to spread confidential information about Torres' complaint, making her employment at the agency intolerable, she said.

inappropriately spoke to Torres about her claims against Laidlaw, including "providing direct counseling, warnings, and retrainings on necessary protocol for formally referring and escalating any and all such complaints."

Torres, who had earned a $96,000 salary in Human Resources, left for a job that paid $30,000 less because of the ongoing harassment, the suit alleges.

The DSS official denied Torres' claim that she was effectively demoted before her departure.

"While at the Agency, Ms. Torres voluntarily sought a position with a different department within the Agency where she received the same salary — allegations of demotion are not accurate."

In an Oct. 21 e-mail to Bronx Justice News, Lori Blair, a Texas-based attorney retained by Laidlaw, said: "In over 35 years of his career fighting inequities, Mr. Laidlaw has never had a complaint, grievance, or lawsuit filed against him. That not one person joined Ms. Torres in her lawsuit or grievance illuminates the falsehood of there being multiple complaints regarding our client."

Blair said "there was no complaint filed" against Laidlaw alleging he ever danced inappropriately with a subordinate; an allegation made in Torres' lawsuit.

"Our client resigned his position rather than subject himself to a process he knew would be unfairly used to undermine his effectiveness," wrote Blair. "Mr. Laidlaw understood from his experiences that the process is the punishment and this unmerited complaint would cast a cloud over his leadership."

Blair said Torres' lawsuit "is still ongoing and may in fact be dismissed (a dismissal hearing in the case is scheduled soon). Justice, in this instance, has not yet run its course and Mr. Laidlaw's defense should be allowed to be fully heard before any allegations are reported as true."

*This story has been updated.*

### About Kevin Deutsch › 265 Articles

Kevin Deutsch is a Staff Writer for Bronx Justice News covering the criminal justice system, drugs, and DNA use by law enforcement. An award-winning journalist, Deutsch is the author of the true crime books "Pill City" and "The Triangle." He has worked on staff at the Daily News, Miami Herald, Newsday, The Palm Beach Post, and The Riverdale Press. His work has also appeared in Newsweek, Columbia Journalism Review, The New York Times, The Village Voice, The Forward, The Independent, Huffington Post, Orlando Sentinel, and the New York Post, among other publications. His numerous television appearances include spots on CNN, MSNBC, and C-SPAN's BookTV. He has also been featured in The New Yorker. A Bronx resident, Deutsch hosts the true crime podcast "A Dark Turn" on the Authors on the Air Global Radio Network.



**« PREVIOUS**
Man Sentenced To Life For Killing Two Bronx Livery Drivers

**NEXT »**
One Man Killed, Another Wounded by Gunfire in Bronx



✎ The "One More Thing in the List of What Can Kill Us in the City" Edition

Comments are closed.

Copyright © 2024 | WordPress Theme by MH Themes

# EXHIBIT B

**Goonewardena, Prasanna**

| | |
|---|---|
| **From:** | Goonewardena, Prasanna |
| **Sent:** | Friday, March 8, 2024 4:46 PM |
| **To:** | Pira, Frank |
| **Subject:** | Possible misconduct |

Good afternoon,

This is a legal communication.

I am a colored immigrant. It is within my right to make this allegation.

By law, I am obligated to alert the appropriate individuals if a crime had been committed.

It is my belief that following people are clocking in/out using their HRA phone without putting in honest 7 hours of work 5 days a week:

1. Ms. Dinorah Nunez-White;

2. Ms. Emily Tone-Hill

3. Mr. Paul ligresti

4. Albert Gamarra

5. Maria Feliu

6. Stephen Dickerson

7. Daniel Korenstein

Since these individuals get paid by taxpayer's money, by law they are required to account 7 hours of work each day. Not clock in and sleep rest of the day at home. This applies to even if the person is pregnant. Also, they are not entitled to abuse their position for personal gain-falsely accuse colored immigrants.

I respectfully ask your office to investigate my allegations.

Thanks.

Have a great weekend.

Best,

-/s/-

Prasanna  Goonewardena

1