UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

PRASANNA  GOONEWARDENA                    FOURTH AMENDED
                                          COMPLAINT (MMG) (RFT)


                        Plaintiff          JURY TRIAL DEMANDED

        -against-                          DOCKET No.24 CV 5554

City of New York, Emily Tone-Hill, Ann Scalia,
Dinorah Nunez-White, Eric Smalls, Caroline Hernandez,
Frank Pira, April Hill, Petal Harlow, Tyra Branch,
Denise Deprima, Alexander Stadnyk, Cindy Rivera,
Charise Latimer-Jackson, Sherkia Boone, Mark George,
Paul Ligresti, Stephen Dickerson, Dennis Whinfield, Jill
Berry, and Department of Social Services.

                        Defendants
--------------------------------------------------------------------X

# Preliminary statement


1.    There probably had never been a plaintiff who brought a civil action in the Southern

District with slam dunk evidence (audio recordings, documentary evidence & trial a transcript

with evidence lying at a trial making an unbelievable story that is not logically possible).  The

Defendants were taped. They didn't know that the conversations they had with the Plaintiff were

taped, until Plaintiff revealed after they filed the petition with OATH.


2.    The Defendants were never involved in hiring the Plaintiff. They [are] only involved in

committing unlawful acts against the Plaintiff.

3.     The DSS inexperience Counsel Emily-Tone Hill asked for Plaintiff's resignation twice prior to the petition being filed with the OATH. In *Buckley v. Fitzsimmons*, 509 US 259 - Supreme Court 1993, the U.S. Supreme Court ruled, "a constitutional wrong is complete before the case begins, 'the prosecutor is entitled only to qualified immunity.'" *Id.,* at 1241-1242. The Defense attorney falsely and mislead the court about prosecutorial immunity that requires sanctioning.

4.     It is well settled that prosecutorial immunity does not apply to The DSS General Counsel's Ann Scalia, Paul Ligresti & Emily Tone-Hill (all white race), conspired, aided & abetted with Black & Hispanic HRA employees to falsely accuse (recorded conversations) the Plaintiff for each benefiting in the process (conspiracy based on personal stake). (These are not conclusory allegations, true facts supported by recorded conversations and documents.) The DSS legal department ("OLA") and the office of the disciplinary affairs ("ODA") for years covered up criminal activities by Black & Hispanic employees. The DSS covered up criminal acts by 1st deputy commissioner Michael Laidlaw & Gary Jenkins (both black). Mr. Gary Jenkins, who was a sexual predator, ended up being the DSS commissioner. The only reason Gary Jenkins became the DSS commissioner is because he is black. He was a disappointment and an embarrassment from day one. The DSS became a criminal enterprise. The Plaintiff was retaliated for exposing unlawful acts by the ODA and the OLA staff. Ms. Tone-Hill, Ms. Dinorah Nunez-White, Mr. Paul Ligresti, Ms. Denise DePrima & Frank Pira for several years committed criminal acts by clocking in and out being at various locations using an agency-giving cellphone without working, required 35- hours of honest work in a week. This scam had been in practice for several years by Dinorah Nunez-White, Paul Ligresti & Emily Tone-Hill. Ms. Emily Tone-Hill has been

home since 2020 and getting paid without working 7 hours a day. Her explanation [is] that she has reasonable accommodation because she is pregnant. Pregnant for 5 ½ years? She was given special treatment.  Ms. Tone-Hill went on maternity leave on the third week of May 2024, and yet to report to work in person. This is a known fact.

5.    This complaint was filed on 7/23/24.

6.    It was filed within the statute of limitations. (*id*.)

7.    Buddha said, "Three things cannot be hidden long- the Sun, the Moon & the truth."

## Jurisdiction and venue

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state causes of action pleaded.

9.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the underlying events took place in Manhattan, New York and proper in this district.

### Procedural requirement

10.    The plaintiff filed a copy of the complaint within with the NYC corporate counsel in July 24, 2024, & the NYC Commission on Human Rights on July 29, 2024, within 10 days of filing the complaint pursuant to NYC Administrative Code § 8-502 (c). This requirement was satisfied.

11.    On 5/7/2024, EEOC issued the right to sue letter. This action is within the statute of limitation.

### Parties

12.     Plaintiff is a 55-year-old male of Sri Lankan ancestry and race, and South Asian   descent. The Plaintiff has been continuously employed by the CITY and the HRA since February of 2020. Plaintiff's address is: 247-34A 77 Cres, Bellerose, NY 11426.

13.     Plaintiff is a resident of the City of New York and the State of York.

14.     Defendant New York CITY is a municipal corporation existing under and by the laws of the State of New York.

15.     Defendant Department of social service/Human Resources Administration is a NYC agency located at 150 Greenwich Street, New York, NY 10007.

16.     Defendant Denise DePrima (White Race) at all relevant times was the labor relations director. She is sued in her personal capacity. Her address is 150 Greenwich Street, 31st Floor, New York, NY 10007.

17.     At all relevant times, Defendant Emily Tone-Hill (white Race female) was (and is) an assistant counsel for the HRA and its joint agency, the Department of Homeless Services ("DHS") is sued in her personal and official capacity. Her address is: 150 Greenwich Street, 38th Floor, New York, NY 10007.

18.     Defendant Ann Scalia (white Race) is the General Counsel of the DSS is sued in her personal capacity. Her address is: 150 Greenwich Street, 38th Floor, New York, NY 10007.

19.     Defendant Paul Ligresti (white Race) is the Assistant General Counsel of the DSS and sued in her personal capacity. Her address is: 150 Greenwich Street, 38th Floor, New York, NY 10007.

20.     Defendant Dinorah Nunez-White (Dominican Descent) is the Executive Director of the Office of Disciplinary Affairs and sued in her personal capacity. Her address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

21.     Defendant Charice Latimer-Jackson (black race) is the Deputy Director of the Office of Disciplinary affairs and sued in her personal capacity. Her address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

22.     Defendant Cindy Rivera (Hispanic Puerto Rican Descent) is a step 1 hearing officer with the office of Disciplinary affairs and sued in her personal capacity. Her address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

23.     Defendant Petal Harlow (black Race) is a step 1 hearing officer with the office of disciplinary affairs and sued in her personal capacity. Her address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

24.     Frank Pira (white race) is the executive director of the special investigation division sued in his personal capacity. His address is: 151 West Broadway 7th Floor, New York, NY 10007.

25.     Caroline Hernandez (Hispanic race) is an assistant investigator with the Special investigation division and sued in her personal capacity. Her address is: 151 West Broadway 7 th Floor, New York, NY 10007.

26.    Alexander Stadnyk (white race) is an investigator with the special investigation division and   sued in his personal capacity.  His address is: 151 West Broadway 7th Floor, New York, NY 10007.

27.    Defendant Mark George (White Race) is the Office of Disciplinary office coordinator. He is  sued in his personal capacity. His address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

28.    Eric Smalls (black race) is an investigator & counsel with the EEO office and sued in his personal capacity. His address is: 150 Greenwich Street, 42nd Floor, New York, NY 10007.

29.    Dennis Whinfield is the deputy director of the EEO office and sued in his personal capacity.  His address is: 150 Greenwich Street, 42nd Floor, New York, NY 10007.

30.    Tyra Brach (black race) is an assistant with the conflict resolution office and reports to Stephen Dickerson sued in her personal capacity. Her address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

31.    Sherkia Boone (black race) is an assistant of the office of the disciplinary office and sued in her personal capacity. Her address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

32.    Stephen Dickerson (black race) is a social worker with the conflict resolution office and sued in his personal capacity. His address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

33.    April Hill (black race) is the coordinator in the office of the disciplinary office and sued in her personal capacity. Her address is: 150 Greenwich Street, 31st Floor, New York, NY 10007.

34.    Defendant Jill Berry (white Race) is the first deputy commissioner and sued in her personal capacity. Her address is: 150 Greenwich Street, 42nd Floor, New York, NY 10007.

### Factual allegations

35.    Although Plaintiff lists the third amended complaint as "allegations" they're not, rather facts directly obtained from the trial transcript, documentary evidence, and audio recordings.

36.    This complaint is essentially a summary judgment request from the court in favor of the Plaintiff: no discovery is needed as most of the witnesses already testified lying at trial confirming the violation of laws, and statues; 12 (b) (6) motion is not necessary as this circuit ruling pertains to similar action – *Thomas Colon v. City of New York*, 19 Civ. 10435 (PGG) (SLC) (S.D.N.Y) & *Jim Trotter v. NFL*, 23-cv-08055 (JSR) (S.D.N.Y.) Exhibit C - Colon case, the requirements, and case laws for each claim in this action are presented & covered.

37.    Plaintiff filed the notice of claim on June 16,2023. It was Amended on May 28, 2024. The City of New York Office of the Comptroller acknowledges the receipt of Notice of Claim on 8/31/2023. They assigned claim number 203LE028581. (Exhibit D.) So, when the defense attorney said Plaintiff didn't file a Notice of Claim is lie that requires sanctions. She says, "Under New York law, a plaintiff cannot maintain a tort claim against the state or a subdivision of the state unless he or she serves a notice of claim within ninety days of when the claim rose."

See Taylor v. City of N.Y., 207 F. Supp. 3d 293, 310 (S.D.N.Y. 2016). Additionally, Plaintiff

must plead that he served a timely notice of claim. Id. "Notice of claim requirements are

construed strictly" and "failure to comply with these requirements generally requires dismissal

for failure to state a claim." See Arum v. Miller, 304 F. Supp. 2d 344, 348 (E.D.N.Y. 2003). The

Complaint does not plead or otherwise indicate that Plaintiff filed or served a notice of claim on

the city" (Docket entry # 55 p. 23.)

38.    Defense attorney Ms. Damera specifically knows that Plaintiff filed a Notice of Claim

because her colleague Anthony Bila told her and Bila himself filed Plaintiff's Notice of Claim in

the docket on 7/17/24 at 5:37 pm on case 301348/2023 New York Supreme Court. (See

Document # 8, 301348/23.) Again, another false and misleading statement by the defense

attorney. This is what both Judges wanted: anything in writing.

39.    The DSS consists of 62% Black, 32% Hispanic, and the other 6 % round up of different

races.

40.    As such, Thomas Colon's claim that he was demoted and eventually terminated because

he is Hispanic is dubious and not plausible: He was given a deputy commissioner position

because he is Hispanic; he was demoted and eventually terminated because he committed a

criminal act. Mr. Colon's criminal act was published in the newspaper after thorough review. The

Colon case was settled immediately because he is Hispanic, and his lawyer is a Black. Colon's

claim that Whites were promoted (Jill Berry) over him is not plausible because there are not that

many whites to find to promote. Essentially, Mr. Thomas is saying that he should have been the

1st deputy commissioner because he is Hispanic, even though he is not qualified. Just

nonsensical. However, Plaintiff agrees with Mr. Colon that Defendant Jill Berry is unqualified to

be the 1st deputy commissioner. Plaintiff met Jill Berry at the OATH trial. Mr. Colon is lucky that

he was not criminally charged for committing a crime. The OATH Judge Spooner recommended Colon's termination because the evidence clearly showed that he committed a criminal act was overwhelming.

41.   In Jim Trotter case, Jim Trotter is unattractive, not charismatic, doesn't have an awesome voice like President Obama. Yet, he claims that he was not promoted because he is black. His case was settled immediately just like the Colon case. In the entertainment industry, a reporter must possess certain criteria and skills to attract viewers to the company. Mr. Trotter does not possess the necessary essential criteria. He would be a top candidate at DSS because DSS hires Blacks & Hispanics.

42.   Upon information and belief, Mr. Colon had a history of sexually harassing women. Factual evidence is that "Both Gary Jenkins and Colon previously had multiple sexual harassment complaints filed against them but DSS 'did nothing to stop their behavior' and even gave them pay increases" according to Jacqueline Torress lawsuit.

43.   Jacqueline Torres' claim was filed in 2019 in Bronx Supreme Court (Index No.: 260161/19) and was settled on 2/18/20.Torress is Hispanic. The city law department immediately settled Torres' case because the Plaintiff- Torress is Hispanic. This is proof that Hispanics and blacks get justice.

44.   Mr. Colon was not terminated for sexually harassing women because he is Hispanic. The final straw was his criminal conduct.

45.   The accuser Gamarra comes to work wearing a t-shirt and sneakers violating DSS dress code policy. He is Hispanic.

## *Culture at the HRA*

46.      Since outsiders do not know what kind of people HRA/DHS hire. Here are excerpts right

from an OATH trial: See Stephanie Thompson case- In the Matter of ; DEPARTMENT OF

SOCIAL SERVICES ; (HUMAN RESOURCES ADMINISTRATION) ; Petitioner ; - against - ;

STEPHANIE THOMPSON ; OATH Index No. 1598/20.  Excerpts from the transcript:

Respondent testified that she was walking down a concededly narrow hallway to distribute

folders. Ms. Stephenson and Ms. McMillian were coming from the opposite direction.

Respondent stopped by the beam to permit them to pass but Ms. Stephenson did not stop or

move over. Instead, she plowed through, touching respondent's arm and shoulder. No words were

exchanged. Respondent immediately reported the incident to Ms. Stephenson's supervisor, who

said that he would speak with Ms. Stephenson (Tr. 64, 66-67). As respondent was returning to

her cubicle, she passed by the pantry where she saw Ms. McMillian and Ms. Stephenson and

according to her, the following exchange ensued: [*12] Respondent to

Ms. Stephenson: "Do not touch me again."

Ms. Stephenson: "Bitch, shut the fuck up!"

Respondent: "No, you shut the fuck up!"

Ms. Stephenson: "I got something for you."

Respondent: "What do you have for me?

(*id*, p.5-6)

47.      This behavior is common at HRA. This is how Maria Feliu, Sherkia Boone, Tyra Branch,

Cindy Rivera & Petal Harlow talk.

48.    Ms. Stephenson, Ms. McMillian & Stephanie Thompson are Black.

49.    Ms. Stephenson, Ms. McMillian & Stephanie Thompson are still with the HRA at the same positions. DSS do not terminate Black employees. But they want Plaintiff terminated.

## *Prosecutorial immunity*

50.    It is well settled pursuant to the U.S. Supreme Court ruling in *Buckley V. Fitzimmons*, supra, The Court of Appeals held that "[n]othing in *Burns* undermine[d]" its initial holding that prosecutors are absolutely immune for "normal preparatory steps"; unlike the activities at issue in *Burns*, "[t]alking with (willing) experts is trial preparation." 952 F. 2d, at 966-967.

51.    The Defendants – Tone-Hill, Ligresti, Scalia's acts prior to prosecuting the case at OATH and the step 1 hearing, and giving false legal advice to Albert Gamarra, Maria Feliu, and asking them to file false accusations against the Plaintiff, giving false legal advice to defendants Petal Harlow, Cindy Rivera, Mark George and Dinorah Nunez-White is not protected by prosecutorial immunity. As the Supreme Court concluded in Buckley, "We further decided, however, that prosecutors are not entitled to absolute immunity for their actions in giving legal advice to the police. We were unable to identify any historical or common-law support for absolute immunity in the performance of this function. 500 U. S., at 492-493. We also noted that any threat to the judicial process from "the harassment and intimidation associated with litigation" based on advice to the police was insufficient to overcome the "[a]bsen[ce] [of] a tradition of immunity comparable to the common-law immunity from malicious prosecution, which formed the basis for the decision in *Imbler*." *Id.,* at 493, 494. "And though we noted that several checks other than civil litigation prevent prosecutorial abuses in advising the police, 'one of the most important

checks, the judicial process, will not be effective in all cases, especially when in the end the suspect is not prosecuted. *Id.,* at 496. In sum, we held that providing legal advice to the police was not a function "closely associated with the judicial process."' *Id.,* at 495.

52.     Moreover, defense attorney's AI argument that bringing false charges is protected by absolute immunity and that not actionable under § 1983 fails. In *Buckle*, the Supreme Court rules, "It was well after the alleged fabrication of false evidence concerning the boot print that a special grand jury was empaneled. And when it finally was convened, its immediate purpose was to conduct a more thorough investigation of the crime—not to return an indictment against a suspect whom there was already probable cause to arrest. Buckley was not arrested, in fact, until 10 months after the grand jury had been convened and had finally indicted him. Under these circumstances, the prosecutors' conduct occurred well before they could properly claim to be acting as advocates. Respondents have not cited any authority that supports an argument that a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime was immune from liability at common law, either in 1871 or at any date before the enactment of § 1983. It therefore remains protected only by qualified immunity." (*id*.)

53.     The defense attorney's AI argument that defamation fails since the false comments were not sent to Plaintiff's co-workers (acknowledge that it was sent to Plaintiff's deputy director, Nationwide Court reporting company, deputy commissioner Shronda Williams -who has the authority of decision making powers), is protected by absolute immunity fails and absurd since the Supreme Court had ruled, "Fitzsimmons' statements to the media are not entitled to absolute immunity. Fitzsimmons does not suggest that in 1871 there existed a common-law immunity for a prosecutor's, or attorney's, out-of-court statement to the press. The Court of Appeals agreed that

no such historical precedent exists. 952 F. 2d, at 967. Indeed, while prosecutors, like all attorneys, were entitled to absolute immunity from defamation liability for statements made during the course of judicial proceedings and relevant to them, see *Burns,* 500 U. S., at 489-490; *Imbler,* 424 U. S., at 426, n. 23; *id.,* at 439 (White, J., concurring in judgment), most statements made out of court received only good-faith immunity." "The common-law rule was that '[t]he speech of a counsel is privileged by the occasion on which it is spoken . . . .*Flint* v. *Pike,* 4 Barn. & Cress. 473, 478, 107 Eng. Rep. 1136, 1138 (K. B. 1825) (Bayley j.)'"

54.    The Court's conduct thus far, especially Magistrate Judge Robyn Tarnosfky's could reasonably be perceived as antisemitic. Moreover, it is not disputed that Plaintiff had been treated unfairly by Judge Tarnofsky compared to Schwalb *v. City University of New York Queens College* 25 CV 2616 E. D. N. Y.) In that case, Judge Gonzalez is scared to dismiss the case because the Plaintiff is Jewish, and her lawyer is Jewish. That case is frivolous: (1) there is no legal entity called City University of New York Queens College, (2) Throughout the complaint, Schwalb claims that October 7, 2023, Hammas attack on Israel the Queens College is responsible; (3)that she suffered physical injuries (absurd); emotionally damaged (declined to identify which emotional damage she suffered), (4) that Israel is the only Jewish Country which has nothing to do with her employment at Queens College. (Exhibit A.) The City University of New York Queens College has nothing to do with an October 7th attack. Moreover, Ms. Schwalb, an adjunct professor, was not brought back in May of 2023, - that was five months before the October 7th incident that had not happened when Schwalb was last in school. That is a frivolous case that has no substance, yet Judge Gonzalez stuck down defense attorney's request to file a motion to dismiss because plaintiff Schwalb is Jewish. (Exhibit B.)

55.      Judge Garnett should do the same in Plaintiff's case applying *Schwalb* standard, rather than wasting Plaintiff's time that he does not have to invest.

56.      In Plaintiff's claim, Magistrate Judge Robyn Tarnofsky acting as the district Judge scheduling Plaintiff's case to be dismissed that is full of evidence – documentary and audio recordings is antisemitic.

57.      The email communications show that Defendant Nunez-White court[ed] Albert Gamarra to file charges against the Plaintiff after Gamarra already written up the Plaintiff.

### *Plaintiff's life today*

58.      After Plaintiff's father passed away on February 13, 2025, Plaintiff's life turned 180 degrees.

59.      Plaintiff only wants to live until August of 2026, unless his mother stays alive. Plaintiff no longer has any goals, just a bucket list. Prosecuting this case is not on the bucket list. Now the Court is prejudiced, giving the defense attorney to say anything in a motion to dismiss so the Court can dismiss the case, pull the Plaintiff back to the case to explore all avenues instead of executing the bucket list: live the next 12 months peacefully loving everyone like Plaintiff's father did.

60.      Plaintiff is the primary caretaker of his 91+ year old very sick mother. He loves his mother. Many days, at 2 am, Plaintiff gets up to prepare a meal to give to his mother because she is hungry. If Plaintiff gets four hours of sleep each night, it is a good day. Plaintiff's mother barely can walk. She needs assistance.

61.    Plaintiff has no time to go through all cases defense attorney cited, go through each AI

comments she made, read and compare 1500 pages of the OATH transcript (how she got it needs

to be explored) and other exhibits to determine that none are edited and devote time to care for

his mother. It is not possible.

62.    It is not disputed that Plaintiff has a claim against the Defendants compared to *Colon V.

City of New York & Schwalb v. City University of New York* Queens College - 25 cv 2616

E. D. N. Y. Especially baseless allegations that Schwalb was discriminated against because of her

religion (there is no evidence to support that the City University of New York or Queens College

didn't let her practice her religion).

63.    To prove bias that Plaintiff is treated differently by this Court, his case was filed on

7/24/2024. Magistrate Judge Robyn Tarnofsky on a dispositive motion took 7 months to decide

a simple motion to amend the complaint. In Schwalb, which is a 7 -page frivolous case (Exhibit

A & B) was filed on 5/9/2025, already in discovery and Judge Gonzalez struck down defense

attorney's request to file a motion to dismiss.

64.    While Plaintiff is grieving with the loss of his beloved father, and he only plans to live

until August 2026, the Court is lur[ing] the defense attorney to file a motion to dismiss. It

*appears* that the defense attorney – Damera had communications with Judge Tarnofsky's new

Chief law clerk. This is antisemitism.

## *March 30, 2011, murder attempt on Plaintiff*

65.    Both chambers know about Plaintiff's nightmare with the Zucker Hillside Hospital and

LIJ. They do not know the truth as they came to knowledge through the filings and what others

said. They never listened to the recording. It was a murder attempt that went really bad for the Zucker employees because when Chrstopher Phillips smothered the Plaintiff, an Indian doctor came Running. Christopher Phillips had to release Plaintiff from being smothered after 52 seconds because an Indian doctor came running. Plaintiff is lucky to be alive. The entire encounter was recorded and used throughout the litigation. It still haunts the Plaintiff. It was a horrific attack. Why the murder attempt? because Plaintiff was complaining and went to complained to Chairman John Kane about discriminatory practices. Just like the Defendants here, Zucker staff retaliated because they lost control of the Plaintiff and Plaintiff is South Asian. The NYPD and the Queens DA refused to take the complaint in 2011 because the masterminds in the attack are Jewish.

66.    Plaintiff went to Zucker so he could have a roof over his head and other necessities such as food. Then they drugged the Plaintiff. Plaintiff became permanently disabled until he voluntarily withdrew from strong mind-affecting drugs.

67.    Today, with this case, it is Daja vu again.

### *Mr. Gamarra's unlawful conduct*

68.    Rules, procedures, and laws do not apply to these Defendants. These are the star witnesses of the DSS. There are 1500 pages of comical & clown show by the Defendants – especially the two lawyers presented the case to OATH. The Plaintiff cannot put it all here.

69. Mr. Gamarra did not even know what protected speech was under the 1st Amendment. He claims that he has PhD in criminal justice (an online degree) from the City University of New York - where you take online classes through various City University Colleges that he received in 2023.

Q: Is it fair to say that DSS is a -- a government entity?

A: Yes.

Q: And so the -- is it fair to say that the employees have certain rights?

A: Yes.

Q: And could you -- is -- one of the rights is protective speech?

A: No.

Q: No. Okay. And why is that, it's not a -- it's not a right?

A: Within the agency, we operate through the policies and the procedures of the agency, the code of conduct, and a number of other policies informational, that we're supposed to abide by when in agency –

(OATH Tr. 142:12-25)

### *Defendant Emily Tone-Hill*

70. Defendant Tone-Hill is a perfect example that having a bar license does not mean she knows law and possesses legal knowledge. With Ms. Tone-Hill as the lead attorney at OATH trial for the petitioner, it was comical. ALJ Davis had to make objections on behalf of Tone-Hill and had to bail her out.

Q: Well, if they -- if the hearing officer and hearing officer's supervisor behave childishly and incoherently, does the Respondent have the legal right in his response to make known of that?

ALJ DAVIS: Okay. Is there any, is there -- wait, wait, is there an objection?

MS. TONE-HILL: Yeah, I mean, yes.

ALJ DAVIS: Okay. It's sustained.

MR. GOONEWARDENA: You -- it seems like you are enlisting for the objection.

ALJ DAVIS: I am also rephrasing your question so that they are clear. So I suggest that you ask the next question.

> MR. GOONEWARDENA: But isn't that up to the Petitioner to make -- if they
> want to make an objection.

(OATH Tr. 780:11-25)

71. When the trial judge has to bailout the opposing counsel, that is when you know that the things are going really, really bad for them and question the lawyer's skills.

72. Defendant Tone-Hill conspired with others to bring Plaintiff on charges. This is not protected by prosecutorial immunity as they were done prior to the OATH trial. See *Buckley v. Fitzimmon*, supra.

73. Defendant – Emily Tone-Hill (white race) at the employment law division at the advice of her superior General Counsel Ann Scalia (white race) & the 2nd in command Paul Ligresti (white race) who did not hire the Plaintiff, nor do they evaluate Plaintiff's performance conspired & retaliated against the Plaintiff because of Plaintiff's race.

74. Ms. Tone-Hill, at Scalia's orders, requested resignation of the Plaintiff twice prior to the petition had been filed with the OATH.

75. At trial, Defendant Petal Harlow testified that until the step 1 hearing is entertained, until all the evidence is in, ODA does not contact the law department. Then why is Tone-Hill in the direction of Ann Scalia interfering with the step 1 hearing process: racial hatred?

> ALJ DAVIS: Okay. To prepare for the informal conference, do you talk to
> people -- do you talk to other employees at the agency to understand what
> the penalty that's being -- that should be appropriate in that case?
>
> MS. HARLOW: This is done after the informal conference.
>
> ALJ DAVIS: Okay.

MS. HARLOW: After the Respondent has submitted testimony and evidence.

ALJ DAVIS: Okay. Q: So at this -- at this po -- and if I -- if the Department of Legal Affairs, even before the step 1 hearing is being schedule -- held, if the Department of Legal Affairs come up and say -- communicate to the Respondent or someone else that we are requesting his termination, he was just served with the charges. Is that the standard policy?

ALJ DAVIS: Do you understand the question?

A: Sir, it does not work that way.

ALJ DAVIS: Okay.

Q: So –

ALJ DAVIS: So you -- wait. So, just to be clear, your testimony is that the agency does not come with its recommended penalty to you before the step 1 conference?

MS. HARLOW: That is correct.

ALJ DAVIS: Okay. Next question.

Q: So if at any point, a lawyer from the legal department communicated with the Respondent saying, we are asking for his termination and the step 1 hearing has not even been held, is that a -- is that a code of conduct violation?

(OATH Tr. 565: 5-25; 566: 1-8)

76. Ms. Tone-Hill made a fool out of herself in response to her objection that audio recordings should not be played because the witness did not know that he was being taped:

MS. TONE-HILL: Well, Your Honor this -- the -- the witness has no knowledge of this recording as they were not  informed that the recording was being taken at all, prior. They also -- the recording is an hour -- is an hour – over  an hour and a half long. There's been no specification as to what portions of the recording are -- the Respondent intends to admit into evidence. So there's a relevance issue. But the -- yeah, the witness was not informed that this would -- this recording was taking place beforehand. And actually –  ALJ DAVIS: Is there a -- is there -- is there a requirement that the witness be informed  that he -- that he's being recorded?

MS. TONE-HILL: I mean, there -- this meeting was - you know, there was an understanding that -- that the cell phones would not be on as -- as per even the Respondent.

ALJ DAVIS: No, no, no. Okay. Are there any -- what -- you're saying the witness was not informed, and I'm asking you what required the witness to be informed that there was going to be a recording?

MS. TONE-HILL: I'm -- I'm just saying the witness did not have knowledge of this recording taking place.

ALJ DAVIS: I -- I understand that. I understand 6 that, but is there a requirement that the witness be informed that the meeting was going to be recorded?

MS. TONE-HILL: Technically, there's -- there is  the possibility that cases could have been discussed that specific, you know, client information could have been discussed during this –

ALJ DAVIS: No, no, no. Ms. Tone-Hill, I'm asking you a very specific question. Is there some prohibition that -- or -- or -- or some requirement that the witness had

to be alerted that there was -- that the meeting was going to be  recorded?

MS. TONE-HILL: No, there's no specific requirement in this context.

ALJ DAVIS: Okay. So –

MS. TONE-HILL: Yeah.

ALJ DAVIS: Okay. Mr. Goonewardena.

MR. GOONEWARDENA: Yes, Your Honor.


(OATH Tr. 218:3-25)

77. The Defendants violated the code of conduct, and they should be brought upon charges.

78. There are too many attorneys' disciplinary rules violations by Tone-Hill, Ann Scalia, Shavani Naidu-Price, Paul Ligresti, and Dinorah Nunez-White to list here.  This is to satisfy the F. R. Civ. P. 8 (a).

79. After the OATH trial, Shavani Naidu-Price's employment was terminated by the DSS.


***DSS Discriminated against Asians and South Asians***.

80. The DSS discriminates against South Asians. Proof: Plaintiff's case and that there are no  Asian or South Asian managers at DSS. There are less than 2% of Asian and South Asian employees at DSS. The entire HRS (human resources department) consists of Blacks and Hispanics. The DSS breaks civil service laws by bypassing hiring procedures only to hire Hispanics and Blacks. For example, Mr. Gary Jenkins's sister- Ms. Bass was brought into HRA bypassing and manipulating the civil service requirements. Upon information and belief, Gary

Junkin's sister assaulted her director at her previous employment- correction department and was terminated, then suddenly she ended up at the HRA finance department.

81. Upon information and belief, Gary Jenkins & Thomas Colon had a history of sexually harassing women. Yet, they held a high position. Jenkins eventually became the DSS commissioner. He was embarrassed from day one to the DSS. This is evidence that DSS favors blacks, and Hispanics, and society favors blacks.

82. When talking about blacks misbehaving and society favoring them: Clarence Thomas - a  guy who cheats on tax returns, misbehaves, and supports white women and white men. Mr. Thomas dislikes black, Hispanics, South Asians, and has no valid purpose in life. The U.S. Senate gave him a chance. It was a mistake.

83. Also, Eric Adams and Ray Nagy. NYC gave Eric Adams a chance. It was a mistake from day one. Everyone he appointed has a shady background. Everyone he is associated with has shady characters. When the migrants started coming to NYC, Mr. Adams saw money to be made at the expense of migrants and at the taxpayer's expense.

84. As a matter of policy, DSS does not bring charges against Blacks and Hispanics

85. Applying the Colon standard & Jim Trotter, *supra*, Plaintiff's case should be settled immediately.

86. Some claims are not yet actionable as Plaintiff is still employed. If The Defendants terminate the Plaintiff, then the termination will trigger those claims such as property interest.

87.    The Plaintiff is a Fraud investigator (South Asian ancestry & race Sri Lankan-born colored immigrant) who currently works for the Bureau of Fraud Investigation division. He was a fraud investigator approving IDNYC cards at the IDNYC department from February 10, 2020, to March 9, 2023.

88. Plaintiff started his journey with the Department of Social Services ("DSS") on 2/10/2020 as a Fraud Investigator with the IDNYC department.

89. The plaintiff had a dream to be part of NYC. He accomplished his dream. The Plaintiff wanted to continue his journey. But the Defendants [had] other ideas. They continue to harass Plaintiff, creating a hostile working environment by serving 8 sets of dubious disciplinary charges that contained false statements damaging Plaintiff's reputation, emailing them to several people to be served on the Plaintiff.

90. None of the Defendants involved here is involved in hiring, working with, and evaluating the Plaintiff. The Plaintiff met most of the Defendants for the first time at the OATH trial that was held from May 14, 2024, to June 11, 2024.The Defendants only knew that Plaintiff is a South Asian Immigrant.

91. Every phone conversation & meeting Plaintiff had with the Defendants was recorded. They did not know that they were recorded when the false accusations were made. They became aware that they were recorded after the Defendants filed the four sets of charges at OATH in November of 2023. Their unlawful acts were caught on tape. It was too late for them. But the lies continued throughout the trial. The lawyers –

Shavani Naidu-Price and Emily Tone-Hill spoon-fed the false statements to the witnesses.

92. Defendant Emily Tone-Hill said at trial that the HRA law department is not representing the individual defendants, only the agency. (OATH Tr. 592: 7-12, 892: 1-3.) As such, there is no lawyer-client privilege that exists.

***December 23, 2022, interaction by email & Gamarra involvement***

93. On December 23, 2022, following the DSS agency policy time and leave (seven days in advance), Plaintiff requested December 30, 2022, off. As per department policy, Plaintiff requested in writing that his immediate supervisor Andrei Singh (Guyanese descent) CC Maria Feliu and Charmaine Harvey. No violation was made here by the Plaintiff.

94. On the same day, Plaintiff's immediate supervisor - Mr. Singh wrote back asking if the request was sick leave or personal, meaning if it was sick leave, it would be granted.

95. The Plaintiff wrote back stating it was personal for personal business.

96. After some time, Mr. Singh wrote back stating that Plaintiff's request was denied. Since the Plaintiff knew ahead of time that other fraud investigators were going to be present on December 30, 2022, which could have been relieved, the Plaintiff requested an explanation why the 30th off was denied.

97. After back-and-forth communications with Mr. Singh, Plaintiff called Ms. Maria Feliu (the one in charge of site coverage) stating that Plaintiff is no longer requesting December 30, 2023, off and that Plaintiff will report to work. Ms. Feliu wrote to others in writing confirming that the Plaintiff no longer wants the 30th off and that he will be present at the

Navigation site (Red Cross building at 350 West, 49 Street Manhattan). No agency violations and the standard procedures were followed.

98. The Plaintiff reported to work on December 30, 2022, early as usual. The leave request was a dead issue. However, it was not for Mr. Albert Gamarra.

### *Retaliation by Gamarra, Nunez-White & Scalia*

99. Documentary evidence shows that Mr. Gamarra contacted Defendant Dinorah Nunez-White and Ann Scalia in 2023, how to terminate Plaintiff's employment. They felt that they needed to start the process by bringing Plaintiff on false charges.

100. On or around December 28, 2022, Gamarra requested a request from his friend Maria Feliu (Hispanic Race) to pull the Plaintiff from the Navigation site. A reason was not given to the Plaintiff.

101. The Plaintiff was scheduled to be at the navigation site until June of 2023, it's scheduled *closure*. The Plaintiff bonded with his coworkers. The Plaintiff exchanged Christmas gifts and worked as a team. He did not want to leave the Navigation site.

102. Plaintiff contacted Mr. Andrei Singh one of the few Asians at HRA and was in touch with him to find out the reason why Plaintiff was pulled from the site.

103. On or around December 28, 2022, in a recorded phone conversation with Mr. Singh, confirmed that he did not know the reason for the pull and that he was not informed of the reason.

104. A few days later, Plaintiff received an email from Charmaine Harvey, Plaintiff's

deputy Director at the direction of Gamarra, that a meeting had been scheduled for January 11, 2023, and that Plaintiff may bring a union representative as the meeting could lead to disciplinary action.

105.    The Plaintiff was not told what the purpose of the meeting was.

106.    On December 29, 2022, Plaintiff received an email from Sonia Daily, executive director of performance, who oversees community service associates that she wants to get the union representative of the choice of Albert Gamarra (Andrew Douglas) for the Plaintiff. It was so ridiculous.

107.    Plaintiff responded to her email stating that Plaintiff is in touch with his immediate supervisor (standard procedure) and that her help is not needed as she is not in the Plaintiff's chain of command.

108.    Mr. Gamarra does not understand when Plaintiff requested on December 23, 2022, to take December 30, 2022, off, that is seven days in advance pursuant to DSS time and leave policy. Mr. Gamarra has his timeline that is not standard with DSS time & leave policy:

> Q: And this -- and this was about leave that I'm requesting for December 30th, correct?
> A: Yes.
> Q: So is it fair to say, this is a yes or no answer, is it fair to say I did follow the agency time and leave policy by requesting it seven days in advance?
> A: No.
> Q: Yes, or no
> A: No.
> Q: Why is that?

A: Because that's not the deadline you gave the staff member.

Q: I don't have –

ALJ DAVIS: Okay. Okay. Mr. Goonewardena -- Dr. Gamarra?

MR. GAMARRA: Yes.

ALJ DAVIS: Is there a DSS or HRA policy as to the deadline for an
employee to request leave time?

MR. GAMARRA: Yes. Seven days.

MR. GOONEWARDENA: Okay. That's the end of that question.

Q: So it's fair to say that I follow the time and leave  policy to its word. I
requested a -- on 23rd, I requested I want 30th off. I'd like to have the
30th off right? Yes, or no? That's  -- is a yes or no answer.

A: No.

Q: No. Why is it -- so you are telling me that when I requested on
December 23rd, early in the morning –

(OATH Tr. 149:22-25, 150:1-24)

109.    Mr. Gamarra violated the chain of command by not contacting Plaintiff's

Immediate supervisor. He contacted his Hispanic friend Maria Feliu. He didn't contact Plaintiff's

immediate supervisor because he is South Asian.

110.    Mr. Gamarra terminated Mr. Andrei Singh's employment the only South Asian

supervisor at DSS. At the OATH trial, Mr. Gamarra testified:

Q: So you contacted my immediate supervisor and what did you
contact  my immediate  supervisor about this?

A: I contacted a deputy director.

Q: Did you at any point contact my supervisor?

A: No.

(OATH Tr. 190:8-12).

111.    Plaintiff is a proud American and wants to be treated just like other Americans. Also, just like other litigants without being discriminated against.

112.    Plaintiff is a team player. That is why everyone loves to work with the Plaintiff. Today, Plaintiff's Director asks Advice from the Plaintiff on how to execute daily work assignments .

113.    Plaintiff loves his coworkers, that is why coworkers have not had any issues with Plaintiff.

114.    .  Mr.  Gamarra, Dinorah Nunez-White, Ann Scalia & Stephen Dickerson conspired to bring false charges against the Plaintiff. Documentary evidence shows email communication between each other. The subject of the email communications: Plaintiff.

115.    Mr. Gamarra himself confirmed that Defendant Daly is not in Plaintiff's chain of **command**.

116.    Mr. Gamarra stated in that email to Plaintiff, "You should not directly contact Executive Director of Operations Sonia Daly (Who is not in your chain of command) or Deputy Commissioner Colette Samman." Now we have confirmation from Mr. Gamarra that, (1) Sonia Daly is not in Plaintiff's chain of commands, (2) that Ms. Daly herself should not be contacting any investigators (Plaintiff) as she is not in Plaintiff's chain.

117.    As such, the charges against the Plaintiff when he told Daly that she was not in Plaintiff's chain of command is not a violation, it is appropriate and lawful.

118.    When Mr. Gamarra contacted Daly and conveyed confidential information that

119.    Plaintiff was brought up on charges (without a valid cause) and that he needed her

help, Mr. Gamarra violated Plaintiff's rights, specifically confidentiality.

120.    At no point before and after the January 11, 2023, disciplinary meeting, Gamarra

gave any documentation about the false charges. The January 11, 1023, meeting with Gamarra,

Defendant Daly was not present as she had no business – as she was not in Plaintiff's chain of

command. Daly entered the picture (to get a union rep for the Plaintiff) to help Gamarra as a

coconspirator. The meeting on January 11, 2023, was recorded and admitted onto evidence at

the OATH trial.

121.    The Plaintiff was falsely brought upon charges stating that the Plaintiff only

gave

seven days in advance (December 23, 2022) when he requested December 30, 2022, off.

Plaintiff also brought upon charge falsely stating that the Plaintiff made racial comments to

EEO officer Eric Smalls.

122.    Ms. Sonia Daly is the entertainment queen. She does the dirty work for Mr.

Gamarra.

## *Retaliation for filing a complaint with the EEO office*

123.    On December 28, 2022, Defendant Denise DePrima in a recorded phone

conversation

with Plaintiff after listening to the harassment Plaintiff endured, advised:(1) to file a complaint

with the EEO office;(2) she can take a complaint to investigate harassment; (3) that she is going

to refer the facts to conflict resolution officer Stephen Dickerson and that Mr.

Dickerson should help the Plaintiff.

124.  As per DePrima's request, Plaintiff sent a copy of the complaint to Ms. DePrima to investigate harassment and Discrimination complaint to the EEO office.

125. Sometime in January of 2023, Defendant Eric Smalls contacted Plaintiff by email stating that he wants to talk to Plaintiff.

126. Plaintiff spoke with Defendant Smalls on January 10, 2023. The conversation was recorded. That recording was played at the OATH hearing.

127. In the conversation with Mr. Smalls, Plaintiff did not want to go into detail about the complaint since he had the complaint.

128. Defendant Smalls discouraged Plaintiff from moving forward with his complaint. This is a violation of NYC EEO policy. Although Plaintiff already knew that everyone in the EEO department was black since Mr. Smalls' behavior was not in line with NYC EEO policy, Plaintiff wanted to get on record Mr. Smalls admitting that he is Black. The Plaintiff asked whether he was African American after more than ten minutes into the conversation. This is not a violation at all.

129. Then since a complaint should include the Plaintiff's own experiences, the Plaintiff said that the plaintiff was assaulted by an African American guy in December of 2022. There were many African Americans were watching but no one came to assist Plaintiff. Then an Irish man (Tony) from Ireland helped the plaintiff. The Plaintiff told his experience to Mr. Smalls. The Plaintiff never said, "… he was very nice." Mr. Smalls lied to Defendant Nunez-White in writing stating that Plaintiff at the confidential conversation said: (1) Irish man was nice & that his supervisor- Dennis Whinfield "sounds like a black man too" to bring Plaintiff on false charges.

130. Upon information and belief, Mr. Smalls in prejudiced mind spoke on the phone with Defendant Nunez-White on how to bring the Plaintiff on charges. Defendant Nunez-White advised Defendant Smalls to send an email to Nunez-White. That email was used to bring the Plaintiff on charges. They conspired & aided and abetted to injure Plaintiff.

131. Since Plaintiff is South Asian, upon information and belief, after consulting on the phone with Ann Scalia, Nunez-White, Smalls' supervisor Dennis Whinfield, & Charise Latimer-Jackon, Mr. Smalls wrote to Defendant Nunez-White.

132. Mr. Smalls confirmed at trial that he wrote to Ms. Nunez-White to bring Plaintiff on disciplinary charges. Retaliation is established.

133. Mr. Smalls falsely stated: "…when I brought up Dennis Whinfield's name, he stated 'He sounds like a black man also.'"

134. Defendant Smalls admitted that Plaintiff's conversation with him was confidential and that it is a protected activity. (Filing an EEO complaint is a protected activity, and the investigator must not retaliate on the information obtained during that conversation related to an EEO complaint.)

135. Working for the EEO office as an instigator and labor Relations director, positions are a sacred one where no one should be retaliated against & discriminated against for any reason using *the* position for contacting and filing a complaint.

136. Mr. Smalls violated that sacred duty because of his hatred against South Asians and the The department policy is that they only serve blacks and Hispanics.

137. Mr. Smalls owes fiduciary duty to the Plaintiff.

138. On a recorded phone conversation on March 2, 2023, Mr. Smalls stated that he never received a complaint from the Plaintiff, and he referred to the proper area. However, at trial, Mr. Smalls testified:

> Q: So you never referred my complaint to anyone else; yes or no?
> A: No.
> ALJ DAVIS: Other than Ms. Nunez-White?
> MR. SMALLS: Yes.
> Q: Is -- our communications should be confidential?
> ALJ DAVIS: Mr. Goonewardena, you already asked those questions and got the answers.
> MR. GOONEWARDENA: Which is?
>
> ALJ DAVIS: Which is yes, they're supposed to be confidential. Next question, please. On a new subject.

(OATH Tr. 909:10-20).

139. Mr. Smalls further stated:

> Q: So do you believe your actions were proper referring the co -- referring our    confidential conversations to Dinorah Nunez White?
> A: Yes.

(OATH Tr. 910: 3-6).

140. Mr. Smalls to cover up his unlawful act, falsely stated:

> Q: Did you ever tell me that your office never received a complaint from me; yes or no?
>
> A: No.

141. On March 2, 2024, in a recorded phone conversation, Mr. Smalls clearly stated that his office never received a complaint from Plaintiff. If Mr. Smalls never did anything wrong, he should not lie.

142. These kinds of racist people should not be allowed to hold positions where they have decision-making powers.

143. Defendants Tone-Hill, Scalia, Ligresti, & DePrima, have a copy of March 2, 2023, phone call to Mr. Smalls. Yet, the Defendants continue to spin lies, violating ethical obligations as an officer of the Court. They also have a copy of 6/22/23, step 1 hearing recording. The recording proves that Charise Latimer Jackson's and Cindy Rivera's unlawful behavior include admitting that they enlisted a bodybuilder because Defendant Sherkia Boone complained that Plaintiff threatened her that was confirmed at trial by Boone herself as false.

***Defendant Dinorah Nunez-White conspired with the co-Defendants***

***144.*** Defendant Nunez-White testified that she was not directly involved unlawfully ***bringing*** Plaintiff on charges***.***

145. Nunez-White falsely accused Plaintiff on ODA charge # 2 that (1) she told Plaintiff did not contact her, (2) Plaintiff asked for personal information about Petal Herlow. The recording of the conversation was played at trial, and she confirmed that she never heard Plaintiff asking Nunez-White for personal information about Petal Harlow, and that she never told Plaintiff not contact her.

146. Ms. Nunez-White told hearing officer Cindy Rivera to write these false statements on the second set of disciplinary charges against the Plaintiff.

147. Defendant Cindy Rivera typed the false charges with the assistance of her supervisor Charise Latimer-Jackson, then gave the false charges to April Hill to deliver to the Plaintiff's deputy commissioner Sheronda Williams by email. Ms. Williams read it and sent a second set of disciplinary charges by email with special instructions to Venessa Faison - another HRA employee, to serve them to Plaintiff. All these were confirmed at the OATH trial. There are too many to list here.

148. As per policy (chain of command), at the DSS legal department, no one acts without consulting with the General Counsel Ann Scalia. It is her department. Everything goes through her. As such, she is responsible for the legal department's acts.

149. Defendant Paul Ligresti testified that after the charges and specifications are drafted, the hearing officer sends them to the legal department for review. Then they send it back to serve on the Respondent. Therefore, Paul Ligresti, & Scalia, are involved in approving the false accusations on 8 sets of disciplinary charges to move forward. It was a family affair.

150. Petal Harlow testified that her supervisor Charise Latimer-Jackson and her together drafted the first set of charges. Therefore, Ms. Latimer-Jackson is involved in the conspiracy and the discriminatory unlawful conduct of drafting 8 sets of charges that contained false statements along with Mark George, Paul Ligresti, Ann Scalia, Nunez-White and Cindy Rivera.

151. At step 1 hearing on 6/22/23, Latimer-Jackson enlisted a bodybuilder who is not an HRA employee or HRA contracted security – FJC security officer. Ms. Latimer-Jackson admitted that she called the bodybuilder – who harassed, intimidated, and followed Plaintiff around because the secretary Sherkia Boone told her that Plaintiff threatened her.

152. At trial, after the recording, Ms. Bonne confirmed that on the recording the Plaintiff did not threaten her. Now Plaintiff has a claim against Boone, Latimer-Jackson.

153. The hearing officer Cindy Rivera & Latimer-Jackson argued at the step 1 hearing that Plaintiff does not have OATH rights.

154. When asked the name of the author of the first set of charges, Ms. Latimer-

Jackson said that Plaintiff is not entitled to that information.

155. They both recommended a 65-day suspension on the second set of charges. According to CSL, the maximum penalty that can be imposed is 60 days' suspension.

156. At the step 1 hearing on 6/22/23, Defendant Latimer-Jackson was laughing and made incoherent comments. The Plaintiff recorded the step 1 hearing.

157. The ODA step 1 hearing officers Petal Harlow, Cindy Rivera & her supervisor Deputy Director Latimer-Jackson does not even know the CSL. They did not know what is CSL §75-b is and how it should be applied. Both Ms. Rivera and Latimer-Jackson behaved like 10year-olds. These people should be terminated. But it will not happen because of their race.

158. The charges on second, third and fourth sets of charges were related to the comments Plaintiff made in defending the false charges in CSL §75-b. As such, the statements are privileged.

159. The comments Plaintiff made in Defending those charges are privileged. As such, Defendants cannot bring Plaintiff upon charges.

160. The person who drafted the first set of charges was Petal Harlow. The orders to draft all 8 sets of false charges came from Defendants Latimer-Jackson, Mark George & Nunez-White. It was approved by Defendants Ligresti & Scalia.

161. Seven sets of charges were drafted by the 1st step-hearing officer Cindy Rivera in the direction of Nunez-White, Mark George & Charise Latimer-Jackson.

162. Based on the OATH trial transcript, the charges were approved by the legal department employees as a team – Scalia, and Paul Ligresti.

163. Mr. Ligresti testified at the OATH trial that it is the standard policy DSS follows.

*Defendant April Hill*

164. April Hill oversees emailing and mailing documents related to Disciplinary charges. The directives come from Charise Latime-Jackson & Dinorah Nunez-White.

165. At DSS the orders are given and come from top to bottom. All employees, before making any decision, following the chain of commands, must check with their supervisor. In the Plaintiff's case, it was a coordinated attempt by Scalia, Latimer-Jackson, Ligresti, Mark George & Nunez-White involving other Defendants.

166. After the write-up by Albert Gamarra, on 3/13/23, Plaintiff took his expertise and talent to the Bureau of Fraud Division.

167. The Plaintiff and his current Director- Robyn Battle immediately bonded. It was an unbreakable bond.

168. The Defendants destroyed that bond with their false accusations tapping into Plaintiff's director and the deputy commissioner Sheronda Williams.

169. On May 15, 2023, the Plaintiff was brought upon charges related to Gamarra's discriminatory & false accusations. Plaintiff was shocked as (1) he was already punished by Mr. Gamarra; (2) it was a dead issue where everyone moved on; (3) the Plaintiff was in a good place where he was accepted and enjoyed working; and, (4) that the Defendants had a discretion not to retaliate for filing a complaint with the EEO office & labor relations.

170. He was served with charges (1st set of charges) that contained false accusations using Nationwide Court Services. The charges were emailed to Hector Pacheco by April Hill.

171. The charges were unsigned and not dated.

172. Since the Plaintiff was never brought upon charges in his entire life, he took every avenue to fight the false accusations to clear his name.

173. The Defendants thereafter retaliated against Plaintiff for exercising his 1st Amendment rights by speaking out about the first set of charges in a CSL §75-b filing.

174. Based on the evidence that came out at the OATH trial, the final decision was to move forward with the charges given by Defendant Scalia's office.

175. Plaintiff was brought upon three sets of charges (ODA Nos 14102014-06, 07 &08) again on 8/7/2024 in retaliation for the harassment complaint he filed with the labor relations director Denise DePrima.

176. On or around July 8, 2024, Plaintiff filed a harassment complaint with the labor relations director Denise DePrima, against the Defendants for enlisting an outside bodybuilder to intimidate, harass, threaten and annoy Plaintiff when he appeared for step 1 hearing on June 22, 2023.

177. Defendant Denise DePrima in retaliation to the complaint, instead of investigating the criminal conduct by Charise Latimer-Jackson & Dinorah Nunez-White, Defendant DePrima conspired with Nunez-White to bring three new charges against the Plaintiff.

178. The Complaint Plaintiff filed with the labor relations director is a protected activity.

## *Gamarra, Nunez-White & Scalia violated CSL §75*

179. Mr. Gamarra violated CSL §75 &76 when he did not provide any documentation to the Plaintiff to prepare for the charges, but he was eager to get his choice of union rep for the hearing:

Q: Was -- was I given -- was I given any copies of what the allegations were or anything prior to this meeting?

ALJ DAVIS: Was -- was -- Dr. Gamarra, was Mr.  Goonewardena served with any formal charges or specifications  in advance of the January 11th -- 2023 meeting, yes or no?

MR. GAMARRA: No.

ALJ DAVIS: Was there any requirement that Mr.  Goonewardena be served with any formal disciplinary document or charges or specifications before this meeting on January, 11th, 2023, yes or no?

MR. GAMARRA: No.

ALJ DAVIS: Okay. Next question, Mr. Goonewardena.

(OATH Tr. 198:3-14).

## *Claim against Frank Pira, Caroline Hernandez & Alexander Stadnyk*

180. On March 8, 2024, Plaintiff filed a complaint with the Special Investigations Divisions Director Frank Pira for serious misconduct by Dinorah Nunez-White, Emily Tone-Hill, Paul Ligresti, Albert Gamarra, Maria Feliu, Stephen Dickerson & Daniel Korenstein.

181. Plaintiff's communication with Defendant Pira is a protected activity.

182. Mr. Pira in retaliation for exposing serious misconduct by certain HRA high-ranking employees decided to bring false charges against the Plaintiff. Also, because Pira himself clock in and out using his HRA cellphone not being present in the office.


183.  Mr. Pira enlisted two of his colleagues- Caroline Hernandez & Alexander Stadnyk.

184. Upon information and belief, Mr. Pira scouted his loyal friends by passing the civil service list & requirements to work in his department. The friend he harassed to join his department, Joe Acosta, only has an H.S. diploma.

185. Mr. Stadnyk sent a letter emailed to Plaintiff's director Robyn Battle in March of 2024, stating that Plaintiff must report for an interview to their office for misconduct and that Plaintiff was the target of the investigation.

186. The Plaintiff's director Robyn Battle printed the documents in front of the Plaintiff and served on the Plaintiff.

187. The Plaintiff's director sits next to the Plaintiff. Plaintiff saw when she was printing the documents, went back to her desk, and wrote on the envelope from and to and served on the Plaintiff. It is her handwriting on the envelope.

188. After going back and forth, Plaintiff agreed with Defendant Stadnyk for a video phone interview on April 3, 2024.

189. The plaintiff recorded the entire interview.

190. During the conversation, Defendant Stadnyk called the Plaintiff "common man." Since throughout the conversation Plaintiff acted respectfully towards Defendant Hernandez and Stadnyk, Plaintiff asked, "What did you just call me? Man" Mr. Stadnyk replied, "Yes man." Then Plaintiff said that he was ending the interview since Mr. Stadnyk was disrespectful. Ms. Hernandez throughout the interview was arguing with the Plaintiff.

191. After that interview, Plaintiff sent a copy of the audio recording of that interaction to Ms. Hernandez, Mr. Pira, DSS inspector General & Caroline Hernandez.

192. Shortly after that, Plaintiff's director – Robyn Battle, served disciplinary charges

(the fifth set of charges) on Plaintiff that contained false statements that were drafted by Cindy Rivera and approved and vetted by Scalia, Tone-Hill, Ligreasti, Nunez-White, Mark George, and Latimer-Jackson at the direction of Defendant Pira.

193. Upon information and belief, the charges were emailed to the Plaintiff's deputy commissioner Sheronda Williams. Ms. Williams in return emailed it with special instructions to the plaintiff's director Robyn Battle to be served on the Plaintiff. This was the same process the Defendants used to serve Plaintiff on ODA Nos. 1412014-2 to 1412014-5.

194. The Plaintiff also received another copy of the disciplinary charges that contained false statements as an open document hand delivered by a process server by Nationwide Court Services just like the first set of charges – ODA No.: 1412014-01.

195. .The charges and specifications, just like the other four sets of charges were unsigned.

196. On the fifth set of charges, the Defendants falsely accused Plaintiff:

> … you made inappropriate, discourteous comments as well as offensive, racially-based remarks to the SID investigators. Specifically, as the interview started, you unnecessarily made discourteous and unprofessional comments to SID Investigator Alexander Stadnyk by questioning the way he was dressed, making comments about the way he speaks, and calling his smiling during the interview "unprofessional."

(ODA No. 1412014-05, specification V).

197.The accusations are false. Plaintiff never made those comments. The entire interview was recorded. It is easily refutable.

198.The charges and specifications were served by two different people (Robyn Battle & process server at Nationwide Court Services), and have two different fonts, meaning it was drafted by two different people at two different times.

199.The accusations in ODA No. 1412014-05 are false.

200. These false statements were viewed by more than two different people in two different times.

201. These Defendants are dangerous criminals going/went fishing for employees to falsely accuse the Plaintiff because of Plaintiff's race, that he knows too much and for objecting to their unlawful conduct (ex. Clocking in and out without being present in the office for number of years not working required 7 hours).

202. In the process, they made mistakes, and they were caught on tape.

203. Defendants' diabolical acts caused injuries to the Plaintiff.

204. The Defendants' diabolical acts caused the Plaintiff severe emotional trauma.

205. Defendant Nunez-White stated at the OATH trial that Mark George was the coordinator at the ODA, is responsible for reviewing the false charges brought against the Plaintiff to move forward. As such, Defendant Mark George is responsible for the injuries Plaintiff suffered. Defendant Mark George was involved in all 8 sets of disciplinary charges.

### *Stephen Dickerson*

206. Defendant Stephen Dickerson is the conflict resolution officer with the office of the ODA.

207. Defendant Denise DePrima contacted Mr. Dickerson on December 28, 2022,  after listening to Plaintiff's harassment issues, to help the Plaintiff.

208. Upon information and belief, talking to others, Defendant Dickerson helps only white & African American employees.

209. Defendant Dickerson is a social worker.

210. Defendant Dickerson sent an email to Plaintiff stating that he was going to contact Plaintiff at 2:00 pm. He never contacted the Plaintiff. The plaintiff made numerous calls to his office to reach him.

211. Every time Plaintiff called Dickerson's office, different secretaries told unbelievable stories, the outrageous one being that Dickerson was on her phone while she was on the phone with Plaintiff. The problem with her story was that she only had one receiver.

212. These are not the smartest people on earth: not good liars.

213. At the OATH trial, Dickerson's secretary, Tyra Branch, said that Defendant Dickerson told her to file a complaint with Defendant Nunez-White to bring the Plaintiff on charges.

214. On June 22, 2023, when Plaintiff was seated waiting for step 1 hearing, Defendant Dickerson walked in front of Plaintiff staring at Plaintiff.

215. Defendant Dickerson for prejudice & hatred reasons, told his secretary Tyra Branch - who Plaintiff never met, filed a false accusation with Defendant Nunez-White.

216. Those false statements by Tyra Branch were used by Nunez-White in the second set of charges to bring Plaintiff on charges.


*Unlawful conducts after Defendant Scalia was served*

217. Defendant Ann Scalia is the leader of squad five – Ann Scalia, Paul Ligresti,

Dinorah Nunez-White, Mark Neal, and Jill Berry committed the unlawful acts against Plaintiff. To prove that Defendant Scalia was the one who made the final decisions, Plaintiff came up with a strategy to serve only Scalia and wait for a while to see how everyone was going to react.

218. Plaintiff's server served Scalia on 9/09/24. On Wednesday, September 10, 2024, at 10:00 am, the Squad five- Scalia, Berry, Ligresti, Neal, and Nunez-White were in a lengthy meeting on Teams. (When someone is in a Teams using an HRA device, the program Teams shows who is in the meeting) On September 10, 2024, and before that for months there were no issues in Plaintiff's department specifically with Director Robyn Battle and the immediate supervisor Tomica Paisley. On September 11, 2024, Director Robyn Battle went to the conference room behind our desks and was on the phone for hours. This was the first time Ms. Battle used the phone in that room not at her desk, other than the week when her computer hard drive crashed. Ms. Battle always used her phone and the computer at her desk. She sits behind the Plaintiff. The plaintiff hears her every conversation. We are all in an open area.

219. After September 11, 2024, Ms. Battle without informing anyone and consent, for the first time started recording meetings on Teams and conversations with the Plaintiff.

220. Ms. Battle and the Plaintiff bonded on the first day – March 13, 2023. We were good friends. We shared food, went to lunch twice, and exchanged various gifts. Plaintiff is the best worker in the department: Plaintiff is the go-to guy for tech issues, and anything related to work.

221. On September 27, 2024, Plaintiff put on record at the beginning of the meeting on Teams to identify everyone in the conversation, as participants can listen unnoticed. This did not sit well with the immediate supervisor Tomica Paisley. She made various accusations, became hostile, indicated that she can record anyone that NY is a one-party consent, and denied that Teams Meetings were recorded.

222. The plaintiff told Ms. Paisley that a government employee cannot secretly record employees. When Ms. Paisley became our immediate supervisor, in September of 2023, she bragged that in her previous department under Defendant Ann Scalia in the HRA legal department, her team secretly recorded landlords. The Plaintiff told her that without consent or a warrant, the government cannot record private citizens. She said, "New York is a one-party consent and the HRA legal department approved the recording." Ms. Paisley was out on leave from September 2023 to April 2024; then she came back for about two weeks and has been working remotely on reasonable accommodation since then. Ms. Paisley is African American.

Ms. Battle is African American.

### *Harassment at the Defendant Scalia's directive*

223. The Plaintiff was in a training session on September 26, 2024. For the first time in one year and six months, Ms. Battle gets up occasionally and stares at the Plaintiff. One hour into the training session on 9/26/24 (Battle was not a participant), Ms. Battle called plaintiff:

> Battle: Why are you not on camera
>
> Plaintiff: Because I don't want to
>
> Battle: You are supposed to be on camera.
>
> Plaintiff: The instructor sets the rules, she knows that I am not on camera,
>
> others not on camera and she is fine with it.

224. Since Ms. Battle was not in training, she had to look at Plaintiff's computer very carefully for a long period to figure out that Plaintiff was not using the camera. Ms. Battle has no authority to decide how the training sessions are conducted. The instructor does that. Now Ms.

Battle at the Direction of Ann Scalia, is instigating and looking for reasons to write up Plaintiff.

225. As Plaintiff looked over his shoulder around 3:00 pm, Plaintiff noticed that Ms.,  Battle was standing up & just staring at Plaintiff. After a few minutes, she sat down and left her desk most likely to consult with her supervisor, the BFI department Deputy Commissioner, and Ms. Battle's friend Sheronda Williams. Ms. Battle came back around 3:45 and left for the day early. She did not report to work on Friday, September 27, 2024. Ms. Battle always informed her whereabouts to the Plaintiff, including if she was going to be out since we were good friends and trusted each other. Also, Plaintiff does the daily report as he is the most trusted and reliable employee.

### *More retaliation discriminatory acts*

226. The Plaintiff was scheduled, approved by Ms. Paisley, to attend a conference on  10/8/24 at 4 World Trade Center. On 9/20/24, after Plaintiff's appearance for the conference was approved by Plaintiff's supervisor Tomica Paisley, Defendant Scalia with discriminatory intent blocked Plaintiff from attending the conference: Ms. Battle told Plaintiff on 9/20/24, "Prasanna they are saying you can't attend the conference on 10/8/24." The plaintiff said, "Who is telling you?" Ms. Battle replied, "You know I can't tell you that."

227.  Now this court has evidence of harassment and retaliation orchestrated by Scalia after she was served. These are not conclusory accusations against the Defendants, specifically Scalia, it is factual evidence based on documents.

228. After the Colon debacle in 2019, there was a shakeup at the executive level. The

previous General Counsel was let go and Defendant Scalia became the General Counsel. Defendant Scalia is not a good legal mind. Just a person with a law license. She does not leave a paper trail. She does not send emails. All her communications are over the phone and on Teams. The plaintiff's supervisor, Ms. Paisley told this to us. Ms. Paisley's old department was with the HRA legal department.

### *Misconduct by Scalia and the defense attorney*

229. Defendant Scalia was served putting her on notice on September 9, 2024. She retained the NYC Corporate Counsel to defend her. By law, she was supposed to cease any & participating in any conspiracy against the Plaintiff. All communications must be through Ms. Damera. Since Scalia was so upset that she is being sued, she could not stay away from conspiring against the Plaintiff.

### *September 30, 2024, unlawful act*

230. On September 30, 2024, Plaintiff called his immediate supervisor Tomica Paisley on her work cell to inform her that Plaintiff put his excuse absence from work to attend the October 8, 2024, conference at 4 World Trade Center that she approved, and that if she could sign off on that. Ms. Paisley said, "I'll get back to you on that later." The conversation was recorded, as all Plaintiff's conversations. At around 10:30 am, Ms. Paisley, Ms. Robin Battle – Plaintiff's director, Defendant Ann Scalia, Jill Berry deputy commissioner, and Demon O'Donnell were all in a meeting on Teams until 11:30 am. Right after that meeting at 11:39 am, Ms. Paisley sent Plaintiff an email stating that Plaintiff could not attend the October 8, 2024, conference as Plaintiff was not selected. The problem: there is no selection process for the conference. It is for everyone.

231. Plaintiff responded to Ms. Paisley's email at 11:59 asking for proof that Plaintiff was not selected to attend the conference. As of today, Ms. Paisley has not responded with evidence. At noon, on September 30, 2024, Plaintiff called Ms. Paisley on her work cell since she was working from home every Thursday and Friday and told her that Plaintiff knew that she was on a meeting on Teams until 11:30 am. Ms. Paisley did not deny about the meeting on Teams. She asked Plaintiff if Plaintiff knew who was at the meeting. When asked about the meeting and who told her that Plaintiff was not selected to attend the October 8, 2024, conference, Ms. Paisley said, "I am not going answer any questions about the meeting and anything related to the conference." The plaintiff recorded the conversation. Now Plaintiff has undisputed evidence against Scalia & Jill Berry of conspiracy, aiding and abetting, selective enforcement, and clear unlawful acts caught on tape.

232. Since Plaintiff was approved to attend the conference and on the list as a guest, on September 19, 2024, Plaintiff received the notice to attend the Wellness Conference on October 8, 2024. The plaintiff was looking forward to attending the conference. The Plaintiff was not allowed to attend the conference. The Defendants' act caused injury to the Plaintiff.

233. The two that were involved in conspiracy, aiding and abetting after September 9, 2024, Scalia was served were Scalia & Jill Berry.

234. he defense attorney states that Plaintiff was not selected. This creates a claim of selective enforcement: (1) there was no section process as anyone can attend, (2) If the defense team says that Plaintiff was not selected, that creates a claim against DSS based on custom and policy of not selecting certain individuals.

235.It is undisputed that Scalia and the other two of the Squad 5 (Jill Berry & Mark Neal) were in a meeting on Teams with Plaintiff's immediate supervisor Tomica Paisley and director Robyn Battle on 9/30/2024 because the defense attorney Ms. Damera never denied or disputed at the conference on 10/18/2024. Her silence was admission. If it looks like if a duck, swims like a duck, and quacks like a duck, then it probably is a duck.

236. The Defendants violated the Civil Rights Act of 1964 Title VIII as described, *supra*.

237.Termination of Plaintiff's employment is not a requirement to succeed in the claims Plaintiff listed, *infra*. Moreover, Defendants repeatedly asked Plaintiff's resignation and took steps requesting Plaintiff's termination on 4 sets of charges at OATH, Defendants terminated the Plaintiff. And on the other four sets of charges, defendants recommended Plaintiff's termination. This is evidence that substitute termination as the Defendants actively took steps to terminate the Plaintiff.

## First claim for relief:
## Race and Ancestry Discrimination in violation of
## 42 U.S.C.  Section 1981 pursuant to Section 1983

238. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 237 as if fully set forth herein.

**239.** For the standard required for the 12 (b) (6) motion was taken directly from Colon **case** 19 CV 10435. As such, all rulings in this case must follow the Colon case & Jim Trotter claim. **(Exhibit C.)**

240. Defendants subjected Plaintiff to differential terms and conditions of employment because of his race and ancestry and violated Plaintiff's rights under Section 1981 and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution pursuant to Section 1983.

241. Specifically, Plaintiff was subjected to adverse employment actions, including: (i) accusing Plaintiff falsely; (ii) Being brought up on false disciplinary charges, unlike Hispanics, whites, and blacks. (iii) created a hostile work environment by serving five frivolous sets of charges that contained false accusations and accusations that were not legally actionable to Plaintiff's director and others.

242. Defendants took the above actions to deprive Plaintiff of equal employment opportunities and other contractual opportunities on account of his race and ancestry.

243. None of the Defendants were involved in hiring and working with Plaintiff

every day just violating his rights including liberty interests for prejudiced reasons. Because of Defendants' willful and deliberate actions, and as a proximate cause thereof, Plaintiff has been denied his right to equal employment opportunity in violation of Section 1981 pursuant to 1983.

## *Section 1983 & 1981 claims*

244. Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v.*

*Cnty. of Oneida*, N.Y., 375 F.3d 206, 224 (2d Cir. 2004); *see also* 42 U.S.C. § 1981(a). Section

1983 – which is not "a source of substantive rights" – "provides a method for vindicating.

Federal rights elsewhere conferred, such as those conferred . . . by § 1981." Patterson, 375 F. 3d

at 225 (citations and quotation marks omitted); *see id.* (explaining that § 1983 "allows an action

at law against a 'person who, under color of any statute, ordinance, regulation, custom, or usage,

of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'"

(quoting 42 U.S.C. § 1983)).

245. "'[T]he express cause of action for damages created by § 1983 constitutes the exclusive

federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'"

*Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (quoting *Jett v. Dallas Indp. Sch.*

*Dist.*, 491 U.S. 701, 733 (1989)) (emphasis in original); *see also id.* at 620-21 ("Because § 1983

already provides a remedy against state actors, there is no reason to infer from the rights-

conferring language of § 1981(c) that it creates an additional, and duplicative, remedy. . . . We . .

. therefore join nine of our sister Circuits in concluding that § 1981 does not provide a separate

private right of action against state actors."). Employment discrimination claims and retaliation

claims brought pursuant to § 1983 are analyzed under the *McDonnell Douglas* framework.

*Bermudez v. City of New York,* 783 F. Supp. 2d 560, 575 (S.D.N.Y. 2011); *Radice v.*

*Eastport S. Manor Cent. Sch. Dist.*, 437 F. Supp. 3d 198, 209 (E.D.N.Y. 2020); *see also*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (Colon at p. 16.)

246. Section 1983 Discrimination Claim to state a claim for employment discrimination under

Section 1983, a plaintiff must allege that the defendants "(1) act[ed] under color of state law, and (2) . . . [that their] conduct deprived [the plaintiff] of a constitutional or a federal statutory right." Bermudez v. City of New York, 783 F. Supp. 2d at 575; see also *Harris v. Westchester Cnty. Dep't of Corr.*, No. 06 CIV. 2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) ("to state a claim for damages under Section 1983, the plaintiff must allege sufficient facts to demonstrate that defendants were personally or directly involved in the violation, that is, that there was personal participation by one who had knowledge of the facts that rendered the conduct illegal" (citation, quotation marks, and alteration marks omitted)).

247. It is not disputed that Plaintiff was treated differently than Blacks, Hispanics, and Whites, where Blacks & Hispanics sexually harassed women were promoted, unqualified to do the assigned job, given pay races, does not even work (Michael Laidlaw, Gary Jenkins Defendant Dinorah Nunez-White, Defendant Eric Smalls, Defendant Stephen Dickerson, Defendant Tyra Branch and the rest of the Defendants).

## Second claim for relief:
## Selective Enforcement under the equal protection clause
## Of the 14th Amendment

248. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 247 as if fully set forth herein.

249. The Equal Protection Clause of the Fourteenth Amended provides "that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr*., 473 U.S.

432, 439 (1985). To establish a selective enforcement claim, a plaintiff, ordinally, must show: "(1) that [he], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004) (citation and alteration marks omitted). "In short, a plaintiff must allege that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination," and "[t]o be similarly situated," means that "the individuals with whom [the plaintiff] attempts to compare [himself] must be similarly situated in all material respects." *Cook v. Dubois*, No. 19-CV-8317 (CS), 2021 WL 91293, at *6 (S.D.N.Y. Jan. 11, 2021) (citations and quotation marks omitted).

## Municipal liability

250. The defense attorney claimed that Plaintiff was not selected to attend the conference that Plaintiff was approved for and received notice by the organizers. This is selective enforcement by the defendants pursuant to custom by the DSS that was admitted by the defense team.

251. Plaintiff adequately pled the existence of a "mosaic" of intentional

discrimination when the (i)Defendants constantly harassed Plaintiff by serving five disciplinary charges that contain false allegations; (ii) EEO officer Eric Smalls (black race) retaliated by making false accusations on a conversation pursuant to the complaint Plaintiff filed with the EEO office which is a protected to the Executive Director of Office of Disciplinary affairs Dinorah Nunez-White to bring Plaintiff on charges, *supra*, and the labor relations director – Denise Deprima referring to EEO office to bring charges against the Plaintiff for making a

complaint with her office on the confidential (protected activity) information Ms. DePrima (white) obtained which is not even a violation; and the conflict resolution office Stephen Dickerson (black race)- solicited his assistant Tyra Branch to make an outrageous false accusation to Dinorah Nunez-White to bring Plaintiff upon charges. Plaintiff was single-handedly targeted by blacks, Hispanics and whites.

### Third claim for relief:
### Discrimination under NYCHRL
(Race and Ancestry Discrimination under the NYCHRL)

252.Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 251 as if fully set forth herein.

253. Under the NYCHRL, courts must apply a more liberal standard than that applied under other federal and state anti-discrimination statutes. See *Loeffler v. Staten Island Univ. Hosp*., 582 F.3d 268, 278 (2d Cir. 2009); *Bermudez*, 783 F. Supp. 2d at 592. "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims"; "even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 109 (2d Cir. 2013). Under the NYCHRL, a plaintiff need only prove "by a preponderance of the evidence that [he] has been treated less well than other employees because of [his race and ancestry].

254. At all relevant times, Plaintiff was an "employee" within the meaning of the NYCHRL.

255. By adversely affecting the terms, conditions, and privileges of Plaintiff's employment because of his race and ancestry, Defendants violated the NYCHRL.

256. It is not disputed that Defendant – Emily Tone-Hill (white race) at the employment law division at the advice of her superior General Counsel Ann Scalia (white race) & Paul Ligresti(white race) who did not hire the Plaintiff, nor did they evaluate the Plaintiff's performance requested resignation from the plaintiff twice. Then again, conspired with the ODA step 1 hearing officer Cindy Rivera violating CSL § 75, that Ms. Emily Tone Hill requested the termination on the fifth set of charges even before the step 1 hearing.

257. The Plaintiff spent thousands of dollars fighting five sets of false, frivolous disciplinary charges leveled against Plaintiff for filing a complaint with labor relations and the EEO office.

258. The fact that the Defendants terminated Plaintiff's immediate supervisor – Andrei Singh, who is South Asian, is more proof that DSS discriminated against South Asians.

259. Because of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $500,000.00.

## Fourth claim for relief:
## AGAINST ALL DEFENDANTS
## (Race and Ancestry Discrimination under the NYSHRL)

260. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 259 as if fully set forth herein.

261. At all relevant times, Plaintiff was an "employee" within the meaning of the NYSHRL.

262. By adversely affecting the terms, conditions, and privileges of Plaintiff's employment because of his race and ancestry, Defendants violated the New York State Human

Rights Law.

263. Because of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $500,000.00.

### Fifth claim for relief:
### AGAINST ALL DEFENDANTS
### (Retaliation in Violation of NYSHRL)

264. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 263 as if fully set forth herein.

265. Defendants above conduct was in retaliation for Plaintiff's complaints of discrimination to the EEO office, labor relations department, Special Investigations division and the DSS Commissioner Molly Park asking the individual Defendants' employment to be terminated and violating Plaintiff's rights under the NYSHRL.

266. As of today, Labor Relations Director Denise DePrima even attempted to investigate the criminal conduct by the Defendant Charise Latimer-Jacksom, Ann Scalia, Emily Tone-Hill, Paul Ligresti, and Dinorah Nunez-White for enlisting an outside bodybuilder on June 22, 2023, when Plaintiff appeared for the step 1 hearing. Charise Latimer-Jackson stated at the hearing (recorded) that she enlisted the bodybuilder because the secretary Sherkia Boone stated that Plaintiff threatened her. Ms. Boone testified after the recording was played at trial that Plaintiff did not threaten her as there were no threats recorded on the recording.

267. The various actions Defendants took against Plaintiff after he complained of discrimination constitutes unlawful retaliation in violation of the NYSHRL.

268.Because of the foregoing, Plaintiff has suffered loss financially, emotional trauma

and damage in an amount to be determined at trial but estimated to be no less than

$100,000.00.

## Sixth claim for relief:
## AGAINST ALL DEFENDANTS
## (Retaliation in Violation of NYCHRL)

269.Plaintiff realleges and incorporates by reference each and every allegation  contained

in paragraphs 1 to 268 as if fully set forth herein.

270. Defendants above conduct was retaliation for Plaintiff's complaints of discrimination

to the EEO office & labor relations department and violated Plaintiff's rights under the

NYCHRL.

271. All the various actions Defendants took against Plaintiff after he complained of

unlawful discrimination to the EEO office, labor relations, and special investigations division

for constituting unlawful retaliation in violation of the NYCHRL.

## Seventh claim for relief:
## Conspiracy based on personal interest
## Section 1983

272.Plaintiff realleges and incorporates by reference each and every allegation  contained

in paragraphs 1 to 271 as if fully set forth herein.

273.**It is not disputed based on** documentary evidence & audio recordings (email & **trial**

transcript) each of these individual Defendants in different departments (EEO, Labor

Relations, the Law Department & the ODA) conspired to violate Plaintiff's right violating Plaintiff's right to enjoy goods and services DSS has to offer because of Plaintiff's race, color, and ancestry.

274. Under the "personal stake" exception, the doctrine does not apply "when the alleged conspirators are motivated by an improper personal interest separate and apart from that of their principal." (collecting cases). As this Court has previously recognized, various courts in this district have applied the doctrine to § 1983 claims.

275. Defendants falsely state to mislead everyone that plaintiff's conspiracy fails because the defendants are not state actors and completely ignore that Plaintiff's claim is based on personal interest. Plaintiff's this claim supported by Defendant's falsely accusing the plaintiff which triggered that they each had a personal interest that the acts were made based on personal hatred. Moreover, the fact that Plaintiff found out that Dinorah Nunez-White, Ann Scalai, Paul Ligresti & Emily Tone-Hill does not physically come to work as required.

## Eighth claim for relief:
## U.S. Constitution 14th Amendment due process claim

276. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 275 as if fully set forth herein.

### *Harassment and retaliation*

277. Defendants violated Liberty and property interests in discrimination-, harassment-, and retaliation-free workplace.

278. The plaintiff was brought upon three sets of charges in retaliation to the harassment complaint he filed with the labor relations director Denise DePrima. The Plaintiff was

brought upon charges falsely accusing the Plaintiff of filing a discrimination complaint with the EEO office.

279. The complaint with the labor relations director Denise DePrima & the EEO office was a protected activity.

280. Defendants retaliated against the Plaintiff for engaging in a protected activity.

281. Defendants violated Liberty interest in practicing Plaintiff's profession without stigma imposed by state officials to her "good name and reputation"

282. Courts in this circuit have recognized procedural due process claims where the plaintiff was deprived of procedural due process as a result of retaliatory actions. See, e.g., *Parra v. Fischer,* No. 11-cv-6518, 2012 WL 3069952, at *5 (W.D.N.Y. July 27, 2012) (providing false testimony against an inmate motivated by desire to retaliate against inmate's exercise of substantive constitutional rights constitutes due process violation where inmate is denied procedural protections allowing him to clear his name); *Williams v. Foote*, No. 08-cv-2838, 2009 WL 1520029, at *11 (C.D. Cal. May 28, 2009) (finding plaintiff was not afforded due process where a false disciplinary report was filed against him in retaliation for plaintiff exercising a constitutional right and he was deprived of procedural due process in connection with the proceedings flowing from the false report, resulting in the deprivation of a cognizable liberty interest). Moreover, Plaintiff claims here also that cognizable liberty or property interest is the right to a retaliation-free workplace.

283. Currently, under due process, Plaintiff does not have a claim for loss of property interest claim since he is still employed.

## Ninth claim for relief:
## Liberty interest-stigma plus claim

284. Plaintiff realleges and incorporates by reference each and every allegation

contained in paragraphs 1 to 283 as if fully set forth herein.

285. A "stigma plus" claim requires that the plaintiff allege "(1) the utterance of a

statement about her that is injurious to her reputation, that is capable of being proved false, and

that . . . she claims is false, and (2) some tangible and material state-imposed burden." *Velez v.*

*Levy,* 401 F.3d 75, 87 (2d Cir. 2005) (internal citation and quotation marks omitted). The Second

Circuit has recognized that "[w]hile there is no 'rigid requirement [] that both the 'stigma' and

the 'plus' must issue from the same government actor or at the same time, 'they must be

sufficiently proximate.'" *Mudge v. Zugalla*, 939 F.3d 72, 80 (2d Cir. 2019) (quoting *Velez*, 401

F.3d at 89). This requirement is satisfied where "(1) the stigma and plus would, to a reasonable

observer, appear connected . . . and (2) the actor imposing the plus adopted (explicitly or

implicitly) those statements in doing so." Velez, 401 F.3d at 89.

286. Defendant Tyra Branch - who Plaintiff never met falsely stated, "Shortly after, you

stopped Office of Conflict Resolution staff member Tyra Branch on her way to her work area and

asked her if her name was Petal. When she responded, "No, you proceeded to point to your hand

with your finger while rubbing your hand and obnoxiously said, 'Are you sure, because you look

like. Your hand gesture was inappropriate and offensive because it implies that Ms. Branch and

Petal Looked alike due to their skin color.'" The plaintiff never met the individual named Petal &

Tyra Branch prior to OATH trial. The Plaintiff met them for the first time at trial. Ms. Petal

Harlow confirmed that at trial.

287. Ms. Branch testified: that this alleged encounter happened before 10 am as she was

entering the front area. The problem is that she was not on the video footage from 9:00 am to

11:31 am when Plaintiff entered and left the 31st floor. The only people captured on video were

the bodybuilder, the Plaintiff, Sherkia Boone, FJC security person, Stephen Dickerson, and the

union representative.

288. Ms. Branch, however, stated that her supervisor, Stephen Dickerson, told her to

put the false statements in writing to Nunez-White to bring the Plaintiff on charges.

289. She covered her tracks by not signing and notarizing the note so it would not be in  an

acceptable form. Ms. Branch acknowledged that the notary April Hill – who notarizes papers

for the HRA employees was on the floor.

## Tenth claim for relief: Defamation

290. Plaintiff realleges and incorporates by reference each and every allegation contained

in paragraphs 1 to 289 as if fully set forth herein.

291. A defamatory statement is one that exposes an individual to public hatred, shame,

obloquy,  contumely,  odium,  contempt,  ridicule,  aversion,  ostracism,  degradation,  or

disgrace, or . . . induces an evil opinion of one in the minds of right-thinking people

292. The false statements by Tyra Branch, Dinorah Nunez-White, Ann Scalia, Eric Smalls,

Caroline Hernandez & Alexander Stadnyk - at the direction of Frank Pira,  on the five sets of

specifications and charges were emailed to Plaintiff's director and the deputy commissioner

by email, publishing them in their database to be served on the Plaintiff.

293. ODA Nos,: 1412014-01 & 05 were emailed to Nationwide Court Services representative Hector Pacheco by email. Mr. Pacheco in return printed the documents that contained false statements, read and gave them to a process server to serve on the plaintiff. The documents were carried by a process server as an open document - not in an envelope and given to a visitor- Soraya Azra who was in Plaintiff's house. The visitor- Ms. Azra confirmed that she had read the documents and put them by Plaintiff's door. The visitor said, "I can't believe that these people did not put the documents in an envelope."

294. A week ago, Plaintiff's director Robyn Battle told Plaintiff, "I know you. I don't believe what they are saying. I want to keep my team together. I hope OATH dismisses all charges."

295. The evidence shows that Plaintiff's director Robyn Battle and his deputy commissioner, Sheronda Williams read and were trying to figure out what to make out of the Defendant's accusations. They read, printed, and served the charges on the Plaintiff.

296. The documents were and still are published & saved at Hector Pacheco's at Nation Wide Court Services, Sheronda Williams' and Robyn Battles' computers.

297. The toothpaste is out of the tube; there is no way to put it back in the tube.

298. Now the Defendants must pay for the Plaintiff damages for the injuries they caused on the Plaintiff.

## Eleventh claim for relief:
## Conspiracy Libel

299. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 298 as if fully set forth herein.

300. The Defendants conspired with each other by making false statements against the

Plaintiff to cause injuries to the Plaintiff.

# Twelfth claim for relief:
# Garden variety emotional distress

301. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 300 as if fully set forth herein.

302. The Plaintiff is traumatized by harassment by the Defendants. They served not one, not two, 8 frivolous sets of charges that contained false statements delivered to various individuals by email.

303. Defendants' actions affected Plaintiff's work and his personal life causing emotional trauma. (Plaintiff's life is devoted to taking care of his very sick and elderly parents. Defendants' unlawful acts disrupted Plaintiff's ability to take care of his parents.

304. Defendants destroyed Plaintiff's blended family (current director & coworkers) causing tensions and chemistry. It is too late ss the damages cannot be undone.

305. Plaintiff throughout his life had given money, his breakfast, and dinner to African American & Hispanic homeless people. Then came Margo Brodie and the Defendants.

## Thirteenth claim for relief:
## U.S. Constitution 1st Amendment retaliation

306. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 305 as if fully set forth herein

307. The Plaintiff was retaliated for the comments he made exercising the U.S.

Constitution 1st Amendment in defending first sets of charges. The comments are privileged as they were made to defend the disciplinary charges.

308.  Defendants falsely state to mislead the court violating ethics making AI hallucinations "these comments are not protected under the First Amendment because they pertained only to a matter of personal, not public concern. See Saulpaugh, 4 F.3d at 143. As such, Plaintiff's First Amendment retaliation claim should be dismissed." (Docket entry # 55 p. 18.) The Defendants retaliated because Plaintiff made comments that the DSS Commissioner Gary Jenkins [was] unqualified and was an embarrassment. This is public concern that was not made in brief, rather by email to the Defendants that the Defendants used to retaliate and brought new charges against the Plaintiff. Moreover, qualified privilege applies to the Plaintiff (since plaintiff made the comments) against anyone preventing them from bringing charges that does not applied to the Defendants.

309.   The defense attorney must be sanctioned for making false and misleading arguments – let's just say anything, so the Court will buy to dismiss the case. The defense attorney, Ms. Damera's Memorandum, is full of AI hallucinations and misleading arguments.

310. A Georgia federal judge delivered a scathing rebuke to an attorney representing four women suing **comedian Katt Williams**, warning she could face ***"serious discipline"*** for filing a legal brief he described as riddled with ***"AI hallucinations."***

311.  During a heated hearing on Williams' motion for summary judgment in Atlanta federal court, U.S. District **Judge William M. Ray II** directly confronted **attorney Loletha**

**Denise Hale** about whether she used artificial intelligence to prepare her clients' response brief—a document the judge said contained so many fabricated legal citations that he ordered his law clerk to fact-check every single one.

312. Judge **William M. Ray II** , went on to say, ***"After I noticed the first few [errors], I asked my law clerk to look up all of the provisions cited in it,"*** Judge Ray said during the proceedings. ***"The overwhelming majority of them were either cited incorrectly or did not stand for what [Hale] claimed they did."***

313. When pressed by the judge, Hale denied using AI but offered an unusual explanation: she said she had ***"personal issues going on"*** at the time and that her daughter ***"helped her"*** prepare the brief. Notably, Hale neither disclosed her daughter's age nor confirmed whether her daughter is a licensed attorney authorized to work on the case.

314. Judge stated, *"Is your signature on it?"* Judge Ray asked pointedly, prompting Hale to confirm that it was indeed her signature on the document.

The judge said he found that ***"concerning,"*** not only because it presented ***"a possible Rule 11 issue"***—referring to Federal Rule of Civil Procedure 11, which mandates that attorneys conduct reasonable inquiries into facts and law before filing papers with the court—but also because of ***"misrepresentations"*** Hale had made to a jury in another case he previously oversaw.

315. Further, Jude Ray stated, Judge Ray's response signals the growing judicial intolerance for AI-generated legal work that hasn't been properly vetted. ***"I'm going to notice***

*this,"* he told the parties, announcing he would soon set a date for a Rule 11 hearing where he

expected there would be *"a lot of testimony."*

316. The implications for Hale could be severe. Rule 11 hearings can result in monetary

sanctions, referral to the state bar for disciplinary action, or court orders prohibiting attorneys

from filing future documents without prior judicial approval. The judge's directive that

Hale *"self-report to the state bar"* and notify her clients of the situation underscores the gravity

of the matter.*"I also think you should give notice to your client and self-report to the state*

*bar,"* Judge Ray said. *"If I followed what you put in your brief, I could have denied a motion*

*based on what you cited, which was not correct."* Judge Ray went on to say, "Hale's excuse—

blaming personal issues and her daughter's involvement—follows a troubling pattern in recent

AI citation scandals. In similar cases across the country, attorneys caught filing briefs with

fabricated citations have consistently pointed to personal distractions or delegated responsibility

to associates, rather than taking accountability for work bearing their signature. (See *Boston et*

*al. v. Williams et al., case number 1:23-cv-00752, in the U.S. District Court for the Northern*

*District of Georgia.)"*

317. What is the defense attorney Ms. Damer's excuse: Judge Robyn Tarnofsky asked her

to do so.

## Fourteenth Claim for Relief:
## Section 1981 retaliation claim

318. Plaintiff realleges and incorporates by reference each and every allegation

contained in paragraphs 1 to 317 as if fully set forth herein.

319. To bring a Section 1981 retaliation claim, which is analyzed under the same principles as a Title VII retaliation claim, plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Little john v. City of New York*, 795 F.3d 297, 315–16 (2d Cir. 2015) (internal quotation marks omitted). See also, *Trotter v. NFL*, 23-cv-08055 (JSR) (S.D.N.Y. Docket # 35)

320. The Defendants retaliated against the Plaintiff for filing two harassment complaints (one in criminal nature) with the labor relations director Denise DePrima and one discrimination complaint with the EEO office.

321. This is undisputed evidence.

322. Claims against City of New York and municipality DSS are totally different on different grounds.

## Fifteenth claim relief: Negligence
against the city of New York
for retention, hiring, training & supervision

323. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 322 as if fully set forth herein

324. It is not disputed based on the factual evidence that the defendants do not possess the knowledge to execute the work they are assigned to do. The only reason the Defendants were hired and promoted was because of their race & color.

325. The City Corporate Counsel is aware, probably participated in the conspiracy with Ann Scalia, Jill Berry and others participated in a meeting on Teams on 9/30/24 after the city of

New York and Ann Scala was served on 9/9/24 to further harass the Plaintiff.

326. Instead of ceasing any further harassment against the Plaintiff, Defendants decided to double down on the Plaintiff. (See 9/30/24 meeting pertains to the Plaintiff and other acts.)

327. There was another meeting on Teams on 10/25/24, that including the four members of  Squad 5- Scalia, Berry, Mark Neal, Nunez-White with Plaintiff's director Robyn Battle from 1 pm to 2:30 pm. The Plaintiff does not have evidence yet that anyone from the cooperate counsel's office was present.

328.The Defendant city of New York is responsible for employing the unethical, criminals like the Defendants at DSS that caused injuries to the Plaintiff.

329.The 9/30/24 and the 10/25/24 meeting were the last straw. The Defendant City of New York is responsible for the Defendants' unlawful acts.

330.The city of New York is responsible for the unlawful acts that DSS continues to employ unethical & unqualified (does not possess necessary knowledge in their respective field) employees like Eric Smalls, Dinorah Nunez-White, Ann Scalia, Jill Berry, Paul Ligresti, Emily Tone-Hill, Charise Latimer-Jackson, Petal Harlow & Cindy Rivera got the job because of their race.

## Sixteenth Claim for Relief:
## Aiding Abetting under NYHRL

331.Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 to 330 as if fully set forth herein

332. The Defendants' action serving 8 frivolous charges that contained utterly false accusations in a span of over a year and a half with the cooperation of numerous low-level

employees, then again conspiring on 9/30/24, to deny Plaintiff's right to attend a conference that was already approved by Plaintiff's supervisor Tomica Paisley, the Defendants aided and abetted with others to inflict injuries on the Plaintiff.

333.  It is the employer's participation in the discriminatory practice that serves as the

predicate for the imposition of liability on others for aiding and abetting. Thus, the Plaintiff properly stated a cause of action against the co-employees under [HRL] § 296(6). *Murphy v. ERA United Realty,* 674 N.Y.S.2d 415, 417 (2nd Dep't 1998).

334. The defendants aided and abetted claim passes the initial stage as they lied (caught on tape that they lied) on the charges.

## Seventeenth Claim for Relief:
## Aiding Abetting under NYCHRL

335. Plaintiff realleges and incorporates by reference each and every allegations contained in paragraphs 1 to 334 as if fully set forth herein

336. Based on the evidence listed, *supra,* the Defendants must be held liable for aiding and abetting under NYCHRL.

337. The defendants aided and abetted claim passes the initial stage as they lied (caught on tape that they lied) on the charges.

## Eighteenth Claim for relief:
## Hostile work environment under
## NYCHRL & NYSHRL

338. Plaintiff realleges and incorporates by reference each and every allegations contained in paragraphs 1 to 337 as if fully set forth herein.

339. Plaintiff does not have a claim for hostile work environment under federal law; but he has a claim under NYCHRL & NYSHRL.

340. Forensic psychologists will say that for the Defendants, Plaintiff was their Property. Their sociopathic behavior took over when they lost control of the Plaintiff. The Defendants decided to hit Plaintiff with false accusations like a tornado – one after another – 8 sets; then they ran into a problem later when they found out that they were taped. Defendants are sociopaths – even after they were sued, still could not stop the sociopathic behavior, because in their mind, they feel that they are untouchable.

341. This court must not assist the Defendants any further.

342. Ann Scalia & Jill Berry are ticking time bomb: Furious that they are being controlled by a South Asian immigrant.

### Nineteenth claim relief:
against the DSS/HRA
for discrimination based on race, creed, color and ancestry

**343.** Plaintiff realleges and incorporates by reference each and every allegations contained in paragraphs 1 to 342 as if fully set forth herein.

344. Defendants selectively discriminated against Plaintiff when they refused to allow Plaintiff to attend October 8, 2024, Wellness conference.

345. Plaintiff's supervisor approved him to attend the conference. There was no selection

process.   The Plaintiff was single-handedly excluded while the others were allowed to attend. The recording proves that the defendants single handedly excluded Plaintiff from attending the conference. The Defendants were not part of the Wellness Conference. They were not involved in organizing the conference.

346. The Defense attorney admitted in her memorandum of law that the Plaintiff was not selected by the Defendants.  (Docket entry # 55.)

## *Qualified immunity*

347. The Defendants do not enjoy the only immunity city officials afford - qualified immunity as the Defendant's actions were not a one-time act but rather several in a span of more than a year and a half serving eight sets of disciplinary charges that contained false accusations that established retaliation and discriminatory intents with malice. Also, the final straw was the 9/30/24 conduct by Jill Berry and Ann Scalia, *supra*, and the 10/25/24 meeting with the Plaintiff's director Robyn Battle.

### Prayer for relief

**348.The plaintiff requests** compensatory damages in the amount of five hundred **thousand** dollars ($500,000.00)

**349.**Plaintiff requests punitive damages in the amount of five hundred thousand **dollars** ($500,000.00);

**350.**Emotional damages in the amount of five hundred thousand dollars ($500,000.00);

**351.**Injunctive relief,

**352.**Declaratory Judgment in favor of the Plaintiff

**353.** And any other relief this court may deem and proper.

Dated: September 2, 2025                    Respectfully submitted,
New York, NY

      -/s/-

Prasanna Goonewardena

# EXHIBIT A



- **Query**
- **Reports**

- **Utilities**

- **Help**
- **Log Out**

ACO

**U.S. District Court**
**Eastern District of New York (Brooklyn)**
**CIVIL DOCKET FOR CASE #: 1:25-cv-02616-HG**

Schwalb v. City University of New York Queens College

Assigned to: Judge Hector Gonzalez

Cause: 42:1981 Job Discrimination (Race)

Date Filed: 05/09/2025
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Helen Schwalb**                    represented by    **Leah Seliger**
Joseph & Kirschenbaum LLP
32 Broadway
#601
New York, NY 10006
212-688-5640
Email: leah@jk-llp.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Maimon Kirschenbaum**
Joseph Herzfeld Hester &
Kirschenbaum LLP
233 Broadway
5th Floor
New York, NY 10279
212-688-5640
Fax: 212-688-2548
Email: maimon@jk-llp.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

| | | |
|---|---|---|
| **City University of New York Queens College** | represented by | **Elyce Noel Matthews**<br>NY OAG<br>28 Liberty Street<br>New York, NY 10005<br>212-416-8910<br>Fax: 212-416-6075<br>Email: elyce.matthews@ag.ny.gov<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 05/09/2025 | 1 | COMPLAINT against City University of New York Queens College filing fee $ 405, receipt number ANYEDC-19035573 Was the Disclosure Statement on Civil Cover Sheet completed -NO,, filed by Helen Schwalb. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Kirschenbaum, Daniel) (Entered: 05/09/2025) |

| 05/12/2025 | | Case Assigned to Judge Hector Gonzalez. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (SDM) (Entered: 05/12/2025) |
| 05/12/2025 | 2 | Summons Issued as to City University of New York Queens College. (SDM) (Entered: 05/12/2025) |
| 05/12/2025 | 3 | Clerk's Notice Re: Consent. A United States Magistrate Judge has been assigned to this case and is available to conduct all proceedings. In accordance with Rule 73 of the Federal Rules of Civil Procedure, Local Rule 73.1, the parties are notified that if all parties consent, the assigned Magistrate Judge is available to conduct all proceedings in this action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to this Notice is a blank copy of the consent form that should be filled out, signed and filed electronically only if all parties wish to consent. Any party may withhold its consent without adverse substantive consequences. Do NOT return or file the consent unless all parties have signed the consent.The form may also be accessed at the following link: https://img.nyed.uscourts.gov/files/forms/MJConsentForm.pdf (SDM) (Entered: 05/12/2025) |
| 05/12/2025 | 4 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made, if any. (SDM) (Entered: 05/12/2025) |
| 05/12/2025 | | ORDER: Plaintiff shall file a letter no longer than three pages on or before May 30, 2025, describing Plaintiff's efforts to serve Plaintiff's complaint and a summons on Defendant. If Plaintiff fails to file the letter required by this order, or if Plaintiff's letter demonstrates a lack of diligence in attempting service, then the Court is unlikely to extend the deadline for Plaintiff to complete service under Rule 4(m) in the absence of unusual circumstances demonstrating good cause.<br><br>The Court will not extend the deadline for Plaintiff to file the letter required by this order unless Plaintiff requests an extension in accordance with Section I.C of the Court's Individual Practices. |

| | | Ordered by Judge Hector Gonzalez on 5/12/2025. (GEM) (Entered: 05/12/2025) |
|---|---|---|
| 05/23/2025 | 5 | SUMMONS Returned Executed by Helen Schwalb. City University of New York Queens College served on 5/19/2025, answer due 6/9/2025. (Kirschenbaum, Daniel) (Entered: 05/23/2025) |
| 05/27/2025 | 6 | SCHEDULING ORDER: Counsel for all parties are directed to file on the docket a joint letter describing the case and a completed civil case management plan by June 23, 2025, as further described in the attached mandatory requirements. Requests for adjournment of the deadline for these submissions will be considered only if made in writing and otherwise in accordance with Section I.C of the Court's Individual Practices. Plaintiff's counsel shall notify Defendant's counsel of this scheduling order, in writing, as soon as reasonably possible.<br><br>Although the Court will be amenable to a reasonable extension of Defendant's deadline to answer or otherwise respond to Plaintiff's complaint, the Court will require the parties to demonstrate additional good cause to adjourn the deadline for filing the joint letter and proposed case management plan required by this order because the Court does not need Defendant's answer to set a discovery schedule. Ordered by Judge Hector Gonzalez on 5/27/2025. (GEM) (Entered: 05/27/2025) |
| 05/28/2025 | 7 | NOTICE of Appearance by Leah Seliger on behalf of Helen Schwalb (aty to be noticed) (Seliger, Leah) (Entered: 05/28/2025) |
| 05/28/2025 | 8 | Letter by Helen Schwalb (Seliger, Leah) (Entered: 05/28/2025) |
| 06/09/2025 | 9 | MOTION for pre motion conference *regarding CUNY's anticipated motion to dismiss Plaintiff's claims* by City University of New York Queens College. (Matthews, Elyce) (Entered: 06/09/2025) |
| 06/11/2025 | | ORDER: Defendant has filed a pre-motion conference letter in anticipation of a proposed motion to dismiss Plaintiff's complaint. *See* ECF No. 9 . Plaintiff shall file a responsive letter that complies with Section IV.A of the Court's Individual Practices on or |

| | | |
|---|---|---|
| | | before June 18, 2025, which shall address whether Plaintiff believes the complaint can be amended to address the issues raised in Defendant's letter. After Plaintiff has filed her responsive letter, the Court may exercise its discretion to convert the parties' pre-motion conference letters into the motion itself. Ordered by Judge Hector Gonzalez on 6/11/2025. (GEM) (Entered: 06/11/2025) |
| 06/12/2025 | 10 | AMENDED COMPLAINT against City University of New York Queens College, filed by Helen Schwalb. (Seliger, Leah) (Entered: 06/12/2025) |
| 06/12/2025 | | ORDER terminating as moot Defendant's pre-motion conference letter, ECF No. 9 , in light of Plaintiff's amended complaint, ECF No. 10 . Ordered by Judge Hector Gonzalez on 6/12/2025. (GEM) (Entered: 06/12/2025) |
| 06/20/2025 | 11 | Letter MOTION for Extension of Time to File Answer *, file a pre-motion letter, or otherwise respond to Plaintiff's First Amended Complaint and motion for an extension of time for the parties to file the case management plan and joint letter* by City University of New York Queens College. (Matthews, Elyce) (Entered: 06/20/2025) |
| 06/20/2025 | | ORDER: Defendant's motion for an extension of time, *see* ECF No. 11 , is granted. Defendant shall answer or otherwise respond to the amended complaint on or before July 18, 2025, and the parties shall file the case management plan and joint letter on or before June 30, 2025. Ordered by Judge Hector Gonzalez on 6/20/2025. (GEM) (Entered: 06/20/2025) |
| 06/30/2025 | 12 | CASE MANAGEMENT STATEMENT (Attachments: # 1 Appendix Attachment B to proposed CMP) (Seliger, Leah) (Entered: 06/30/2025) |
| 06/30/2025 | 13 | Letter *Joint Letter* by Helen Schwalb (Seliger, Leah) (Entered: 06/30/2025) |
| 07/09/2025 | 14 | ORDER: The Court adopts the parties' proposed case management plan, *see* ECF No. 12 , as the Court's scheduling order required by Rule |

| | | |
|---|---|---|
| | | 16(b). Ordered by Judge Hector Gonzalez on 7/9/2025. (GEM) (Entered: 07/09/2025) |
| 07/18/2025 | 15 | ANSWER to 10 Amended Complaint by City University of New York Queens College. (Matthews, Elyce) (Entered: 07/18/2025) |
| 07/29/2025 | 16 | Joint MOTION for Protective Order *and Stipulation of Confidentiality to be so-ordered by the Court* by City University of New York Queens College. (Matthews, Elyce) (Entered: 07/29/2025) |
| 07/29/2025 | 17 | Joint MOTION for Protective Order */ Rule 502(d) Order to be so-ordered by the Court* by City University of New York Queens College. (Matthews, Elyce) (Entered: 07/29/2025) |
| 08/04/2025 | 18 | ORDER: The Court so-orders the parties' confidentiality stipulation and proposed protective order. *See* ECF No. 16 . Ordered by Judge Hector Gonzalez on 8/4/2025. (PN) (Entered: 08/04/2025) |
| 08/04/2025 | | ORDER TO SHOW CAUSE: The Court is in receipt of the parties' proposed Federal Rule of Evidence ("FRE") 502(d) order, which provides that "[t]he production of privileged or work-product protected documents, electronically stored information ("ESI") or other information, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding." ECF No. 17 para. 1. The proposed order further provides that "[t]he provisions of [FRE] 502(b)," which states that the inadvertent disclosure of privileged materials does not operate as a waiver under certain circumstances, *see* Fed. R. Evid. 502(b), "do not apply," ECF No. 17 para. 1. <br><br> On or before August 11, 2025, the parties shall file a joint letter, not to exceed three pages, explaining why the Court should adopt the proposed order in this prophylactic fashion, and why the order should exclude the provisions of FRE 502(b) from its reach. The letter shall provide any relevant legal authority supporting the parties' request. Ordered by Judge Hector Gonzalez on 8/4/2025. (PN) (Entered: 08/04/2025) |

| 08/08/2025 | 19 | Letter *, jointly filed, in response to August 4, 2025 Order to Show Cause regarding the parties' proposed Rule 502(d) Order* by City University of New York Queens College (Matthews, Elyce) (Entered: 08/08/2025) |
| --- | --- | --- |
| 08/08/2025 | 20 | ORDER: The Court so-orders the parties' proposed Rule 502(d) order. *See* ECF No. 17 . Ordered by Judge Hector Gonzalez on 8/8/2025. (GEM) (Entered: 08/08/2025) |

| **PACER Service Center** | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 09/01/2025 15:32:26 | | | |
| **PACER Login:** | nanddp11 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-02616-HG |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT B

D. Maimon Kirschenbaum
Leah Seliger
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
 ------------------------------------------------------------**x**

  **HELEN SCHWALB,**

         **Plaintiff,**

    **v.**

  **CITY UNIVERSITY OF NEW YORK**
  **QUEENS COLLEGE,**

         **Defendant.**
 ------------------------------------------------------------**x**

      **Case No.: 1:25-CV-2616**

      <u>**COMPLAINT**</u>

      **DEMAND FOR JURY TRIAL**

    Plaintiff Helen Schwalb alleges as follows:

<u>**INTRODUCTION**</u>

1.    It has been front-page news for years that City University of New York Queens College (the "Queens College" or "Defendant") has an antisemitism problem.

2.    Queens College repeatedly failed to protect Jewish students and faculty from the barrage of antisemitic hate speech and violence that emerged on campus since the October 7, 2023 massacre of Israelis by Hamas.

3.    Even prior to the recent deluge of hate speech and violence, the College's teaching staff union, known as the Professional Staff Congress ("PSC"), was sued by six professors after it condemned Israel and called for a boycott of the world's only Jewish country.

4.      Continuing in the same manner, Queens College's Accounting Department has now laid off all of its part-time accounting adjunct professors who are Jewish, including Plaintiff Helen Schwalb.

## JURISDICTION AND VENUE

5.      Plaintiff Helen Schwalb brings this action against Defendant City University of New York Queens College alleging discrimination and retaliation claims brought under 42 U.S. Code § 1981 ("Section 1981") and New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL").

6.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Section 1981. This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

8.      Defendant City University of New York Queens College ("Defendant" or the "College") is a public college in the New York City borough of Queens. Queens College is part of the City University of New York school system. Queens College is located in Flushing, New York.  Queens College offers undergraduate, graduate and certificate programs to approximately 16,000 students.

9.      Plaintiff Helen Schwalb ("Plaintiff") was a part-time adjunct professor of accounting at Queens College from 2012 until her unlawful non-reappointment in May 2023. Plaintiff is an observant Jewish woman and a resident of Rockland County, New York.

## FACTS

10.      Plaintiff is a 66-year-old observant Jewish woman.

11.      She worked as an adjunct professor for Queens College in the Accounting and Information Systems ("AIS") department since 2012.

12.      Every year for the past 12 years, Plaintiff taught two to three classes per semester during the academic year as well as two classes each summer.

13.      Each year, Queens College assessed Plaintiff's work, and Plaintiff's colleagues and supervisors consistently gave her high ratings on all aspects of her teaching and research.

14.      Despite stellar reviews and positive feedback from students, in 2023, Queens College informed Plaintiff and five other Jewish accounting adjunct professors that they would not be reappointed to their positions for the upcoming school year.

15.      At the same time, Queens College did keep the non-Jewish accounting adjunct professors – many of whom had fewer years of seniority and lower performance ratings than the Plaintiff.

16.      Queens College stated in writing that the non-renewal of Plaintiff's contract was not the result of any performance issue.

17.      Terminations of accounting adjunct professors such as Plaintiff are governed by a collective bargaining agreement between the adjuncts and Queens College.

18.      Among other things, Plaintiff complained that Queens College violated the collective bargaining agreement ("CBA") governing her role by not providing a "comprehensive

review of the [Plaintiff's] performance" and by "insufficiently demonstrate[ing] … fiscal and programmatic needs within a 'feasible and rational academic personnel policy'" as required by the CBA. In plain English, Queens College ended the employment of Plaintiff and the other Jewish accounting adjunct professors without providing the required justification and information to support its decision pursuant to the CBA.

19.     Queens College claims that it terminated Plaintiff, and five other Jewish adjunct professors, because of a shortage of student enrollment and budgetary needs.

20.     However, Plaintiff's courses were fully enrolled at the time that Queens College informed her of its decision not to renew her contract.

21.     Further, any budgetary requirements that did exist would not demand that only Queens College's Jewish adjunct professors be terminated. Nor would a shortage of enrollment – if that was occurring – necessitate that a Jewish professor with excellent reviews be terminated instead of newer and less successful instructors.

22.     Also, Queens College did not cancel Plaintiff's classes after firing her.

23.     Queens College gave Plaintiff's classes to at least two other non-Jewish accounting adjunct professors. Upon information and belief, the classes were fully-enrolled while still listed under Plaintiff's name.

24.     Queens College terminated Plaintiff and five other Jewish accounting adjunct professors as part of an effort to clean house of its Jewish staff.

25.     The only remaining Jews in the AIS department are those with tenure who are in their 70s and 80s and will likely retire soon. Without Jewish adjunct professors, the AIS department will soon be completely free of its Jews.

## FIRST CLAIM FOR RELIEF
### (Section 1981 – Race Discrimination)

26.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

27.     In violation of Section 1981, Defendant intentionally and willfully discriminated against Plaintiff on the basis of her Jewish identity.

28.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

29.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

30.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (New York State Human Rights Law ("NYSHRL"),
### N.Y. Exec. L. §§ 290 et seq. – Religious Discrimination)

31.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

32.     In violation of the NYSHRL, Defendant intentionally discriminated against Plaintiff on the basis of her religion when it offered ongoing employment to the non-Jewish accounting adjunct professors and terminated all of the Jewish accounting adjunct professors.

33.     Defendant's discrimination was sufficiently severe so as to affect the terms of Plaintiff's employment.

34.     Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

35.     As a direct and proximate consequence of Defendant's discrimination against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff' good name and reputation, lasting embarrassment, humiliation and anguish.

36.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to: damages for lost wages, emotional distress, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

(A)     For compensatory, liquidated and punitive damages in an amount to be determined by the trier of fact;

(B)     For reasonable attorneys' fees, interest, and costs of suit;

(C)     For such other and further relief as the Court may deem just and equitable.

Dated: New York, New York    Respectfully submitted,
May 9, 2025    JOSEPH & KIRSCHENBAUM LLP

By:  */s/ D. Maimon Kirschenbaum*
      D. Maimon Kirschenbaum
      Leah Seliger
      32 Broadway, Suite 601
      New York, NY 10004
      Tel: (212) 688-5640
      Fax: (212) 688-2548

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS COLON,

                         Plaintiff,

          -against-

CITY OF NEW YORK, STEVEN BANKS,
JENNIFER YEAW, JILL BERRY, MARK
L. NEAL, MATTHEW BRUNE, MARTHA
CALHOUN, PAUL LIGRESTI, ISAAC
MCGINN, JOHN AND JANE DOE,

                         Defendants.

**ORDER**

19 Civ. 10435 (PGG) (SLC)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff Thomas Colon asserts claims under 42 U.S.C. §§ 1981 and 1983, the

New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights

Law (the "NYCHRL") for alleged race and ancestry discrimination and retaliation.  Colon also

brings claims for selective enforcement under the Equal Protection Clause of the U.S.

Constitution and for defamation.  (Cmplt. (Dkt. No. 1)  Defendants are the City of New York

(the "City") and Plaintiff's supervisors, managers, and/or fellow employees at the City's Human

Resources Administration ("HRA"):  Steven Banks, Jennifer Yeaw, Jill Berry, Mark L. Neal,

Matthew Brune, Martha Calhoun, Paul Ligresti, and Isaac McGinn (collectively, "Defendants").

(See id.))

          On June 22, 2020, Defendants moved to dismiss pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  (Def. Mot. (Dkt. No. 49))  On September 21, 2020, this Court

referred Defendants' motion to Magistrate Judge Sarah L. Cave for a Report and

Recommendation ("R&R").  (Dkt. No. 55)  On January 15, 2021, Judge Cave issued a fifty-

seven page R&R recommending that Defendants' motion be granted in part and denied in part. (See R&R (Dkt. No. 56) at 2, 55-56)  On February 15, 2021, Plaintiff filed objections to the R&R (Dkt. No. 62), and on March 15, 2021, Defendants filed an opposition to Plaintiff's objections.  (Dkt. No. 67)

The R&R will be adopted as set forth below.

## BACKGROUND

I.   **FACTS**[1]

A.   **The Parties**

Plaintiff Thomas Colon – "a 49-year-old male of Hispanic ancestry and race, and Mexican and Puerto Rican descent" (Cmplt. (Dkt. No. 1) at 3)[2] – "was one of the few high-level Hispanic employees working for the" HRA prior to his termination in July 2019.  (Id. at 1) Plaintiff began working for the HRA in 1995.  (Id. at 3)

Defendant Steven Banks is the Commissioner of HRA, as well as "its joint agency, the Department of Homeless Services," and Defendant Jennifer Yeaw was – "[a]t all relevant times" – Banks's Chief of Staff.  (Id.)  Defendant Jill Berry was the Executive Deputy Commissioner of Humans Resources Operations at HRA.  (Id. at 4)  Defendant Mark L. Neal is the Executive Deputy Commissioner of the Office of Human Capital Management at HRA.  (Id.) Defendant Matthew Brune is the Chief Operating Officer of HRA.  (Id.)  Defendant Martha Calhoun is the General Counsel of HRA.  (Id.)  Defendant Paul Ligresti is the Assistant General

---

[1]  The facts set forth in this Order are drawn from the Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

[2]  All cites to the Complaint are to page numbers, as the paragraph numbering in the Complaint is not sequential and is, at times, duplicative.  All references to page numbers in this Order are as reflected in this District's Electronic Case Files system.

Counsel of HRA.  (Id.)  Defendant Isaac McGinn was the Director of Communications at HRA.[3]
(Id.)

The Complaint alleges that Banks, Yeaw, Berry, Neal, Brune, Calhoun, and
Ligresti – "aided by others at HRA and the City's Mayor's Office [–] were responsible for and
made personnel decisions at HRA, including the decisions to demote Plaintiff, drastically cut his
salary by 32%, bring disciplinary charges seeking his termination and, ultimately, to terminate
him."[4] (Id. at 5)

**B.    Colon's Employment at HRA**

Plaintiff was a City employee for more than thirty years, and worked at HRA
from 1995 until his termination in July 2019.  (Id. at 1, 5-6)  Plaintiff received numerous
promotions during his employment at HRA, which brought increased responsibilities.  (Id. at 5-
6)  In May 2014, Plaintiff was promoted to Senior Advisor to Brune, who then served as HRA's
Chief Operating Officer.  (Id. at 6)  In August 2014, Brune named Plaintiff interim Deputy
Commissioner of Human Resources for the Office of Staff Resources ("OSR") at HRA.  (Id.)
And in January 2015, Banks named Plaintiff permanent Deputy Commissioner of Human
Resources for OSR.  (Id.)  Plaintiff's civil service title was then Administrative Staff Analyst,
Level M-4.[5]  (Id.)

---

[3] Banks is sued in both his personal and official capacities, while the remaining individual
defendants are sued in their personal capacities.  (Id. at 3-4)  Plaintiff alleges that "each
Defendant had policymaking authority and was responsible for ensuring that employees are not
subjected to discriminatory and/or retaliatory practices."  (Id. at 5)

[4] The Complaint alleges the following reporting structure:  Calhoun, Brune, Yeaw, and Neal
reported to Banks.  Berry reported to Brune, while Ligresti reported to Calhoun.  (Id. at 3-4)

[5] Between November 2014 and August 2016, Plaintiff reported to Michael Laidlaw, the then
Executive Deputy Commissioner of Human Resources.  (Id. at 7)  Between August 2014 and
September 2018, Plaintiff reported to Banks, Brune, and Yeaw.  (Id.)

C.      **HRA's History with Hispanic Managerial Employees**

In July 2013, former-HRA Commissioner Robert Doar met with Hispanic employees (the "Hispanic Committee") "about the lack of Hispanic employees in mid- and high-level HRA managerial positions within HRA, after receiving a signed petition about the issue." (Id. at 7)  In September 2014 and December 2014, when Banks became the new HRA Commissioner, Banks met with the Hispanic Committee to discuss this issue.  (Id. at 8)

"On April 8, 2015, the Hispanic Committee pressed [Banks] about their concerns," and on April 15, 2015, they sent Banks "statistics about the persistent lack of high-level Hispanic employees at HRA." (Id.)  However, the Hispanic Committee's concerns have not been addressed, and Hispanic employees have faced discrimination over the past several years, including an Hispanic employee being stripped of her authority, and Plaintiff being demoted, having his salary cut, and being faced with disciplinary charges.  (Id. at 8-9)

D.      **Alleged Discrimination on the Basis of Race and Ancestry**

Plaintiff complains that – although he received a number of promotions – he was paid less than "similarly situated and sometimes lesser qualified white and non-Hispanic employees." (Id. at 9)  For example, in January 2015, when he became Deputy Commissioner of Human Resources, he was paid $130,000 and managed more than 200 employees.  (Id.)  A white female counterpart – who oversaw fewer employees – was paid roughly $25,000 more.  (Id.)  In November 2014, "Plaintiff complained to [Brune] that his senior advisor . . . a white female, made approximately $15,000.00 more than [he did], despite having no direct reports."  (Id.)  In April 2016, as a result of the Department of Homeless Services' integration into HRA, Plaintiff

took on added responsibilities, but he received no salary increase.[6]  (Id.)

### E.   Alleged Retaliation Against Plaintiff

In August 2014, when Plaintiff became Deputy Commissioner, he began "protest[ing] and resist[ing] the near-constant unlawful and discriminatory personnel actions [Banks] and [Yeaw] attempted to implement."  (Id. at 11)

#### 1.   Employee Hiring Practices

According to Plaintiff, Banks's "hiring practices involved unlawful and improper cronyism, including the appointments of unqualified white individuals, without following the [City's] competitive process, as well as hiring unqualified staff based on referrals from City Hall."  (Id.)  For example, in April 2015, when instructed by Banks and Yeaw to "absorb" an employee, Plaintiff categorized the employee at Level M-2, as was proper.  (Id.)  Banks and Yeaw became angry, and Banks "threatened to fire Plaintiff if he did not raise [the employee] from an M-2 to M-4 [classification]."  (Id.)  After Plaintiff explained why the employee could not receive an M-4 title, Banks insisted that the employee be given an M-3 title.  (Id.)  Plaintiff claims that "[d]ue to his protests," he "faced increased scrutiny and hostility from [Banks] and [Yeaw]."  (Id. at 12)

#### 2.   Mayoral Personnel Meetings

In November 2015, Plaintiff began attending weekly Mayoral Personnel

---

[6]  Beginning in August 2016, Plaintiff "frequently requested a salary increase in keeping with his new duties and the salaries of white executive and even non-executive staff."  (Id. at 10)  "Between May 2016 and June 2017, Plaintiff complained about this pay disparity to [Brune] on several occasions, to no avail."  (Id.)  In July 2017, Plaintiff received a salary increase, but "only after he threatened to file an internal complaint with HRA's Equal Employment Opportunity . . . office."  (Id.)  Since July 2017, Plaintiff "was paid a lower salary than several other Assistant Deputy Commissioners and non-executive staff who have a lesser span of control and fewer responsibilities than" he did.  (Id.)

Meetings, during which Plaintiff "voiced his opposition" to unlawful personnel actions.  (Id. at

12-13)  Because of his protestations, Yeaw "continuously yelled and glared at Plaintiff, falsely

accused him of wasting time and not preparing and forcefully instructed him to take certain

actions during the Mayoral Personnel Meetings."  (Id. at 13)  After a December 2015 Mayoral

Personnel Meeting, Plaintiff and Brune discussed Yeaw's "discriminatory behavior."  (Id.)

Yeaw "stormed into the room and yelled at Plaintiff."  (Id.)  After this incident, Plaintiff

complained to Brune about Yeaw's "discrimination against him on the basis of his race and

ancestry."  (Id.)

On January 27, 2016, Plaintiff "complained [to] . . . HRA's [Equal Employment

Opportunity ('EEO')] Officer . . . that [Yeaw] – with [Banks's] knowledge and implicit approval

– was harassing [him] on the basis of his race and ancestry."  (Id.)  Plaintiff did not file a formal

EEO complaint, however, because he "[f]ear[ed] retaliation."  (Id. at 14)  Banks and Yeaw

nonetheless learned of his complaint to the EEO officer, and "from in or about January 2016

until his demotion in September 2018 . . . [they] began excluding Plaintiff from high-level

discussions and meetings while looking to terminate him."  (Id.)

### 3.     The 2016 Promotion Denial

In August 2016 – when the then-Executive Deputy Commissioner of Human

Resources resigned – Berry, a white female with no human resources experience, was appointed

acting Executive Deputy Commissioner rather than Plaintiff.  (Id.)  In October 2016, both Berry

and Plaintiff interviewed for the permanent position.  (Id.)  At his second interview, Plaintiff told

Brune that Berry was unqualified for the position and had received special treatment due to her

race.  (Id. at 14-15)  Brune replied, "'I don't want to hear that . . . [l]et's not bring that up again.

She is eminently qualified.'"  (Id. at 15)  Plaintiff asserts that "Defendants had no intention of

considering" him for the position.  (Id.)  Berry was given the permanent Executive Deputy

Commissioner position on November 14, 2016 (the "Promotion Denial").  (Id.)

### 4.    The 2016 Functional Demotion

In December 2016, Plaintiff asked Berry to change his title to First Deputy

Commissioner, Level M-5.  (Id.)  "In further discrimination and retaliation" for opposing Berry's

appointment, however, Berry stripped Plaintiff of his management duties relating to certain

divisions (the "2016 Functional Demotion).  (Id.)  "[T]o no avail," "Plaintiff complained to

[Berry] that her actions were discriminatory on the basis of race and ancestry."  (Id.)

### 5.    2016 Violations of HRA Policies and Procedures

Plaintiff alleges that he "was directed to blatantly circumvent HRA policies and

procedures in order to hire and promote unqualified white individuals."  (Id. at 16)  For example,

in December 2016, Plaintiff was directed to "'make up'" content for a job description to "ensure

approval" of a white man's promotion.  (Id.; see also id. at 16-17 (alleging that Plaintiff reported

the unlawful promotion to Ligresti, who did not respond, and warned that the New York City

Department of Investigation would flag the promotion, which it ultimately did); id. at 27-28

(discussing other alleged improper hires))  Plaintiff was questioned by the Department of

Investigation about the promotion of the unqualified employee, after which Banks "was

infuriated" with Plaintiff.  (Id. at 17)  During this time period, "Plaintiff and other Hispanic

employees in HRA continued to discriminatorily be denied fair promotion and salary increases."

(Id.)

### 6.    Plaintiff's 2018 Demotion and Salary Reduction, and the Alleged "Sabotage" of Plaintiff's Efforts to Obtain a New Position

In May 2017, "Defendants began laying the groundwork to demote and terminate

Plaintiff."  (Id.)  In June 2017, Plaintiff told Berry that he would file an internal discrimination

complaint unless he received a salary increase.  (Id. at 18)  Plaintiff's salary was then raised to $151,000.  (Id.)

In July 2017, after Yeaw resigned, Raquel Lucas became Banks's Acting Chief of Staff.  (Id. at 17)  Plaintiff learned that Banks "intended to move Lucas into an Assistant Deputy Commissioner [of Human Resources] position, after her return from maternity leave in September 2018."  (Id.)  "Lucas had no prior HR supervisory experience," however, and "Plaintiff was forced to create a job description for Lucas despite her lack of qualifications, in an unjustified move that would in the future be used to replace [him]."  (Id. at 17-18, 20)

At this same time, Berry arranged to have Plaintiff "investigated for Medicaid payroll fraud."  (Id. at 18)  Plaintiff claims that Berry took this action in retaliation for his pay-raise demand and Plaintiff's earlier internal EEO complaint.  (Id.)

In November 2017, Plaintiff interviewed for a position at the New York City Department of Design and Construction ("DDC").  (Id.)  DDC's Commissioner told Plaintiff that she wanted to offer him the position but first needed to speak with Banks.  (Id.)  Plaintiff was not offered the job (the "DDC Sabotage").  (Id. at 18-19)  Plaintiff asserts, "upon information and belief," that Banks and Calhoun spoke negatively about him to the DDC Commissioner "in retaliation for his claims of discrimination and opposition to supporting cronyism that benefitted white employees and job candidates."  (Id. at 19)

On August 28, 2018, Neal told Plaintiff that because of "Lucas' arrival in HR," the HR Partnerships division would be removed from Plaintiff's portfolio and assigned to a Black woman who – according to Plaintiff – "lacked the proper qualifications."  (Id. at 15, 19)  Plaintiff complained to Neal that the reassignment of his responsibilities was based on Plaintiff's race and ancestry.  (Id. at 19)  Neal told Plaintiff to "'prove him wrong' in order to keep the

position." (Id.)

On September 12, 2018 – after Lucas returned from maternity leave – Neal told Plaintiff "that he had been demoted to a non-managerial ASA, Level M-2 position, and his salary [was] reduced by over $35,000.00 or 32%" (the "2018 Demotion and Salary Reduction"). (Id. at 20) Plaintiff asserts that Banks, Brune, Yeaw, Berry, Calhoun, and Ligresti all played a part in the decision to demote him and cut his salary, and that he was demoted in "retaliation for his complaints." (Id.) Lucas "assume[d] a portion" of Plaintiff's responsibilities. (Id.) In connection with this demotion, Plaintiff was also "retaliatorily reassigned and moved to another office," where only one other employee was located, and was given no assignments. (Id. at 21) Plaintiff claims that this "demotion and deep salary cut were clearly retaliatory, discriminatory and unlawful," "[c]oming within weeks of [his] repeated objections and protests" regarding Defendants' unlawful actions.[7] (Id.)

### 7.      Disciplinary Charges, Termination, and Defamation

In July 2017, Banks, Brune, Yeaw, Berry, Neal, Calhoun, and Ligresti singled Plaintiff out "to be investigated for Medicaid fraud in relation to whether HRA employees' salaries are paid by the City or the State through Medicaid."[8] (Id. at 22) Plaintiff asserts that

---

[7] Plaintiff also claims that his demotion and salary reduction violated New York City Personnel Services Bulletin, Article 3, Section 320-R, which provides that managers must be informed of their right to appeal demotions and salary cuts. (Id. at 21) According to Plaintiff, he received no such notice. (Id.) On October 10, 2018, Plaintiff appealed his 2018 Demotion and Salary Reduction, and on December 10, 2018, Neal informed Plaintiff that he had been "restored to the title of Administrative Staff Analyst Managerial Level 4, with full salary and retroactive pay and benefits effective to September 12, 2018." (Id. at 28)

[8] Plaintiff asserts that, "[i]n 2017, approximately 77% of HRA's fiscal funding came from New York City funds, while the remaining 23% of HRA's fiscal funding came from State and/or Federal sources." (Id. at 22) According to Plaintiff, and pursuant to New York law, City employees performing Medicaid-related work are paid by the City. (Id.) The City is then "reimbursed by the State for these employees' salaries that are 100% attributable to Medicaid work." (Id.)

any Medicaid payroll fraud or impropriety was caused by Banks, who directed subordinates to engage in the wrongdoing. (Id. at 22-24)

On September 12, 2018, Plaintiff was charged with "Misconduct and/or Incompetence" (the "Disciplinary Charges") due to his alleged involvement with the Medicaid fraud scheme. (Id. at 24) According to Plaintiff, the Disciplinary Charges were retaliation for his opposition to the "agency-wide unlawful activities and discrimination." (Id.; see id. ("Defendants falsely pinned the Medicaid misappropriation on Plaintiff to get rid of him and disguise their own unlawful conduct"); id. at 25 (alleging that, beginning in March 2015, Plaintiff had alerted senior managers about Medicaid payroll funding issues and tried to address them, to no avail); id. at 26 (discussing other employees who engaged in Medicaid payroll fraud))

On June 13, 2019 – following "a series of hearings pursuant to Section 75 of the Civil Service Law with the [City's] Office of Administrative Trials and Hearings ('OATH')" – an Administrative Law Judge ("ALJ") recommended that Plaintiff be terminated. (Id. at 28-29) On July 29, 2019, Banks terminated Plaintiff's employment (the "Termination").[9] (Id. at 29)

On July 30, 2019, two newspapers reported Plaintiff's termination. (Id.) Plaintiff claims that the newspaper accounts "contain[] a false and defamatory statement" about him, attributed to McGinn (the "Defamation"). (Id.)

## II.   **PROCEDURAL HISTORY**

The Complaint was filed on November 8, 2019, and asserts claims for race and ancestry discrimination and retaliation against all Defendants under 42 U.S.C. §§ 1981 and 1983,

---

[9] Plaintiff claims that, after the "wrongful termination," he "was replaced with a less-qualified white female hire." (Id. at 29)

the NYSHRL, and the NYCHRL for discrimination and retaliation.  (Cmplt. (Dkt. No. 1))  The

Complaint also asserts (1) against all Defendants a selective enforcement claim under the Equal

Protection Clause of the U.S. Constitution; and (2) against the City, Banks, and McGinn, a

defamation claim.  (Id.)  Finally, the Complaint pleads a Monell claim against the City.  (Id.)

On June 22, 2020, Defendants moved to dismiss.  (Def. Mot. (Dkt. No. 49))  On

September 21, 2020, this Court referred Defendants' motion to Judge Cave for an R&R.  (Dkt.

No. 55)  On January 15, 2021, Judge Cave issued her R&R.  (Dkt. No. 56)

In her R&R, Judge Cave recommends that Defendants' motion be granted in part

and denied in part.  (Id. at 55)  Judge Cave concludes that Defendant's motion should be granted

to the following extent:

> Plaintiff's claims based on his November 2014 complaints to Brune about his
> salary, his April 2015 complaints about the hiring of Employee #1, and his
> complaints about the 2015 mayoral meetings [should] be dismissed with prejudice
> as time-barred;
>
> Plaintiff's Discrimination Claims based on the 2018 Demotion and Salary
> Reduction, the Disciplinary Charges, and the Termination claims [should] be
> dismissed without prejudice[;]
>
> Plaintiff's Selective Enforcement Claim [should] be dismissed without
> prejudice[;]
>
> Plaintiff's Retaliation Claims based on his exclusion from high-level meetings,
> subjection to criticism, the 2018 Demotion and Salary Reduction, and the
> rescinding of the DDC Offer [should] be dismissed without prejudice[;]
>
> Plaintiff's Defamation Claim [should] be dismissed with prejudice[; and]
>
> . . .
>
> [Plaintiff's claims] against Individual Defendants Neal, Calhoun, Ligresti,
> McGinn and Yeaw [should be dismissed for failure to state a claim].

(Id. at 55-56 (emphasis omitted))

Judge Cave further concludes that Plaintiff's federal, NYSHRL, and NYCHRL

discrimination claims premised on (1) the 2016 Promotion Denial should be dismissed as to all individual Defendants but Brune; and (2) the 2016 Functional Demotion should be dismissed as to all individual Defendants but Berry.  (Id. at 56)

As to Plaintiff's federal, NYSHRL, and NYCHRL retaliation claims, Judge Cave concludes that Plaintiff's claims as to (1) Brune, based on the 2016 Promotion Denial; (2) Berry, based on the Functional Demotion; and (3) Banks, based on the Disciplinary Charges and the Termination are adequately pled.  (Id.)

Judge Cave further concludes that Plaintiff's Monell claim is adequately pled as to the Sections 1981 and 1983 retaliation claim based on Plaintiff's Termination.  (Id.)

Judge Cave further recommends that Plaintiff be granted leave to amend as to all claims dismissed without prejudice.  (Id.)

On February 15, 2021, Plaintiff filed objections to Judge Cave's R&R.  (Dkt. No. 62)  Plaintiff claims that Judge Cave erred in dismissing as time-barred Plaintiff's Unequal Pay Claim under Section 1981, the NYSHRL, and the NYCHRL, noting that Plaintiff continued to complain about unequal pay through June 2017, and had received "discriminatory pay check[s] . . . within the statute of limitation."  (Id. at 9; see also id. at 8)  Plaintiff further claims that Judge Cave erred in concluding that his discrimination claims are not adequately pled to the extent they are premised on the Disciplinary Charges and Termination.  (Id. at 9-10)  As to Plaintiff's Equal Protection selective enforcement claim, Plaintiff contends that – in recommending that this claim be dismissed – Judge Cave did not consider Plaintiff's argument that Banks had acted in bad faith and with malicious intent to punish Plaintiff for "opposing political cronyism" in hiring. (Id. at 11-13)  Plaintiff also argues that Judge Cave erred in concluding that Plaintiff's race-based Sections 1981 and 1983 retaliation claim cannot proceed under the Equal Protection Clause.  (Id.

at 13-14)  Finally, Plaintiff contends that Judge Cave erred in concluding that his retaliation

claims – to the extent they are premised on the DDC Sabotage – are not adequately pled.  (Id. at

14-17)  To the extent that Plaintiff's NYCHRL retaliation claim rests on this incident, Plaintiff

contends that Judge Cave did not apply the more forgiving standard applicable under the

NYCHRL.  (Id. at 18)

   Defendants filed their opposition to Plaintiff's objections on March 15, 2021.

(Dkt. No. 67)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Review of Report and Recommendation

   A district court reviewing a magistrate judge's report and recommendation "may

accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge."  28 U.S.C. § 636(b)(1)(C).  When a timely objection has been made to a

magistrate judge's recommendation, the district court judge "shall make a de novo determination

of those portions of the report or specified proposed findings or recommendations to which

objection is made."  Id.  However, "[o]bjections that are merely perfunctory responses argued in

an attempt to engage the district court in a rehashing of the same arguments set forth in the

original papers will not suffice to invoke de novo review.'"  Phillips v. Reed Grp., Ltd., 955 F.

Supp. 2d 201, 211 (S.D.N.Y. 2013) (citation, quotation marks, and alteration marks omitted).

"To the extent . . . that the party . . . simply reiterates the original arguments, [courts] will review

the [R&R] strictly for clear error."  IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., 07

Civ. 6865 (LTS) (GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008).  For portions of the

R&R to which no timely objection is made, a Court's review is limited to a consideration of

whether there is any "'clear error on the face of the record'" that precludes acceptance of the recommendations.  Wingate v. Bloomberg, No. 11-CV-188 (JPO), 2011 WL 5106009, at *1 (S.D.N.Y. Oct. 27, 2011) (quoting Fed. R. Civ. P. 72(b) advisory committee note and citing Nelson v. Smith, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)).

### B.   **Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," and must "draw all reasonable inferences in favor of the plaintiff."  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

"[A] plaintiff alleging employment discrimination or retaliation is not required to plead facts sufficient to establish a prima facie case."  Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 512 (S.D.N.Y. 2010).  Instead, "the 'ordinary rules for assessing the sufficiency of a complaint' under Federal Rule of Civil Procedure 8(a)'s notice pleading standard applies."  Id. (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002)).

Under this standard, a plaintiff is required only to set forth a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft 'to sho[w] that the pleader is entitled to relief.'"  Twombly, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)).  To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level," id. at 555, and a plaintiff's claims must be "plausible on [their] face."  Id. at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S.

at 678.

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" Id. (quoting Twombly, 550 U.S. at 557).  Moreover, where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," Twombly, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." Id. at 570.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, [] documents incorporated by reference in the complaint," and documents that are "'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010); see also Nestle Waters N. Am., Inc. v. City of New York, No. 15-CV-05189 (ALC), 2016 WL 3080722, at *4 (S.D.N.Y. May 25, 2016), aff'd, 689 F. App'x 87 (2d Cir. 2017) ("a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings" (citation, quotation marks, and alteration marks omitted)).

**C.     Section 1981 and 1983 Claims**

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 224 (2d Cir. 2004); see also 42 U.S.C. § 1981(a). Section 1983 – which is not "a source of substantive rights" – "provides a method for vindicating

federal rights elsewhere conferred, such as those conferred . . . by § 1981." <u>Patterson</u>, 375 F. 3d at 225 (citations and quotation marks omitted); <u>see</u> <u>id.</u> (explaining that § 1983 "allows an action at law against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" (quoting 42 U.S.C. § 1983)).

"'[T]he express cause of action for damages created by § 1983 constitutes the <u>exclusive</u> <u>federal</u> <u>remedy</u> for violation of the rights guaranteed in § 1981 by state governmental units.'" <u>Duplan v. City of New York</u>, 888 F.3d 612, 619 (2d Cir. 2018) (quoting <u>Jett v. Dallas Indp. Sch. Dist.</u>, 491 U.S. 701, 733 (1989)) (emphasis in original); <u>see</u> <u>also</u> <u>id.</u> at 620-21 ("Because § 1983 already provides a remedy against state actors, there is no reason to infer from the rights-conferring language of § 1981(c) that it creates an additional, and duplicative, remedy. . . . We . . . therefore join nine of our sister Circuits in concluding that § 1981 does not provide a separate private right of action against state actors.").

Employment discrimination claims and retaliation claims brought pursuant to § 1983 are analyzed under the <u>McDonnell Douglas</u> framework. <u>Bermudez v. City of New York</u>, 783 F. Supp. 2d 560, 575 (S.D.N.Y. 2011); <u>Radice v. Eastport S. Manor Cent. Sch. Dist.</u>, 437 F. Supp. 3d 198, 209 (E.D.N.Y. 2020); <u>see</u> <u>also</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

 **D.**  <u>**Selective Enforcement Claim under the Equal Protection Clause**</u>

The Equal Protection Clause of the Fourteenth Amended provides "that all persons similarly situated should be treated alike." <u>Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985). To establish a selective enforcement claim, a plaintiff, ordinally, must show:

"(1) that [he], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234 (2d Cir. 2004) (citation and alteration marks omitted). "In short, a plaintiff must allege that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination," and "[t]o be similarly situated," means that "the individuals with whom [the plaintiff] attempts to compare [himself] must be similarly situated in all material respects." Cook v. Dubois, No. 19-CV-8317 (CS), 2021 WL 91293, at *6 (S.D.N.Y. Jan. 11, 2021) (citations and quotation marks omitted).

### E. Municipal Liability

"[A] municipality cannot be held liable [under Section 1983] solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) (emphasis in original). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. Thus, to prevail on a municipal liability claim under Section 1983, a plaintiff must prove: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008).

To determine "'municipal liability, it is necessary to conduct a separate inquiry into whether there exists a "policy" or "custom."'" Triano v. Town of Harrison, New York, 895 F. Supp. 2d 526, 531 (S.D.N.Y. 2012) (citation omitted); see also Kucharczyk v. Westchester

Cnty., 95 F. Supp. 3d 529, 538-39 (S.D.N.Y. 2015) (discussing how a plaintiff may satisfy the "policy or custom" requirement). "Normally," a plaintiff cannot satisfy this requirement "by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." Kucharczyk, 95 F. Supp. 3d at 539 (citation, quotation marks, and alteration marks omitted). Although "[a]t this stage, . . . Plaintiff need not prove these elements, but still must plead them sufficiently to make out a plausible claim for relief." Id. at 540.

## II.    ANALYSIS

### A.    Timeliness of Plaintiff's Claims

As the R&R explains, "claims under Section 1983, the NYSHRL, and the NYCHRL are subject to a three-year statute of limitations." (R&R (Dkt. No. 56) at 22 (citing Owens v. Okure, 488 U.S. 235, 251 (1989); Kassner, 496 F.3d at 238; Bermudez, 783 F. Supp. 2d at 573-74)) While the statute of limitations can be extended in certain circumstances pursuant to the continuing-violation doctrine, "'[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire'" will not be actionable if they are "'time barred, even when they are related to acts alleged in timely filed charges.'"[10] (Id. at 23 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-15 (2002)); see also Gross v. Nat'l Broad. Co., 232 F. Supp. 2d 58, 68 (S.D.N.Y. 2002) ("alleged failures to compensate adequately . . . cannot form the basis for a continuing violation claim").

Because Plaintiff filed the Complaint on November 8, 2019 (Cmplt. (Dkt. No.1), "[h]is Section 1983, NYSHRL, and NYCHRL claims based on conduct that occurred before

---

[10]  The continuing violation exception is "heavily disfavored" in this Circuit and will not be employed absent "compelling circumstances." Zabar v. N.Y.C. Dep't of Educ., No. 18 Civ. 6657 (PGG), 2020 WL 2423450, at *4 (S.D.N.Y May 12, 2020) (citation and quotation marks omitted).

November 8, 2016 are time-barred unless the continuing violation exception to the statute of limitations applies."  (R&R (Dkt. No. 56) at 24)

Judge Cave concludes that Plaintiff's allegations of "discriminatory treatment before November 8, 2016" are discrete acts that do not trigger the continuing-violation exception, such that they are time-barred.  (Id. at 24-25)

Plaintiff's objects to this portion of the R&R only to the extent that it finds his unequal pay claims entirely barred.  (Pltf. Obj. (Dkt. No. 62) at 8-9)  Plaintiff notes that the Complaint pleads that "'from August 2016, Plaintiff frequently requested a salary increase in keeping with his new duties and the salaries of white executive and even non-executive staff. Between May 2016 and June 2017, Plaintiff complained about this pay disparity to [Brune] on several occasions, to no avail.'"  (Id. (quoting Cmplt. (Dkt. No. 1) at 10) (emphasis omitted))

To the extent that Plaintiff objects to Judge Cave's findings concerning the statute of limitations with regard to his unequal pay claims, this Court reviews the R&R de novo. Phillips, 955 F. Supp. 2d at 211.  Judge Cave's findings as to pre-November 8, 2016 conduct are reviewed for clear error.  Wingate, 2011 WL 5106009, at *1.

Given that the Complaint was filed on November 8, 2019, this Court agrees with Judge Cave that unequal pay claims predicated on conduct occurring before November 8, 2016 are time-barred.  (R&R (Dkt. No. 56) at 24-25)  Accordingly, this portion of the R&R is adopted.

As to the unequal pay claims post-dating November 8, 2016, the R&R does not acknowledge, much less address, the Complaint's allegation that Plaintiff complained to Brune about a pay disparity on several occasions "[b]etween May 2016 and June 2017."  (Cmplt. (Dkt. No. 1) at 10)  The Complaint indicates that Plaintiff continued to complain about unequal pay as his duties expanded, but Plaintiff asserts that he "did not receive a salary increase until in or

around July 2017," and only then after he threatened to file a complaint with the HRA's EEO

office.  (Id.)

> The Second Circuit explained in Pollis v. New School for Social Research, that
>
>> a claim of discriminatory pay is fundamentally unlike other claims of ongoing
>> discriminatory treatment because it involves a series of discrete, individual
>> wrongs rather than a single and indivisible course of wrongful action.  As the
>> Supreme Court explained in Bazemore v. Friday, characterizing the harm imposed
>> by a racially discriminatory pay scale, "Each week's paycheck that delivers less to
>> a [disadvantaged class member] than to a similarly situated [favored class
>> member] is a wrong actionable under Title VII, regardless of the fact that this
>> pattern was begun prior to the effective date" of limitation. 478 U.S. 385, 395-96,
>> 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986) (Brennan, J., concurring in part,
>> joined by all other members of the Court).

132 F.3d 115, 119 (2d Cir. 1997).

> The Court concludes that, at this stage of the proceedings, the Complaint's

allegations concerning unequal pay are sufficient for purposes of conduct that occurred after

November 8, 2016.  Accordingly, Plaintiff's objection is sustained as to post-November 8, 2016

unequal pay conduct.

**B.** **Section 1983 Discrimination Claim**

> To state a claim for employment discrimination under Section 1983, a plaintiff

must allege that the defendants "(1) act[ed] under color of state law, and (2) . . . [that their]

conduct deprived [the plaintiff] of a constitutional or a federal statutory right."  Bermudez v. City

of New York, 783 F. Supp. 2d at 575; see also Harris v. Westchester Cnty. Dep't of Corr., No.

06 CIV. 2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) ("to state a claim for

damages under Section 1983, the plaintiff must allege sufficient facts to demonstrate that

defendants were personally or directly involved in the violation, that is, that there was personal

participation by one who had knowledge of the facts that rendered the conduct illegal" (citation,

quotation marks, and alteration marks omitted)).

As the R&R notes, in order to establish a <u>prima facie</u> case of discrimination, a plaintiff may allege less favorable treatment "'than similarly situated employees of other races.'" (R&R (Dkt. No. 56) at 26) (quoting <u>Brown v. Daikin Am. Inc.</u>, 756 F.3d 219, 229 (2d Cir. 2014); <u>see</u> <u>id.</u> ("Allegations of 'adverse actions taken against employees who are not similarly situated' does not 'establish an inference of discrimination'" (quoting <u>Littlejohn v. City of N.Y.</u>, 795 F.3d 297, 312 (2d Cir. 2015)))) Although the question of "whether two employees are similarly situated . . . presents a question of fact, rather than a legal question to be resolved on a motion to dismiss," <u>Brown</u>, 756 F.3 at 230 (citation, quotation marks, and alteration marks omitted), "it is insufficient for a plaintiff to make naked assertions of disparate treatment without factual allegations indicating those employees were treated differently while similarly situated." <u>Sosa v. N.Y.C. Dep't of Educ.</u>, 368 F. Supp. 3d 489, 514 (E.D.N.Y. 2019).

In analyzing Plaintiff's Section 1983 employment discrimination claims, Judge Cave considers the following categories of alleged discriminatory conduct: (1) denial of equal pay compared to non-Hispanic employees; (2) the 2016 Promotion Denial; (3) the 2016 Functional Demotion; (4) the 2018 Demotion and Salary Reduction; and (5) the Disciplinary Charges and Termination. (<u>See</u> R&R (Dkt. No. 56) at 25-26; <u>id.</u> at 26-34) The R&R concludes that the Complaint "adequately allege[s] [a Section 1983] Discrimination Claim based on (1) the 2016 Promotion Denial, as to Brune only, and (2) the 2016 Demotion, as to Berry only." (<u>Id.</u> at 26)

Plaintiff objects to Judge Cave's analysis concerning the Disciplinary Charges and Termination. (Pltf. Obj. (Dkt. No. 62) at 8-11) The Court will review the relevant portions of the R&R to which Plaintiff does not object for clear error, <u>Wingate</u>, 2011 WL 5106009, at *1,

and those to which he does object de novo.  Phillips, 955 F. Supp. 2d at 211.[11]

### 1. 2016 Promotion Denial

To plead a discrimination claim based on a failure to promote, a plaintiff must show that "'(1) []he is a member of a protected class; (2) []he applied and was qualified for a job for which the employer was seeking applicants; (3) []he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.'"  (R&R (Dkt. No. 56) at 27 (quoting Estate of Hamilton v. City of N.Y., 627 F.3d 50, 55 (2d Cir. 2010)))  Proof that an employer filled a position with "'a person outside the protected class who was similarly or less well qualified than'" the plaintiff also satisfies the fourth element.  (Id. (quoting Yu v. N.Y.C. Housing Dev. Corp., 494 F. App'x 122, 125 n.4 (2d Cir. 2012); see also Littlejohn, 795 F.3d at 312-13 (same))

Plaintiff alleges that Berry, a white female, was promoted to the position of Executive Deputy Commissioner of Human Resources instead of him, and that Berry was less qualified.  (Cmplt. (Dkt. No. 1) at 4, 14-15)  The Court finds no clear error in Judge Cave's conclusion that Plaintiff has adequately alleged a Section 1983 discrimination claim against Brune based on the 2016 Promotion Denial, and adopts this portion of the R&R.  (R&R (Dkt. No. 56) at 27-29)

---

[11]  This Court has sustained Plaintiff's objection to Judge Cave's finding that his unequal pay claim is time-barred in its entirety.  To the extent that Plaintiff's Section 1983 discrimination claim is premised on a theory of unequal pay, however, the claim fails because Plaintiff has not identified a comparator – within the limitations period – who was treated more favorably.  As discussed above, "naked assertions of disparate treatment" – without identifying even one comparator who was treated more favorably – are insufficient.  Sosa, 368 F. Supp. 3d at 514; see also Goodine v. Suffolk Cty. Water Auth., No. 14 Civ. 4514 (JS)(ARL), 2017 WL 1232504, at *4 (E.D.N.Y. Mar. 31, 2017); see also Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2013 ("A plaintiff relying on disparate treatment evidence must show []he was similarly situated in all material respects to the individuals with whom []he seeks to compare [himself]." (citation and quotation marks omitted)).

### 2.     2016 Functional Demotion

The Complaint alleges that – after Plaintiff opposed Berry's promotion – she removed certain responsibilities from his portfolio and gave these duties to a less-qualified Black woman.  (Cmplt. (Dkt. No. 1) at 15)  As the R&R notes, "'[a]n inference of discrimination can arise from circumstances including . . . the more favorable treatment of employees not in the protected group.'"  (R&R (Dkt. No. 56) at 30 (quoting Littlejohn, 795 F.3d at 312 (citation and quotation marks omitted)))  This Court finds no clear error in Judge Cave's determination the Complaint's allegations are sufficient "'to make plausible [Plaintiff's] claim that [his] demotion occurred under circumstances giving rise to an inference of discrimination.'"  (Id. (quoting Littlejohn, 795 F.3d at 313); see id. at 31)  Accordingly, this portion of the R&R is adopted.

### 3.     2018 Demotion and Salary Reduction

Although the Complaint alleges that Plaintiff suffered a demotion and salary reduction in 2018, the Complaint also explains that Plaintiff was ultimately restored to his prior position and salary, with retroactive pay and benefits.  (Cmplt. (Dkt. No. 1) at 19-21, 28)  As the R&R explains, Plaintiff's admission that his position and salary were restored is "'fatal'" to his discrimination claim.  (R&R (Dkt. No. 56) at 31 (citing, inter alia, Bonds v. Cnty. of Westchester, No. 19 Civ. 1712 (KMK), 2020 WL 4347704, at *10 n.11 (S.D.N.Y. July 28, 2020) (collecting cases holding that restoration of prior position and salary precludes a finding of an adverse employment action))  This Court finds no clear error in Judge Cave's conclusions regarding this claim.  Accordingly, this portion of the R&R is adopted.

### 4.     Disciplinary Charges and Termination

The Disciplinary Charges against Plaintiff, and his Termination, are premised on his alleged participation in a Medicaid fraud scheme.  Because Plaintiff's Section 1983

discrimination claim and Plaintiff's selective enforcement claim both rely on the Disciplinary Charges and Termination (see Cmplt. (Dkt. No. 1) at 22-27, 33, 36), Judge Cave addresses these claims together.  (R&R (Dkt. No. 56) at 31-34)

Judge Cave concludes that Plaintiff has not "plausibly allege[d] a Selective Enforcement Claim against any of the Defendants and has not adequately [pled] that the Disciplinary Charges and Termination were discriminatory based on his race and ancestry."  (Id. at 34)  Because the Complaint does not plead factual "allegations connecting his Disciplinary Charges and Termination to his race or ancestry," he has not demonstrated the existence of a "mosaic" of intentional discrimination.  (Id. at 33 (citing Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72 (2d Cir. 2015)))  Plaintiff's "theory that, because he was charged and terminated, and others outside his protected group were not, it must have been because he was Hispanic," rests on a "conclusory leap" that fails to "allege a plausible inference that his Hispanic background was a 'motivating factor' in the Disciplinary Charges or his Termination." (Id. at 34 (citing Mears v. Allstate Indem. Co., 336 F. Supp. 3d 141, 151 (E.D.N.Y. 2018)))  In sum, Judge Cave concludes that the Complaint does not plead facts that give rise to even a "minimal inference of discriminatory motivation."  See Littlejohn, 795 F.3d at 311.

In his objection, Plaintiff argues that Judge Cave misapplied the pleading standards on a motion to dismiss, and that this claim is sufficiently pled.  (Pltf. Obj. (Dkt. No. 62) at 9-10)  Plaintiff also argues that Judge Cave did not conduct a separate inquiry "under the more forgiving NYCHRL."  (Id. at 11)  This Court will review these issues de novo.  Phillips, 955 F. Supp. 2d at 211.

As discussed above, to plead a Section 1983 discrimination claim, "a plaintiff must allege that the employer took adverse action against [him] at least in part for a

24

discriminatory reason, and []he may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." Vega, 801 F.3d at 87 (citing Littlejohn, 795 F.3d at 310); see id. at 88 (applying this standard to Section 1983 claims; "for a § 1983 discrimination claim to survive . . . a motion to dismiss, a plaintiff must plausibly allege a claim under the same standards applicable to a Title VII claim – and that the adverse action was taken by someone acting 'under color of state law.'" (citation omitted); id. ("A state employee acting in his official capacity is acting 'under color of state law.'").

Judge Cave concludes that Plaintiff's allegations regarding the Disciplinary Charges and his Termination – which also form the basis for his Selective Enforcement Claim – lack any connection to race or ancestry. (R&R (Dkt. No. 56) at 33); see also Vega, 801 F.3d at 88-89 (finding the plaintiff had pled a "plausible discrimination claim" because he plausibly alleged that his employer's action – a school district – occurred "'because of' his Hispanic ethnicity, that is, that his Hispanic ethnicity was a motivating factor in the employment decisions."); see id. at 89 ("Because the Complaint also alleges that [two individual defendants] each had input into personnel decisions at the High School including hiring, firing, evaluations and discipline of employees, [the plaintiff] has plausibly alleged state action for the purposes of § 1983." (citation, quotation marks, and alteration marks omitted))

The Complaint alleges that Plaintiff was "singled-out . . . to be investigated for Medicaid Fraud," that he "was unjustifiably charged with 'Misconduct and/or Incompetence' in further discrimination and retaliation for opposing agency-wide unlawful activities and discrimination," and that "Defendants falsely pinned the Medicaid misappropriation on" him. (Cmplt. (Dkt. No. 1) at 22, 24)

Plaintiff's claims regarding the Disciplinary Charges and his Termination are
supported by specific allegations demonstrating that similarly situated managers of other races as
well as more senior supervisors of other races

> were part of the Medicaid payroll scheme and should have faced formal charges
> instead of Plaintiff[, including,] [Banks], [Brune], Laidlaw, [Yeaw], [Berry],
> [Neal], Villari, Rosine Ferdinand, a black female and Director of Office of Budget
> administration in the Finance Division[,] Joe Lamars, a white male, and Michelle
> Watson, a black female.
>
> . . . In fact, [Brune], [Berry], and Villari were above Plaintiff in the chain of
> command and personally signed documents certifying to the State annually that
> all 100% Medicaid funded employees were only doing Medicaid reimbursable
> work.
>
> . . . Moreover, Villari and Watson were supposed to review and ensure before
> sending certification to the State about Medicaid reimbursements that all
> employees were performing 100% Medicaid work but did not perform the
> required audits and knowingly submitted the forms with erroneously classified
> HRA employees.
>
> . . . Denise Deprima, the Deputy Commissioner of Labor Relations for HRA, was
> copied on the annual certification and knew that several employees included in
> that certification were not doing 100% Medicaid work, even though the annual
> certification indicated that they were.

(Id. at 26)

The Court concludes that the Complaint's allegations, considered as a whole,
plausibly allege that the Disciplinary Charges and the Termination were motivated by
discrimination premised on Plaintiff's race and ancestry.[12]  Accordingly, Plaintiff's objection

---

[12]  Plaintiff also complains that Judge Cave did not conduct a separate analysis under the
NYCHRL.  (Pltf. Obj. (Dkt. No. 62) at 11)  Under the NYCHRL, courts must apply a more
liberal standard than that applied under other federal and state anti-discrimination statutes.
See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009); Bermudez, 783 F.
Supp. 2d at 592.  "[C]ourts must analyze NYCHRL claims separately and independently from
any federal and state law claims"; "even if the challenged conduct is not actionable under federal
and state law, federal courts must consider separately whether it is actionable under the broader
New York City standards."  Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102,
109 (2d Cir. 2013).  Under the NYCHRL, a plaintiff need only prove "by a preponderance of the

(Pltf. Obj. (Dkt. No. 62) at 9-11) is sustained.

### C.   Retaliation Claims

Judge Cave recommends that Plaintiff's retaliation claims be dismissed to the extent that they are based on Plaintiff's exclusion from high-level meetings, unfair criticism, the 2018 Demotion and Salary Reduction, and the rescinding of the DDC offer. (R&R (Dkt. No. 56) at 55)

Plaintiff objects to two aspects of the R&R.  As an initial matter, Plaintiff contends that Judge Cave erred in stating that Plaintiff's federal retaliation claims can be brought under only Section 1981, and not also under the Equal Protection Clause through Section 1983.[13] (Pltf. Obj. (Dkt. No. 62) at 13-14; see also R&R (Dkt. No. 56) at 35)  According to Plaintiff, his federal retaliation claim "should go forward under both Section 1981 and the Equal Protection clause."  (Pltf. Obj. (Dkt. NO. 62) at 14)

Plaintiff further contends that Judge Cave erred in concluding that his retaliation claims fail to the extent that they are premised on Defendants' alleged "sabotaging" of his application for a new position at the Department of Design & Construction (i.e., the DDC).  (See id. at 14-18)  The relevant portions of the R&R to which Plaintiff objects will be reviewed de novo.  Phillips, 955 F. Supp. 2d at 211.

### 1.   Whether Retaliation Claims May Be Brought under the Equal Protection Clause

Judge Cave states that Plaintiff's "Retaliation Claim does not arise under Section

---

evidence that [he] has been treated less well than other employees because of [his race and ancestry]."  Id. at 110.  Here, Judge Cave did not conduct the required "separate and independent" analysis.  Given that Plaintiff's claims pass muster under the more demanding standard applicable under Section 1983, they pass muster under the NYCHRL.

[13]  Plaintiff does not disclose the practical implications of this alleged error.

1983 because '[t]he Equal Protection Clause does not protect against retaliation due to complaints of racial discrimination.'" (R&R (Dkt. No. 56) at 35 (quoting Littlejohn, 795 F.3d at 315 n.14)) She thus concludes that Plaintiff's federal retaliation claims may be pursued solely under Sections 1981, and not under the Equal Protection Clause and Section 1983. (Id.) Plaintiff contends that his federal retaliation claims should proceed under both Section 1981 and the Equal Protection Clause. (Pltf. Obj. (Dkt. No. 62) at 14 (citing Vega, 801 F.3d at 81))

In Vega, the Second Circuit "acknowledge[d] that there has been considerable confusion surrounding the viability of retaliation claims under § 1983, and . . . clarif[ied] that retaliation claims alleging an adverse action because of a complaint of discrimination [and in violation of the Equal Protection Clause] are actionable under § 1983." Vega, 801 F.3d at 80; see id. at 80-82) In sum, under Vega, retaliation claims stemming from complaints of racial discrimination are actionable under the Equal Protection Clause pursuant to Section 1983.

Accordingly, Plaintiff's objection to this portion of the R&R (Pltf. Obj. (Dkt. No. 62) at 13-14) is sustained.

## 2. Sabotage of DDC Job Offer

To state a prima facie "case of retaliation, [a plaintiff] must show that: (1) []he engaged in a protected activity; (2) h[is] employer was aware of this activity; (3) the employer took adverse employment action against h[im]; and (4) a causal connection exists between the alleged adverse action and the protected activity." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (2d Cir. 2006); Lewis v. Roosevelt Island Operating Corp., 246 F. Supp. 3d 979, 990 n.6 (S.D.N.Y. 2017) ("The standard for retaliation under Title VII, § 1981, [and] § 1983 . . . is the same.").

An adverse employment action occurs where a plaintiff "'endures a "materially adverse change" in the terms and conditions of employment,'" (R&R (Dkt. No. 62) at 36 (quoting Bermudez, 783 F. Supp. 2d at 576) (internal citation omitted))) which can include "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" (Id. at 37 (quoting Galabya v. N.Y.C. Bd. of Ed., 202 F.3d 636, 640 (2d Cir. 2000))  A retaliation claim may also be premised on conduct that – while not directly affecting the terms and conditions of employment – is "materially adverse," such that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry.  Co. v. White, 548 U.S. 53, 64, 67-68 (2006) (explaining that the anti-retaliation provision of Title VII covers retaliatory conduct beyond the scope of employment conditions; "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"; "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm"; "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (citations and quotation marks omitted)); see also Owens v. City of New York Dep't of Educ., No. 17-CV-519 (SHS), 2021 WL 3862974, at *15 (S.D.N.Y. Aug. 30, 2021) (noting that retaliation claims under Section 1983 and Title VII "are essentially the same"))  Included among the adverse actions alleged in the Complaint is that Banks and Calhoun took action to cause the DDC to rescind its job offer to Plaintiff.  (Cmplt. (Dkt. No. 1) at 18-19)

As discussed above, the Complaint pleads that in November 2017, Plaintiff interviewed for a position at DDC.  (Id. at 18)  DDC's Commissioner told Plaintiff that she wanted to offer him the position but first needed to speak with Banks.  (Id.)  Plaintiff was not offered the job, and Plaintiff asserts, "[u]pon information and belief," that Banks and Calhoun spoke negatively about him to the DDC Commissioner "in retaliation for his claims of discrimination and opposition to supporting cronyism that benefitted white employees and job candidates."  (Id. at 19)

Judge Cave recommends that Plaintiff's retaliation claims be dismissed to the extent that they are based on his claim that Banks and Calhoun sabotaged his job application to DDC.  (R&R (Dkt. No. 56) at 37-38, 55)  Noting that Plaintiff's allegations about communications with the DDC Commissioner are made on "information and belief," Judge Cave finds that Plaintiff has not supported his "information and belief" allegations "'with a statement of facts that create a plausible inference of their truth.'"  (Id. at 37 (quoting Moore v. City of New York, No. 15 Civ. 6600 (GBD)(JLC), 2017 WL 35450, at *23 (S.D.N.Y. Jan. 3, 2017)))

In his objections, Plaintiff argues that "the R&R did not construe the facts and inferences in [his] favor when dismissing his claims that he experienced retaliation when Defendants Banks and Calhoun sabotaged his ability to obtain a new position with the [DDC]." (Pltf. Obj. (Dkt. No. 62) at 14)  The Court will review this portion of the R&R de novo.

Plaintiff has no knowledge of what Banks or Calhoun may have said to the DDC Commissioner.  Accordingly, he attempts to provide the necessary factual support for his "information and belief" allegations by citing their behavior soon after his second interview at the DDC.  (See Cmplt. (Dkt. No. 1) at 18-19)  The day after his second interview, Plaintiff passed Banks in the hallway at work.  (Id. at 18)  Banks – "who had for over one and [a] half

years avoided speaking directly to Plaintiff" – "uncharacteristically looked at Plaintiff, smiled pleasantly," and asked Plaintiff how he was.  (Id. at 18-19)  This "out of character" behavior "alarmed" Plaintiff.  (Id. at 19)  Plaintiff then attended a meeting where Calhoun – who "never" spoke to Plaintiff – "greeted him with, 'Hiiiiiiiii Tom' and a big smile, and waving while wiggling" a finger.  (Id.)  Plaintiff pleads that he found Calhoun's behavior "unsettling."  (Id.) "Two days [after these encounters], the DDC offer was rescinded."  (Id.)  Plaintiff alleges, "[u]pon information and belief," that Banks and Calhoun "provided negative comments" about him "to DDC, in retaliation for his claims of discrimination and opposition to supporting cronyism that benefitted white employees and job candidates."  (Id.)

Accepting as true Plaintiff's factual allegations, and drawing "all reasonable inferences in" his favor, Kassner, 496 F. 3d at 237, this Court cannot reasonably infer that Banks and Calhoun sabotaged the DDC job offer.

While Plaintiff may plead upon information and belief facts that are peculiarly within the possession of third parties – such as what, if anything, Banks and Calhoun said to the DDC Commissioner, see Lindner v. Int'l Bus. Machines Corp., 06 Civ. 4751 (RJS), 2008 WL 2461934, at *5 (S.D.N.Y. June 18, 2008); see also Arista Records, LLC v. Doe 3, 604 F. 3d 110, 120 (2d Cir. 2010)); Moore, 2017 WL 35450, at *23 ("The Second Circuit has ruled that pleading on information and belief in employment discrimination suits can suffice to meet the relevant plausibility standard when the relevant facts are particularly within the possession, knowledge, and control of the defendant" (collecting cases)), "information and belief" allegations must be supported by "a statement of facts that create a plausible inference of their truth."  Moore, 2017 WL 35450, at *23 (collecting cases).

Here, the Complaint pleads that Banks and Calhoun smiled at Plaintiff, and greeted him warmly, soon after his second interview with the DDC.  (Cmplt. (Dkt. No. 1) at 18-19)  Accepting Plaintiff's assertion that Banks and Calhoun did not commonly smile at and greet him (see id.), the fact that they did soon after his second interview at the DDC does not suggest that they sabotaged his job application at the DDC.[14]  Because Plaintiff has not pled facts to support his "information and belief" allegations, Plaintiff's objection (Pltf. Obj. (Dkt. No. 62) at 14-18) is overruled, and his retaliation claims will be dismissed to the extent that they are premised on the claim that Banks and Calhoun sabotaged his job application to the DDC.[15]

Having reviewed the remaining portions of the R&R addressing Plaintiffs' retaliation claims and having found no clear error, these portions of the R&R will be adopted.

### D.    Selective Enforcement Claim

In the Complaint, Plaintiff alleges that

---

[14]  In his objections and in the Complaint, Plaintiff asserts both that the DDC Commissioner "all but promised Colon a job," and that the DDC Commissioner "rescinded [the job] offer."  (Pltf. Obj. (Dkt. No. 62) at 15-16; see also Cmplt. (Dkt. No. 1) at 18-19)

[15]  "Retaliation claims under the NYSHRL are treated the same as retaliation claims under Section 1983 and Section 1981."  Bermudez, 783 F. Supp. 2d at 576.  "Unlike retaliation claims under Section 1983 and [the] NYSHRL, [however,] the retaliation complained of under the NYCHRL need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms or conditions of employment."  Id. at 577 (citation and quotation marks omitted).  "To prevail on a retaliation claim under the NYCHRL, the plaintiff must show that []he took an action opposing h[is] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  Isbell v. City of New York, 316 F. Supp. 3d 571, 593 (S.D.N.Y. 2018) (citation, quotation marks, alteration marks omitted))

Having analyzed the DDC job offer retaliation claim under the more liberal standards of the NYCHRL, this Court concludes that the outcome is the same.  Even under the NYCHRL, Plaintiff has not alleged facts sufficient to demonstrate that Banks and Calhoun sabotaged his job application to the DDC.

> Defendants selectively charged and prosecuted Plaintiff in regard to improper
> Medicaid reimbursement on the basis of race and ancestry, unlike similarly
> situated white and non-Hispanic HRA employees.
>
> . . . Defendants also selectively charged and prosecuted Plaintiff in regard to
> improper Medicaid reimbursement based on a malicious or bad faith intent to
> injure Plaintiff for questioning [Banks's] and the other defendants' improper
> cronyism and political favors in the form of undeserved raises and hiring that
> violated City rules and Civil Service laws.

(Cmplt. (Dkt. No. 1) at 36)  Plaintiff's Selective Enforcement Claim is brought under the Equal

Protection Clause, pursuant to Section 1983.  (Id.)

Judge Cave recommends that Plaintiff's Selective Enforcement Claim be

dismissed because he "failed to plausibly allege . . . that the Disciplinary Charges and

Termination were discriminator[il]y based on his race and ancestry."  (R&R (Dkt. No. 56) at 34)

Plaintiff objects to Judge Cave's recommendation concerning his Selective

Enforcement Claim, arguing that she failed to address that portion of his claim "premised on

Bank[s's] malicious or bad faith intent, and only analyzed the claim as one for race-based

selective enforcement."  (Pltf. Obj. (Dkt. No. 62) at 12 (citing R&R (Dkt. No. 56) at 31-34))

Having reviewed the R&R, the Court agrees with Plaintiff that Judge Cave did not analyze that

portion of Plaintiff's claim premised on malice and bad faith.

> The murky corner of equal protection law . . . that creates a cause of action for
> selective enforcement provides protection from adverse governmental action that
> is not motivated by legitimate governmental objectives.  Thus, if the motivation to
> punish is to secure compliance with agency objectives, there is no constitutional
> violation.  A successful plaintiff must establish that the governmental actor was
> motivated by reasons wholly unrelated to any legitimate state objective, a burden
> few are able to carry.  Nonetheless, if the complaint states a claim it must
> withstand the Rule 12(b)(6) motion to dismiss, regardless of the likelihood of
> success.

Morningside Supermarket Corp. v. New York State Dep't of Health, 432 F. Supp. 2d 334, 340-

41 (S.D.N.Y. 2006) (citations, quotations marks, and alteration marks omitted); see also

Christian v. Town of Riga, 649 F. Supp. 2d 84, 95 (W.D.N.Y. 2009) ("[T]he Second Circuit has

explained that, in analyzing the second prong of selective enforcement claims [i.e., whether the

treatment of plaintiff was motivated by malice or was otherwise in bad faith], courts must

distinguish between a motivation to punish in order to secure compliance with agency objectives,

and spite, or malice, or a desire to get someone for reasons wholly unrelated to any legitimate

state objective." (citation, quotation marks, and alteration marks omitted)).

Here, as discussed above, the Complaint contains extensive factual allegations

concerning (1) other managers' knowledge of and involvement with the alleged Medicaid payroll

fraud scheme; and (2) the fact that no charges of misconduct were brought against these other

managers and supervisors.  (Cmplt. (Dkt. No. 1) at 1-2, 22-27)  The Complaint also contains

extensive factual allegations concerning Plaintiff's role in challenging allegedly discriminatory

conduct at the HRA, including conduct engaged in by Banks.  (Id.; see also, e.g., id. at 16-17; 27-

28)  Considering the Complaint as a whole, the Court concludes that Plaintiff has plausibly

alleged – as to Banks – that the Medicaid payroll fraud disciplinary charges and his termination

were motivated by a malicious, bad faith desire to (1) punish Plaintiff for his role in opposing

discrimination at the HRA; and (2) cover up Banks's own alleged role in the Medicaid payroll

fraud scheme.  Such motivations are, of course, "wholly unrelated to any legitimate state

objective."  Morningside Supermarket Corp.  432 F. Supp. 2d at 340.

Plaintiff's objection to Judge Cave's recommendation concerning his Selective

Enforcement Claim (Pltf. Obj. (Dkt. No. 62) at 11-13) is sustained.[16]

---

[16]  The Court acknowledges that Defendants contend that certain factual findings were made in
the OATH proceeding brought against Plaintiff that have a preclusive effect here.  (See, e.g. Def.
Br. (Dkt. No. 51) at 7-8, 12-13, 22, 31; see also R&R (Dkt. No. 56) at 21-22, 34 n.4)  The Court
will decide at a later date what preclusive effect, if any, flows from determinations made in the
OATH proceeding.

III.    <u>**Leave to Amend**</u>

Plaintiff requests leave to amend in the event that this Court grants any aspect of Defendants' motion.  (Pltf. Br. (Dkt. No. 54) at 35)

District courts "ha[ve] broad discretion in determining whether to grant leave to amend," <u>Gurary v. Winehouse</u>, 235 F.3d 793, 801 (2d Cir. 2000), and "leave to amend should be freely granted when 'justice so requires.'" <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 70 (2d Cir. 1999) (quoting Fed. R. Civ. P. 15(a)); <u>see also</u> <u>Rachman Bag Co. v. Liberty Mut. Ins. Co.</u>, 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.'" (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962))).  Leave to amend may be denied, however, due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . futility of amendment, etc." <u>Foman</u>, 371 U.S. at 182.

The Court finds no error in Judge Cave's recommendation that Plaintiff "be granted leave to amend those claims that the Court has determined were inadequately pled, but denied as to those claims the Court has found are time-barred or are procedurally-barred for failure to comply with New York's notice of claim requirement," as the latter are "'not susceptible to cure.'"  (R&R (Dkt. No. 56) at 55 (quoting <u>Trujillo v. City of New York</u>, No. 14 Civ. 8501 (PGG), 2016 WL 10703308, at *21 (S.D.N.Y. Mar. 29, 2016), <u>aff'd</u>, 696 F. App'x 560 (2d Cir. 2017)))  Accordingly, leave to amend will be granted as to the claims found to be inadequately pled.

*       *       *       *

The Court has addressed all of Plaintiff's objections to the R&R. As to those portions of the R&R to which Plaintiff did not object, the Court has reviewed them for clear error and, finding none, adopts them.

## **CONCLUSION**

Defendants' motion to dismiss (Dkt. No. 49) is granted in part and denied in part as set forth above. Plaintiff's objections to the R&R (Dkt. No. 62) are sustained or overruled as set forth above. The R&R (Dkt. No. 56) is adopted to the extent set forth above. Any Amended Complaint is to be served and filed by **October 8, 2021**.

The Clerk of Court is directed to terminate the motion (Dkt. No. 49).

Dated: New York, New York
September 26, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

www.comptroller.nyc.gov



**THE CITY OF NEW YORK**
**OFFICE OF THE COMPTROLLER**
**CLAIMS AND ADJUDICATIONS**
**1 CENTRE STREET  ROOM 1200**
**NEW YORK, N.Y.  10007-2341**

_____

**Brad Lander**
**COMPTROLLER**

015 - 365

Date:       8/31/2023
RE:       Receipt of Notice of Claim
Claim Number:  2023LE028581

PRASANNA GOONEWARDEAN
247 34A  77 CRES
BELLEROSE NY 11426

Dear Claimant:

   We acknowledge receipt of your Notice of Claim, which has been assigned the above claim number. Please refer to this claim number in any correspondence or inquiry you may have with our office.

   If your claim is not resolved, most lawsuits against the City must be started within one year and 90 days from the date of the alleged incident.

The Bureau of Law & Adjustment